**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**ANDERSON DIVISION**

| | |
|---|---|
| TTI Consumer Power Tools, Inc. f/k/a One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment, | ) ) ) ) |
| Plaintiff/Counter-Defendant, | ) ) |
| vs. | ) ) |
| Engineered Plastic Components, Inc., | ) ) |
| Defendant/Counter-Plaintiff. | ) ) ) |

Civil Action No. 8:22-cv-04085-TMC

**SECOND AMENDED COMPLAINT**
**(Jury Trial Demanded)**

Plaintiff, TTI Consumer Power Tools, Inc. f/k/a One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment ("TTI"), amends its Complaint against Defendant, Engineered Plastic Components, Inc. ("EPC"), and states as follows:

## PARTIES AND JURISDICTION

1.      TTI is a Delaware corporation with a principal place of business at 100 Innovation Way, Anderson, South Carolina, 29621.

2.      Engineered Plastic Components, Inc. ("EPC") is an Iowa corporation with its principal place of business at 4500 Westown Pkwy Suite 277, West Des Moines, Iowa 50266.

3.      As explained in greater detail below, this matter involves a Master Supply Agreement (the "Agreement" or "MSA") between TTI and EPC. Per the MSA's terms, EPC was required to timely supply certain Ryobi plastic storage products (the "Products") at specific prices for the duration of the Agreement's three-year initial term.

4.      The Court has personal jurisdiction over EPC pursuant to Federal Rule of Civil Procedure, Rule 4(k)(l)(A) and South Carolina's long-arm statute (S.C. Code Ann. § 36-2-803) because EPC: (a) transacts business in South Carolina; (b) contracted to supply services or things

in South Carolina; (c) entered into a contract to be performed in whole or in part in South Carolina; and (d) produces, manufactures, or distributes goods with the reasonable expectation that those goods are to be used or consumed in South Carolina, and are, in fact, used or consumed in South Carolina. All such facts form the bases supporting the causes of action set forth herein.

5.    EPC likewise continuously sold and shipped the Products at issue in this matter to TTI's Anderson, South Carolina facility since January of 2022. Accordingly, EPC has continuous and systematic contacts with the State of South Carolina such that the exercise of personal jurisdiction over it by this Court does not offend traditional notions of fair play and justice. EPC further consented to jurisdiction in this Court as per Section 24.9 of the MSA, which states, in pertinent part: "[a]ny dispute, controversy or claim arising out of or relating to this Agreement, including the validity, invalidity, breach or termination thereof, shall be submitted to and finally resolved by litigation at the court of the place where TTI is domiciled having jurisdiction."

6.    Venue is proper pursuant to 28 U.S.C. § 1391 because TTI's facilities are located in and a substantial portion of the events giving rise to this lawsuit occurred within Anderson County, South Carolina. And, as noted above, EPC likewise consented to venue in this Court as per Section 24.9 of the MSA.

## FACTUAL BACKGROUND

### TTI's Pitch to Home Depot and the TTI/EPC Relationship

7.    TTI is a manufacturer of power tools and outdoor products. TTI operates a 1.3 million square-foot warehouse and manufacturing facility in Anderson, South Carolina.

8.    In 2020, TTI determined that it wanted to begin producing and supplying modular plastic storage products to Home Depot, including a medium toolbox, small toolbox, small parts toolbox, rolling box, and open crate (the "Products").

9.     The launch of the Products was a major endeavor for TTI, who had not previously produced similar products for Home Depot nor any other entity.

10.     Expanding into a new "category" of products with a major retailer like Home Depot is an involved process. TTI put forth a great deal of effort over the course of several months as it competed with other companies for the opportunity to supply the Products to Home Depot.

11.     The Products would be manufactured through a complex injection molding manufacturing process. Because TTI is not an injection molding manufacturer, it needed to outsource the manufacturing of the Products to a third party with the requisite experience and technical capabilities with injection molding (which, as discussed below, EPC represented it possessed).

12.     As part of its pitch, TTI was required to provide Home Depot with pricing quotes for the Products.

13.     Accordingly, TTI sent requests for quotes to a number of potential suppliers so TTI could select an adequately experienced and skilled manufacturer and provide an accurate pricing quote to Home Depot.

14.     EPC was one of the entities from which TTI requested a quote. EPC was aware that it was competing with other entities for the opportunity to manufacture the Products for TTI and was, therefore, incentivized to provide the most competitive pricing possible and offer the quickest rollout of the Products.

15.     In September of 2020, TTI met with James Rank and Cheryl Rank from EPC, along with representatives from two of EPC's suppliers, Osterman and Asahi Kasei Plastics, to discuss EPC's capabilities and pricing. The meeting took place in-person at TTI's facility in Anderson, South Carolina.

16.     At the September 2020 meeting, EPC emphasized its experience and expertise with the materials and processes needed to manufacture the Products *via* the injection molding process. EPC also represented, among other things, that it had open capacity at all of its facilities such that EPC could meet the forecasted demand.

17.     EPC was aware the project was TTI's first endeavor into this type of injection molding with a domestic manufacturer and TTI was relying upon EPC's manufacturing expertise, including but not limited to EPC's expertise regarding the materials and tooling used in injection molding.

18.     When TTI initially asked about EPC's abilities to perform the complex manufacturing and assembly processes needed to produce the Products, EPC reassured TTI that it was able to perform those complex manufacturing processes. In fact, while representatives from TTI visited EPC's Siler City, North Carolina facility in early 2021, EPC went so far as to show TTI an example of a complex molding project it had done for an automotive client as demonstrative of EPC's capabilities and expertise.

19.     EPC was similarly informed the pricing terms it agreed to with TTI would ultimately be used by TTI to develop TTI's own quotes for Home Depot.

20.     Thus, after EPC and TTI underwent multiple rounds of price negotiations and discussed TTI's needs regarding production, storage, delivery, quality, and pricing, TTI ultimately awarded the business to EPC.

21.     The major factors in TTI's selection of EPC as its manufacturer were EPC's represented: capabilities, expertise, capacity (*e.g.,* possessed the required space and infrastructure), competitive pricing, and promises of an on-time launch.

22.     After selecting EPC as its manufacturer, TTI presented its final pricing quotes to Home Depot, which were based on the pricing terms agreed upon by TTI and EPC.

23.     Home Depot thereafter agreed to TTI's proposal to supply the Products, including the proposed pricing.

24.     Home Depot initially wanted core placement of the Products in a number of its stores by October 2021, followed by placement of the Products in additional stores in November 2021.

25.     EPC was aware that it was extremely important for the Products to launch on time for TTI to qualify for certain promotions and eventually expand into additional Home Depot stores in November 2021.

### The TTI/EPC Master Supply Agreement

26.     On January 15, 2021, TTI and EPC entered into a Master Supply Agreement (previously designated as "Agreement" or "MSA") wherein EPC agreed to manufacture, supply, and sell the Products to TTI in compliance with the terms set forth in the Agreement.

27.     The Initial Term of the Agreement was three (3) years from the Effective Date, meaning its Initial Term expired on January 15, 2024, unless sooner terminated as provided under the MSA's terms.

28.      Per the terms of the Agreement (and purchase orders issued thereunder), EPC was required to, among other things:

   a.  Allocate sufficient production and labor capacity to meet TTI's rolling forecast(s) of its expected purchases of the Products;

   b.  Allocate sufficient production capacity to fulfill all purchase orders on time;

c. Keep a minimum inventory of the Products on hand such that EPC's inventory of the Products did not fall below the "Minimum Inventory Level" set forth in Section 3.3 of the MSA;

d. Manufacture the Products in compliance with TTI's specifications, quality standards, and instructions;

e. Fulfill purchase orders in a commercially reasonable manner according to the terms of the applicable purchase orders and the Agreement;

f. Deliver the Products "On-Time," which Section 5.3 of the Agreement defined as: "a Delivery performed no more than two (2) days prior to or on, and no more than two (2) days later than, the original or rescheduled Delivery date as ordered by TTI";

g. Comply with the various pricing provisions of the Agreement, which provided, *inter alia*: (i) the Products' pricing would be set and adjusted according to the TTI Pricing File 111720 ("Pricing File") — which sets forth pricing proposed by EPC, itself—and Section 4.1 of the MSA; and (ii) any pricing modifications, including adjustments based on resin costs, as agreed upon in writing by both parties; and

h. Comply with the Agreement's termination provisions, including but not limited to a requirement of six (6) months written notice prior to termination—or-- where a specific set of circumstances occurs such as breach of the Agreement and the breaching party fails to remedy the same within thirty (30) days of written notice thereof;

i.   Comply with the provisions in the MSA governing EPC's responsibility for defective Products and Products shipped in excess of those ordered *via* TTI's Purchase Orders, including but not limited to complying with TTI's instructions and requests regarding the same;

j.   Hold TTI Property as bailee and fiduciary for TTI and not create or permit any liens, encumbrances, security interests, levies or charges against TTI Property in favor of EPC or anyone else;

k.   Upon request, permit TTI to access EPC's facility to obtain TTI Property, including molds and equipment, and remove such property from EPC's facility; and

l.   Upon termination of the Agreement, immediately return all TTI Property to TTI.

29.   EPC expressly warranted in the MSA the Products would be: of good and merchantable quality; fit for their intended use and purpose; and free from defects in workmanship, manufacturing, and materials.

30.   TTI relied upon EPC's representations about its willingness and ability to supply the Products per the terms of the MSA when entering the Agreement.

31.   The Agreement similarly put EPC on notice that any failure to supply the Products per the MSA's terms could cause TTI significant monetary and other damages.

32.   In that regard, Schedule 10 of the Agreement, entitled "Supplier Compliance Program," expressly indicates supplier issues relating to non-compliance with TTI policies, including but not limited to quality issues, late shipments, late delivery, and failure to provide sufficient capacity to meet purchase orders, could cause TTI to suffer expenses and damages and result in delayed shipments to TTI's customers, the need for additional TTI manpower and labor, unnecessary expenses

incurred by TTI, customer penalties/fines, damage to TTI's good will, and damage to the reputation of its brands. Schedule 11 of the MSA specifically listed four customers who have established contractual relationships with TTI.

33.     The Agreement also includes a *Force Majeure* provision which specifically excludes labor or raw material shortages.

34.     The Agreement contains a Liquidated Damages provision in Section 19.1 which states that, in the event of EPC's breach of certain enumerated provisions of the Agreement, where there is any defective product, or where any "non-compliance incident" described in the Supplier Compliance Program arises, EPC must pay TTI liquidated damages according to the terms specified therein. Non-compliance incidents listed in the Supplier Compliance Program include late shipments, late delivery, Product quality issues, and failure to provide sufficient capacity to meet purchase orders.

35.     Section 19.2 of the MSA further provides that, in addition to the liquidated damages described in section 19.1, EPC must hold harmless and indemnify TTI from and against any and all claims, demands, actions, losses, damages, liabilities, fines, costs, and expenses—including legal fees—arising out of or in connection with, among other things, any defective product and any breach by EPC of any representations, warranties, or agreements contained in the MSA.

36.     Various provisions in the MSA expressly establish TTI's right to set off its damages and/or deduct certain costs from sums which may still be due to EPC under the MSA or any other agreement between TTI and EPC.

37.     TTI is further entitled under applicable law to deduct all or any part of its damages resulting from any breach of the MSA from any part of the price still due under the Agreement.

38.     Finally, the Agreement includes a termination provision in section 21.2 which sets forth the specific instances when the Agreement may be terminated and the processes that must be followed in doing so.

## EPC's Breach of its Production Obligations

39.     As noted above, EPC agreed to allocate sufficient production capacity to meet TTI's rolling forecast(s) of its expected purchases of the Products and to fulfill all purchase orders on time.

40.     Soon after entering into the Agreement, however, EPC immediately fell behind on setting up its facilities to manufacture the Products per the MSA's terms in time for the scheduled launch of the Products.

41.     Although EPC represented to TTI in the months leading up to the start of production that it would, and in fact was, preparing for production such that it could meet the initial October 2021 launch deadline, EPC failed to take any of the necessary steps do so.

42.     More specifically, EPC: failed to hire and train labor; failed to prepare its manufacturing space and warehouse space for production; failed to acquire the extra warehouse space needed for production; and failed to timely install the assembly cells to manufacture the Products.

43.     Upon information and belief, EPC's representations regarding its pre-launch preparations were designed to prevent TTI from discovering that EPC had no intention of actually taking the needed steps to prepare for launch until the last possible second, all in an effort to ensure EPC incurred the lowest possible overhead costs while ultimately forcing TTI to absorb the costs associated with preparing EPC's facilities for Production.

44.     EPC's failure to prepare for production caused TTI to incur substantial losses and expenses.  For example, because EPC completely failed to install the assembly cells needed to assemble the Products, TTI was forced to undertake the extraordinary measure of sending its own

personnel to EPC's facilities to build and otherwise acquire the actual fixtures needed to assemble the Products before the start of Production.

45.     EPC's failure to prepare its facilities for Production not only forced TTI to step in and expend its own resources to get EPC ready for Production, but also delayed the process for working through the quality documentation, training personnel, and resolution of any issues with such processes prior to launch of the Products.

46.     Ultimately, EPC failed to meet the initial launch date despite knowing the launch needed to proceed as planned in order to maintain Home Depot's excitement and trust in the Products.

47.     TTI was, therefore, forced to request a six-month delay from Home Depot. Although Home Depot permitted the delay, TTI forfeited the original wide-scale launch, resulting in a much smaller launch of the Products.

48.     Even after the initial launch of the Products, TTI remained behind schedule and never caught up due to EPC's failure to fulfill the Agreement's terms.

49.     Once the Products were in production, it became clear EPC had grossly misrepresented its capacity, capabilities, and expertise to manufacture sufficient quantities of the Products under the MSA's terms.

50.     Contrary to EPC's representations to TTI about its expertise and capabilities to handle the manufacturing processes needed to produce the Products, EPC proved to be inexperienced and incapable of adequately handling the manufacturing processes needed to make the Products, which slowed production even further.  To make matters worse, TTI later learned the sample molding project EPC had presented to TTI as demonstrative of EPC's expertise, capacity and

capabilities to manufacture the Products was actually the work product of an entirely different entity.

51. Despite repeatedly assuring TTI it would be able to meet its production obligations, EPC refused to hire additional labor or take other needed steps to ramp up production to fulfill its obligations under the MSA.

52. The production deficiencies were so severe that TTI had no option but to use even more of its own resources to hold daily calls (sometimes twice daily) with EPC in an effort to get EPC's production numbers on track.

53. Despite TTI's best efforts, however, because EPC lacked the capacity, capabilities, and expertise to manufacture the Products—as previously represented to TTI—EPC remained behind schedule for the entire project.

54. While EPC assured TTI it would have sufficient assembly stations to meet its production requirements under the MSA, in reality, EPC lacked adequate space to house the necessary number of assembly stations, a fact EPC would have known all along. Despite that reality, EPC continued to reassure TTI that it had the capacity, capabilities, and expertise to meet its production obligations under the MSA.

55. For example, on March 25, 2021, Reid Cheatham (TTI) sent an email to James Rank (EPC) wherein Mr. Cheatham expressed concern the assembly capacity numbers EPC had sent earlier that day were less than the 25,000 per month the parties had agreed upon. In response, James Rank (EPC) assured Steven Hoppe and Reid Cheatham (TTI) by email: "[w]e will add an assembly station to meet the number."

56. EPC made such representations knowing that it could not and would not meet the production numbers.

57.     Because of EPC's failure to meet its obligations under the MSA, including its failure to allocate or acquire sufficient space and capacity to meet its production obligations, EPC extended its manufacture of the Products to the weekend and then charged TTI an extra $4000/week for such labor, all of which was EPC's responsibility under the MSA. Even working weekends, however, EPC still failed to fulfill its contractual obligations.

58.     Upon information and belief, EPC's representations about its capacity, capabilities, and expertise to handle the manufacturing processes needed to produce the Products were designed to prevent TTI from discovering EPC could not meet its promised production numbers and obligations under the MSA so as to keep TTI as a customer for as long as possible.

59.     As a result of EPC's failure to meets its production obligations, TTI has incurred various damages including missed promotional opportunities and lost sales.

**EPC's Breach of the Minimum Inventory Requirement**

60.     In further breach of the MSA, EPC likewise never satisfied the Minimum Inventory Requirements of Section 3.3 of the Agreement.

61.     According to Section 3.3 of the Agreement, during the "Term" (defined in the Agreement as the duration of the Agreement, including the Initial Term and all renewed terms) for each product, TTI and EPC were required to agree upon the Minimum Inventory Level EPC would need to maintain at all times.

62.     Section 3.3 of the MSA sets forth the Minimum Inventory Levels agreed upon by the parties, as follows:

- Raw materials (Minimum Inventory Level = 30 days On-Hand; Maximum Inventory Level = 45 days On-Hand;

- Work in process materials (Minimum Inventory Level = 7 days On-Hand; Maximum Inventory Level= 14 days On-Hand; and

- Finished goods (Minimum Inventory Level = 30 days On-Hand; Maximum Inventory Level = 45 days On-Hand.

63.     The parties further agreed TTI's Rolling Forecasts would determine the appropriate quantities needed to satisfy the Minimum Inventory Level requirement per Section 3.3.

64.     At the time EPC and TTI executed the Agreement, EPC did not have the warehouse space needed to store the level of inventory (raw material, work in progress, and finished goods) forecasted by TTI.

65.     EPC, therefore, agreed to purchase an additional warehouse so it could fulfill both TTI's forecasts and EPC's obligations under Section 3.3. of the MSA.

66.     TTI justifiably relied upon EPC's representations about its ability to store TTI's forecasted level of inventory when executing the Agreement and when establishing the initial inventory level according to the MSA's Minimum Inventory Requirements.

67.     Contrary to its representations, however, EPC never purchased an additional warehouse or took any real steps to address the lack of warehouse space needed to store TTI's forecasted level of inventory and comply with the MSA's Minimum Inventory Requirements.

68.     Upon information and belief, EPC's representations that it would acquire sufficient warehouse space were initially intended to induce TTI to enter the MSA.

69.     Upon further information and belief, once the parties had executed the MSA, EPC continued making such representations to prevent TTI from discovering EPC had no intention of actually acquiring the promised warehouse space needed to fulfill EPC's obligations under the MSA--until the parties were so close to the launch of production--that TTI would have no recourse but to incur the warehousing costs that were EPC's contractual obligation under the MSA.

70.     An illustrative (but non-exhaustive) list of communications wherein EPC represented to TTI it would actually acquire the required warehouse space include:

a. EPC created and sent "Project Timeline" spreadsheets to TTI *via* email beginning in April of 2021 acknowledging and confirming EPC's need to secure outside warehouse space before the start of production in order to fulfill its obligations under the MSA.

b. On October 19, 2021, Bob Bachman (EPC) provided Reid Cheatham (TTI) (*via* email) an "update on warehousing" wherein Bachman represented EPC intended to secure the needed warehouse space and cited Stephen Gould--as a potential source of additional warehousing space--from whom he had requested information so EPC could "look at what options [made] sense for 3rd party warehouse support." None of these options ever materialized.

c. On November 17, 2021, Bob Bachman (EPC) sent an email to Steven Hoppa and Kimberly Lees (TTI) indicating that EPC would have, at most, ½ of the warehouse space needed to satisfy its obligations under Clause 3.3 of the MSA.

d. On November 24, 2021, Bob Bachman (EPC) sent an email to Kirk Lesiacsek at Osterman acknowledging EPC still did not have the warehouse space needed, which would have a "serious detriment" on the successful launch of the Products. More specifically, Mr. Bachman's email asked Osterman to "explain why Osterman is not able to warehouse the [resin raw material] on our behalf," and further stated, "*Your inability to provide this service is a serious detriment to the successful project launch. We need every available square foot of our warehouse to support finished goods staging.*" (emphasis added).

e. On December 3, 2021, Abbas Razizadeah (EPC) emailed Reid Cheatham (TTI) with pictures, plans, and other documents purportedly showing the steps EPC

was undertaking to acquire the additional warehouse space needed to comply with MSA clause 3.3. The warehouse space proposed by EPC, however, still remained entirely inadequate for the project's needs.

71.     Despite repeatedly representing to TTI that it was actively working to acquire sufficient warehouse space to comply with its obligations under Clause 3.3 of the MSA, EPC never secured adequate warehouse space.

72.     TTI justifiably relied upon EPC's representations about its ability to store TTI's forecasted level of inventory when entering into the Agreement with EPC and when establishing the initial inventory level according to the Minimum Inventory Requirements of the Agreement.

73.     Contrary to EPC's representations and true to EPC's intended design, EPC never purchased or otherwise acquired the additional warehousing needed to store TTI's forecasted level of inventory and comply with the Minimum Inventory Requirements in the Agreement.

74.     The lack of warehouse space created numerous problems, including but not limited to EPC's turning away shipments of resin needed for production and, in turn, slowing or halting production of the Products due to insufficient storage space, which pushed production even further behind.

75.     Because EPC failed to fulfill its obligation to secure adequate warehousing, TTI was ultimately forced to enter into an agreement with Port City Logistics, Inc. ("Port City"), a third-party provider of distribution and warehousing services, to acquire the warehouse space needed to house the inventory.

76.     The Agreement between TTI and Port City was executed on January 21, 2022, and cost TTI approximately $5.4 million.

77.     EPC is responsible for the costs associated with the warehousing space per the terms of the MSA.

## **EPC's Breach of the Product Quality Obligations**

78.     EPC's unwillingness or inability to produce sufficient quantities of the Products was further exacerbated by recurrent quality problems with the Products EPC did supply.

79.     Such quality deficiencies afflicting the Products included but were not limited to: missing handles, missing wheels, missing labels, non-functional handles, and stripped screws.

80.     The recurrent quality issues with the Products supplied by EPC: resulted in customer returns; caused TTI to lose sales; required TTI to scrap Products; and further hindered TTI's ability to deliver the Products to its customers in a timely manner.

81.     The product quality issues were so frequent that TTI could not rely on EPC to ensure adequate product quality.

82.     When it became clear EPC would require long-term monitoring and assistance, TTI was compelled to hire a third party, Stratosphere Quality, to monitor's EPC's operations on a daily basis.

83.     EPC is responsible for the costs associated with quality issues under the warranty, indemnity, and liquidated damages provisions of the Agreement.

## **EPC Refused to Hire Sufficient Labor to Fulfill its Obligations Under the MSA**

84.     Despite EPC's representations to TTI throughout the parties' relationship promising EPC would hire sufficient labor to manufacture the products, EPC failed to do so.

85.     Upon information and belief, EPC's representations regarding labor were intended to prevent TTI from discovering that EPC did not intend to fulfill its obligations under the MSA such

that, at some later point, TTI would have to contribute money and other resources to bridge EPC's labor gap even though EPC was responsible for labor under the MSA.

86.     An illustrative (but non-exhaustive) list of communications wherein EPC represented to TTI that it would have sufficient labor to manufacture the Products includes:

        a.  On March 26, 2021, EPC showed a PowerPoint to TTI wherein EPC outlined, among other things, a "Strategic Action Plan" with the stated goal of "successfully launch[ing] the TTI Storage Project with no time delays due to staffing issue[s]." Within the Strategic Action Plan, EPC identified numerous steps it had purportedly taken or would imminently undertake to ensure it had adequate labor to fulfill its obligations under the MSA.

        b.  On July 8, 2021, James Rank (EPC) emailed Reid Cheatham (TTI) indicating EPC was undertaking adequate measures to source the necessary labor for the Project to fulfill EPC's obligations under the MSA.

87.     However, once the parties neared the start of production—at such time as no commercially reasonable alternative existed for TTI—EPC began asking TTI to support EPC financially in acquiring adequate labor, despite EPC's repeated prior assurances it would acquire sufficient labor to fulfill EPC's contractual obligations under the MSA.

88.     On October 1, 2021, for example, Bob Bachman (EPC) emailed Reid Cheatham (TTI) indicating EPC would need TTI's financial support to acquire the labor needed to commence production.

89.     Because EPC had no intention of taking steps to secure adequate labor on its own, TTI had to guide EPC through the process of seeking additional labor *via* third-party sources.

90.     In fact, TTI's Senior Vice President of Human Resources had to get involved to engage third-party staffing agencies to try to secure the labor needed for EPC's manufacture of the Products. Even then, EPC failed to hire sufficient labor despite its repeated assurances otherwise.

91.     When TTI raised the issue of insufficient labor to EPC in other instances, EPC represented it was deploying an aggressive campaign to hire additional staff.

92.     Yet, upon further investigation into EPC's efforts to hire additional staffing, TTI discovered EPC's "aggressive campaign" for labor seemingly amounted to nothing more than a handful of posts on its Facebook page and placement of a small sign outside one of its warehouses.

93.     EPC continuously and falsely represented to TTI that it was taking the needed steps to hire the necessary labor in an effort to foist its labor costs onto TTI.

### TTI was Forced to Send its Own Employees to EPC's Facility

94.     Under Clause 8.2 of the MSA, in the event of any delay or deficiency at any stage in the performance of the Agreement, TTI's employees are immediately entitled to attend the premises, factories, or facilities of EPC to assist in resolving the problems causing the delay.

95.     Thus, because EPC was so far behind schedule, refused to hire sufficient labor to meet its obligations under the Agreement, and was supplying Products with recurrent quality problems, TTI sent a group of its own employees to EPC's facility to run the production lines alongside EPC's employees in January of 2022.  TTI's employees thereafter remained at EPC's facility for several weeks.

96.     As noted above, TTI was similarly forced to take the extraordinary measure of sending its own personnel to EPC's facilities to build the actual fixtures needed to assemble the Products before the start of Production as a direct result of EPC's failure to prepare for launch and hire adequate labor.

97.     The costs and expenses associated with TTI's sending its employees to EPC's facility—for which EPC is responsible for under the terms of the Agreement—totaled at least $213,071.20.

### EPC's Breach of its Delivery Obligations

98.     TTI, like most manufacturers, relies on a consistent stream of products to meet its obligations to its customers.

99.     EPC was further aware TTI needed to supply a certain quantity of Products to Home Depot by specific deadlines to qualify for "promotions" valued at several million dollars.

100.     Because the continued and timely supply of the Products at issue in this matter was so important to TTI, the parties included multiple provisions in the MSA specifically relating to the timely delivery of the Products.

101.     EPC, however, was unwilling and/or unable to meet its obligation to timely deliver the Products to TTI.

102.     EPC initially represented to TTI that it had the capacity to ship 15-20 trucks of Products per day.

103.     Joanne Murch (TTI) later sent an email to Bob Bachman (EPC) on November 5, 2021 inquiring for scheduling purposes: "[H]ow many trucks [TTI] can schedule to ship a day[?]" Mr. Bachman represented EPC could manage up to 24 trailers a day.

104.     In reality, EPC's facility had limited lot space and only three operational outbound doors to load Products onto trucks; such limitations rendered it impossible to ship 15-20 trucks of Products per day, let alone the 24 represented by Bachman.  Such limited space similarly impaired EPC's ability to intake the raw materials needed for manufacturing the Products causing further bottlenecks and delays.

105.    As a result, EPC consistently delivered the Products late.

106.    Upon information and belief, EPC's representations regarding its shipping abilities were intended to induce TTI to enter the MSA.

107.    Upon further information and belief, once the parties executed the MSA, such representations were intended to conceal from, prevent, and otherwise delay TTI's discovering that EPC lacked the shipping capacity needed to fufill its contractual obligations under the MSA.

108.    Upon further information and belief, EPC's representations were intended to delay TTI's discovery of EPC's inadequate shipping capacity (and related facts) until such time when TTI no longer had a commercially viable alternative other than to expend TTI's resources in an effort to correct EPC's failures in order to ensure TTI fulfilled its customer obligations.

109.    EPC's failure to deliver the Products on time and otherwise in accordance with the terms of the Agreement has caused significant damage to TTI.

110.    Had EPC shipped the Products on time per the terms of the Agreement, TTI would have been able to ship its finished products to its customers as needed. However, because EPC was consistently late in delivering the Products—and true to EPC's intended design—TTI was routinely forced to upgrade its shipping methods to meet its customer obligations.

111.    The cost of the expedited freight, which EPC is responsible for under terms of the Agreement, totaled at least $468,250.

112.    TTI also lost sales arising from committed customer purchases totaling at least $1,065,768.00 as a result of EPC's failure to deliver sufficient quantities of the Products on time.

**EPC's Breach of the Pricing Provisions – First and Second Price Increase Demands**

113.    As noted above, EPC was aware that TTI based its pricing quotes to Home Depot on the pricing terms that EPC and TTI had agreed upon.

114.     The Agreement specifically addresses pricing for the Products, including how the prices are set, the specific circumstances under which the pricing may be adjusted, and the procedures for any such price adjustment.

115.     More specifically, the Products' pricing is set and adjusted according to Section 4.1 of the Agreement and the TTI Pricing File 111720 ("Pricing File"). The pricing terms included in the Pricing File were based on the quotes provided by EPC, itself.

116.     Further, and as noted above, EPC and TTI went through approximately ten rounds of price negotiations before agreeing upon the terms included in the Agreement.

117.     Per the terms of the Agreement, the only permitted reason for any price adjustments, absent written mutual agreement between the parties, is for the cost of resin.

118.     Even then, there are specific procedures for determining any resin price adjustments in Section 4.1 of the MSA. Based upon those procedures, resin prices may only be adjusted on a quarterly basis.

119.     Under the MSA, any other pricing modifications must be agreed to in writing by both parties.

120.     Price adjustments for factors such as cycle time increase, burden rate increase, scrap rate increase, and labor are not permitted by the Agreement.

121.     Despite the Agreement's express pricing provisions, EPC unilaterally demanded price increases on multiple occasions and threatened to, and in some instances did, stop shipping the Products if TTI did not comply with the increased pricing, all of which directly violated the terms of the Agreement.

122.     In December of 2021, EPC demanded its first price increase ("First Price Increase Demand") on the basis that EPC was losing money under the Agreement.

123.     The First Price Increase Demand was unrelated to the Price File in Schedule 1 of the Agreement. More specifically, despite the fact that a Resin Adjustment as defined in the Agreement is the only permissible price adjustment absent mutual written consent of the parties, EPC's First Price Increase Demand included price increases for additional factors such as labor rate and EPC's miscalculations in its price quotes to TTI.

124.     Notwithstanding the fact that the First Price Increase Demand violated the terms of the Agreement, EPC made it clear to TTI that it would not ship TTI's Products on time, per the terms and conditions of the Agreement, unless TTI agreed to the First Price Increase Demand.

125.     The Products are manufactured through an injection molding process which requires custom molds either provided by TTI or created by EPC. EPC was aware that the custom molds take months to build and install and, as such, TTI could not simply order the Products from a different entity to ensure adequate supply.

126.     Thus, to avoid a sudden cutoff of its supply of the Products, TTI sent EPC a "Notice of breach & temporary price deviation" letter on January 7, 2022 ("January Notice") wherein TTI agreed, under duress, to pay *temporarily* higher prices ("First Temporary Price Deviation") until EPC could get its costs under control. The January Notice also notified EPC of its various other breaches of the MSA.  And, as it did with all such notices, TTI expressly stated the notice was made "without prejudice to any of TTI's rights, powers, privileges, remedies, and defenses, [then] existing or [thereafter] arising."

127.     The parties intended the First Temporary Price Deviation to be temporary and the January Notice expressly stated that the temporary pricing did not amend the Agreement.

128.     The January Notice expressly indicated, "per the conversations between the parties, the First Temporary Price Deviation is limited in time, and such prices will only be paid from

December 17, 2021, to January 31, 2022 (the "Deviation Period")." Beginning February 1, 2022, product prices would then return to the prices determined solely by the Agreement unless the parties otherwise agreed to amended pricing.

129. In a good faith effort to continue the business relationship between the parties, TTI's January Notice further informed EPC that TTI was willing to negotiate amended pricing, and that TTI wanted to execute such an amended pricing agreement before the end of the Deviation Period.

130. In furtherance of that effort, TTI's January Notice also proposed higher February 2022 product prices, which would go into effect at the conclusion of the Deviation Period, as well as any future pricing to go into effect as soon as reasonably possible thereafter.

131. Then, on March 17, 2022, EPC demanded yet another unilateral price increase in violation of the pricing provisions in the Agreement ("Second Price Increase Demand"). Like EPC's First Price Increase Demand, the Second Price Increase Demand is impermissibly based on factors other than Resin Adjustments and therefore violates the Agreement's express pricing provisions.

132. After receiving the Second Price Increase Demand, TTI had already taken a massive price increase in the spirit of partnership and could accept no further increases. The Second Price Increase Demand was related to cycle time increase, burden rate increase, and scrap rate increase – all of which TTI had already accepted a price increase for and which cannot serve as a basis for a price adjustment under the MSA's terms.

133. Thus, on March 24, 2022, TTI informed EPC it could not accept the Second Price Increase Demand and sent EPC, under duress, the maximum increased prices ("Maximum Increased Prices") that TTI would be willing to accept.

134. Notably, the Maximum Increased Prices represented a price increase to TTI of between 90-280% (depending on the item) as compared to the original contract prices. These increased prices capture all changes to the design, specifications, and "scope" of the work under the Agreement.

## EPC's Improper Attempt to Terminate the Agreement

135. On March 25, 2022, the President and CEO of EPC, Reza Kargarzadeh, notified TTI that because TTI refused to agree to the Second Price Increase Demand, EPC "consider[s] the original MSA null and void," effectively immediately. Such a termination is not permitted under the Agreement.

136. In that same email, Mr. Kargarzadeh—in violation of multiple provisions of the Agreement—directed his team at EPC to immediately stop all shipments of TTI Products and cancel all trucks with TTI Products until TTI agreed to EPC's Second Price Increase Demand.

137. That same day (March 25, 2022), TTI sent EPC a second notice of breach informing EPC that:

    a. EPC had failed to cure the breach described in TTI's January Notice (*i.e.*, the First Price Demand Increase);

    b. TTI's March 25, 2022, Notice constituted notice to EPC of its ongoing breach of the Agreement;

    c. Contrary to Mr. Kargarzadeh's email attempting to declare the Agreement "null and void," the Agreement remained in full force and effect per the Agreement's terms; and

    d. Mr. Kargarzadeh's direction to "stop all shipments of TTI products asap" constituted an additional breach of the Agreement and/or repudiation of the contract.

138. The Second Notice again notified EPC of its various other continuing and uncured breaches.

139. Therefore, in light of the EPC's numerous and continuing breaches, TTI informed EPC that it would take legal action if EPC did not continue to perform its obligations under the Agreement and assure TTI of its willingness to do so no later than 12:00 PM, EST on March 27, 2022.

### EPC's Additional Price Increase Demands

140. On March 29, 2022, to avoid a sudden cutoff of its Products, TTI sent EPC a "Notice and Temporary Pricing" Letter ("March Notice").

141. In the March Notice, TTI once again agreed, under duress, to pay *temporarily* higher prices for the remainder of the 2022 calendar year in accordance with the Extended Temporary Pricing terms set forth in the March Notice.

142. The parties again intended for the Extended Temporary Pricing to be temporary, and the March Notice expressly states that the Extended Temporary Pricing did not amend the Agreement nor cure EPC's prior breaches. Instead, the March Notice stated TTI's concessions in the March Notice were made solely to mitigate TTI's own damages.

143. In addition, the March Notice states TTI will pay the temporary, higher prices so long as EPC: "(i) demands no additional price increases except as permitted under the Agreement, (ii) continues to perform its obligations under the Agreement…, and (iii) no longer threatens to cease production or shipment." Should EPC fail to meet the above-stated conditions, the March

Notice states TTI would immediately revert to the pricing terms and conditions set forth in the Agreement.

144. The March Notice again notified EPC of its various other material, continuing, and uncured breaches.

145. On April 12, 2022, Mr. Kargarzadeh informed TTI it would not agree to the pricing terms set forth in TTI's March Notice and EPC would again cease shipment of the Products unless TTI agreed to a third unilateral price increase for the month of April ("Third Price Increase Demand"), as well as "monthly updates" to the pricing ("Future Price Increase Demands"), even though the Agreement specifically provides for resin price adjustments on a *quarterly* basis.

146. Like EPC's First and Second Price Increase Demands, the Third Price Increase Demand and Future Price Increase Demands violated the Agreement's express pricing provisions.

147. More specifically, in support of EPC's Third and Future Price Increase Demands, Mr. Kargarzadeh cited an increased cost from EPC's resin supplier and demanded that "EPC must be paid for total price of what it is paying for material regardless of the index."

148. Notwithstanding the fact that the Third and Future Price Increase Demands clearly violated the terms of the Agreement, EPC once again made it clear to TTI that EPC would not ship TTI's Products on time, per the terms and conditions of the Agreement, unless TTI agreed to the Third and Future Price Increase Demands.

149. Thus, on April 14, 2022, TTI sent EPC another "Notice & Extended Temporary Pricing" letter ("April Notice") wherein TTI agreed, under duress, to pay *temporarily* higher prices for a third time in accordance with the April Pricing terms set forth in the April Notice.

150. The parties once again intended the April Pricing to be temporary, and the April Notice expressly states that such pricing did not amend the Agreement nor cure EPC's prior

breaches. Instead, the April Notice states that TTI's concessions in the April Notice were made solely to mitigate its damages.

151. Like the March Notice from TTI, the April Notice also states TTI will pay the April Prices so long as EPC "(i) demands no additional price increases except as permitted under the Agreement, (ii) continues to perform its obligations under the Agreement…and (iii) no longer threatens to cease production or shipment." Should EPC fail to meet those conditions, the April Notice states TTI would immediately revert to the pricing terms and conditions set forth in the Agreement.

152. The April Notice additionally acknowledges EPC's expressed intent to demand an additional price increase for the month of May 2022. TTI informed EPC in the April Notice that such a demand would constitute yet another breach of the Agreement but, in continuing efforts to mitigate its damages and without amending the Agreement, TTI stated that it would pay a reasonable price increase for the month of May 2022, which must be confirmed by both parties before May 1, 2022 (the "May Pricing").

153. Finally, TTI expressly stated in the April Notice that it would only pay the April and May Pricing on the condition that EPC agreed to comply with Section 4.1 of the Agreement for all products starting June 1, 2022.

154. The March Notice again notified EPC of its various other material, continuing, and uncured breaches.

155. After the April Notice, EPC continued to demand monthly price increases in clear violation of the terms the Agreement.

156. TTI has been forced to comply, under duress, with EPC's continued unilateral price changes to ensure EPC continued manufacturing and shipping the Products.

157.     EPC's numerous breaches of the Agreement's pricing provisions have caused TTI to pay in excess of $12.7 million *more* than the contract price for the Products.

158.     As a result of EPC's numerous, material, continuing and uncured breaches, and in accordance with the termination provisions of the Agreement, TTI terminated the MSA and provided EPC with notice of the same on October 12, 2022.

### EPC's Failure to Return TTI Property

159.     EPC has further breached the MSA by improperly withholding TTI Property.

160.     On April 28, 2021, James Rank (EPC) emailed Reid Cheatham, Steven Hoppa, and Keith Lombardi (TTI) indicating EPC needed additional equipment to install the water-tight seal on the Products after molding. The equipment for the seal application ("Henkel Seal Application") would be installed on the Henkel machine.  In that same email, Mr. Rank indicated TTI would need to fund the Henkel Seal Application, and, as such, it "would be a TTI asset."

161.     On May 6, 2021, James Rank (EPC) emailed Tammy Banks (TTI) again indicating the Henkel Seal Application would be "TTI funded" at a cost of $247,618.86.

162.     EPC thereafter sent TTI an invoice for the cost of the Henkel Seal Application, which TTI paid.

163.     Section 14.1 of the MSA states: "Any molds and tooling (together "Molds") and other materials (including but not limited to tools, jigs, fixtures, patterns, prototypes, and gauges) and equipment owned by TTI and supplied by TTI *or procured by Supplier for TTI*….("TTI Property") shall remain the sole property of TTI and shall (i) be clearly marked or tagged as the property of TTI for identification purposes, (ii) be subject to inspection and removal by TTI at any time, (iii) be used only for the purpose of executing Purchase Orders from TTI, and (iv) not be modified in any manner by [EPC] without the prior written approval of TTI." (emphasis added).

164.     Accordingly, pursuant to the MSA and by EPC's own admission, TTI owns the Henkel Seal Application.

165.     Following the MSA's termination on October 12, 2022, Section 21.3 of the Agreement required EPC to: "immediately dismantle and return to TTI all TTI Property," including but not limited to the Henkel Seal Application. EPC failed to do so.

166.     Following the MSA's termination, TTI had a duty to mitigate its damages and costs under both the MSA and applicable law.  As a result, at the beginning of January of 2023, TTI identified a buyer for the Henkel Seal Application.  And, since EPC had not yet fulfilled its contractual obligations by timely returning the equipment, TTI notified EPC in writing of its need to return the Henkel Seal Application by the end of February 2023.

167.     Despite its contractual obligation to return the equipment, despite express contract provisions to the contrary, and despite the written communications between the parties expressly confirming the Henkel Seal Application as TTI Property, EPC responded to TTI on January 10, 2023 claiming that EPC, not TTI, owned the Henkel Seal Application.  EPC also indicated it had modified the Henkel Seal Application and would not otherwise return the TTI Property because it disputed TTI's exercise of its set off rights under the MSA.

168.     EPC's contention that the Henkel Seal Application is not TTI Property directly contradicts the language of the MSA, including but not limited to Section 14.1, as well as EPC's own admissions and representations acknowledging the equipment is a "TTI asset."

169.     Section 14.2 of the MSA also states, in relevant part: "[EPC] does not and shall not have any ownership interest or any right to acquire any ownership whatsoever in TTI Property."

170.     Thus, EPC's admission that it allegedly modified the Henkel Seal Application without TTI's approval does not transform the equipment into EPC's property or otherwise give EPC any

ownership interest in the equipment. Rather, such admission only confirms EPC has breached the MSA.

171.   EPC's outright refusal to return the Henkel Seal Application to TTI breaches Sections 14.1, 14.2, and 21.3 of the MSA.

172.   Despite claiming that EPC, not TTI, owned the Henkel Seal Application, on January 27, 2023, EPC filed an improper "molders lien" against TTI's equipment.

173.   In filing the lien, EPC further breached its fiduciary duty to TTI regarding TTI Property as well as Section 14.2 of the MSA, which states: "[EPC] shall hold TTI Property as bailee and fiduciary for TTI. [EPC] shall not create or permit any liens, encumbrances, security interests, levies or charges against or in TTI Property in favor of [EPC] of in favor of anyone else claiming through or under [EPC]."

### EPC's Shipment of Excess and Defective Products Post-Termination

174.   Following termination of the MSA, EPC shipped Products to TTI in excess of the quantities TTI had ordered *via* its Purchase Orders.

175.   More specifically, TTI ordered 3,154 of the STM 104 Products, but EPC delivered 3,968 STM 104 Products.

176.   EPC's final shipments also included thousands of Defective Products, including the following:

   a.   2,130 Defective STM 101 Products;

   b.   660 Defective STM 102 Products;

   c.   380 Defective STM 104 Products; and

   d.   1,350 STM 201 Products.

177.     On February 16, 2023, TTI informed EPC (*via* email) of the defective and excessive Products.

178.     TTI's February 16, 2023 email likewise informed EPC that, of the 3,968 STM 104 Products EPC had delivered, only 3,588 were of acceptable quality, resulting in an overage of 434 products. TTI indicated that it intended to keep those extra 434 STM 104 products and would set off the contract price for those products against the sums EPC still owed to TTI.

179.     In accordance with Sections 3.1, 12.1-12.3, 15.1, 15.3, and Schedule 6 of the MSA, TTI further requested that EPC come retrieve all Defective Products, destroy them, and send proof of their destruction to TTI.

180.     TTI informed EPC that if EPC declined to comply with TTI's request regarding the Defective Products, such a refusal would constitute yet another breach of the MSA and TTI would proceed to destroy the Defective Products, add all costs associated with that destruction to TTI's damages, and amend its Complaint to include EPC's additional breach.

181.     EPC responded to TTI's email on February 17, 2023 by: denying EPC had shipped excessive Products; denying thousands of the shipped Products were Defective; baselessly accusing TTI of failing to act in good faith; and refusing to comply with the applicable provisions of the MSA requiring EPC to retrieve and dispose of the Defective Products in accordance with TTI's request.

182.     EPC denied having shipped excessive Products even though the quantity of Products ordered by TTI, as listed on the SAR, was less than the quantity of Products EPC delivered.

183.     The estimated cost for TTI to scrap the Products is at least $49,500, which EPC is responsible for under the terms of the MSA.

184.     EPC is further responsible for all costs associated with the Defective Products, including all of TTI's costs related to handling and storing the Defective Products.

## FOR A FIRST CAUSE OF ACTION
### (Breach of Contract)

185.     To the extent not inconsistent, TTI incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

186.     The Agreement between TTI and EPC is a valid and binding contract supported by sufficient and valuable consideration exchanged between the parties.

187.     At all times relevant hereto, TTI has performed in good faith and complied with its obligations under the Agreement.

188.     As described in this Complaint, EPC has repeatedly breached the Agreement by refusing to deliver the Products to TTI under the terms of the Agreement, including but not limited to:

   a.   Failing to timely deliver the Products;

   b.   Failing to maintain adequate production capacity;

   c.   Failing to satisfy the Minimum Inventory Requirements;

   d.   Failing to produce sufficient quantities of the Products;

   e.   Failing to supply Products which met the specifications and quality requirements set forth in the Agreement;

   f.   Failing to comply with the pricing provisions of the Agreement;

   g.   Attempting to improperly terminate the Agreement;

   h.   Failing to return TTI Property immediately following termination of the MSA;

   i.   Failing to return TTI Property after TTI requested that EPC do so;

   j.   Failing to receive written approval for any alleged modifications to TTI Property;

k.  Failing to ship only those quantities of Products specified in TTI's Purchase
    Orders;

l.  Failing to comply with TTI's requests regarding excessive and Defective
    Products shipped by EPC.

189.    In addition to these express breaches, EPC also breached the implied duty of good faith and fair dealing.

190.    As a direct and proximate result of EPC's numerous breaches, TTI has sustained and will continue to sustain monetary damages and other losses, all of which are recoverable under the Agreement along with attorney's fees and the costs of bringing this action.

191.    Accordingly, TTI is entitled to recover actual and consequential damages along with such other and further relief as the Court deems just and proper.  Alternatively, TTI is entitled to recover liquidated damages, when allowed by the MSA and applicable law.

**FOR A SECOND CAUSE OF ACTION**
(Breach of Contract Accompanied by a Fraudulent Act)

192.    To the extent not inconsistent herewith, TTI incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

193.    The Agreement is an enforceable contract between TTI and EPC.

194.    As set forth in greater detail throughout this Complaint and incorporated herein by reference, EPC has breached the Agreement between the parties.

195.    Also as set forth in greater detail throughout this Complaint, EPC's breaches of the Agreement were accompanied by separate and distinct fraudulent acts, including but not limited to the following:

a.  Making fraudulent misrepresentations about its intent to prepare for the
    expected launch dates;

b.  Making fraudulent misrepresentations about its ability to satisfy production requirements;

c.  Making fraudulent representations about its ability to meet the Minimum Inventory Requirements;

d.  Making fraudulent representations about its willingness, abilities, and efforts to hire sufficient labor;

e.  Making fraudulent representations about its ability to ship a certain volume of Products per day;

f.  Assuring TTI that it would secure another warehouse to meet the Minimum Inventory Requirements but never doing so;

g.  Wrongfully strong-arming TTI into complying, under duress, with multiple, unilateral price increase demands by threatening to stop supplying the Products if TTI failed to comply;

h.  Attempting to terminate the Agreement improperly when TTI would not agree to additional and future unilateral price increase demands;

i.  Making fraudulent representations as to its alleged ownership interest in the Henkel Seal Equipment; and

j.  Making fraudulent representations as to the quantity of Products shipped by EPC as compared to the actual quantity ordered by TTI.

196.    EPC's breaches and accompanying misrepresentations were done with fraudulent intent.

197.    The circumstances surrounding EPC's various breaches, which again are explained in greater detail throughout this Complaint, evidence a dishonest design and devious scheme

orchestrated in an effort to secure and keep TTI's business with EPC while passing its own costs off to TTI in violation of the express terms of the MSA.

198.     EPC's various misrepresentations, which are explained in greater detail throughout this Complaint, were relied upon by TTI.

199.     EPC's fraudulent actions and breaches were willful, reckless, and made in conscious disregard of TTI's rights under the Agreement.

200.     As a direct and proximate result of EPC's fraudulent actions and breaches, TTI has been injured and is entitled to damages in such amount as may be proven at trial, including but not limited to actual, consequential, and punitive damages along with such other and further relief as the Court deems just and proper.

## FOR A THIRD CAUSE OF ACTION
(Fraud in the Inducement)

201.     To the extent not inconsistent herewith, TTI incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

202.     In order to induce TTI to enter into the Agreement, EPC represented that:

   a.   EPC would begin supplying the Products in the necessary quantities by the initial launch date;

   b.   EPC had the ability to supply sufficient quantities of Products in Compliance with the Agreement;

   c.   EPC had the ability to handle complex manufacturing processes like those needed to produce the Products;

   d.   EPC would supply the Products at prices which EPC knew were too low to be sustainable;

e.  EPC had sufficient production capacity to manufacture and supply the Products in Compliance with the Agreement;

f.  EPC would purchase an additional warehouse to store the level of inventory (raw material, work in progress, and finished goods) that TTI was forecasting;

g.  EPC would supply Products that complied with the specifications and quality standards set forth in the Agreement;

h.  EPC would deliver the Products "On-Time" as defined in the Agreement;

i.  EPC would comply with the pricing provisions of the Agreement; and

j.  EPC would not seek to terminate the Agreement except in accordance with the termination provisions set forth therein.

203.  EPC's statements were representations of material fact.

204.  EPC either knew the representations it made to TTI were false or it made the representations with a reckless disregard for the truth.

205.  EPC's representations were part of a general design or plan existing at the time the parties entered into the contract.

206.  EPC intended for TTI to rely on the representations in order to induce TTI to enter into the Agreement.

207.  As demonstrated by the broad failure of EPC to live up to any of the representations it made to TTI, EPC had no intention of following through with its representations.

208.  TTI was ignorant of the falsity of EPC's representations and would not have entered into the Agreement had EPC not made the above-referenced representations.

209.  TTI had a right to rely on EPC's representations.

210.     As a direct and proximate result of EPC's conduct, TTI has sustained and will continue to sustain monetary damages and other losses, all of which are recoverable under the Agreement along with attorney's fees and the costs of bringing this action.

211.     EPC's conduct was also grossly negligent, willful, wanton, malicious, and/or reckless, and TTI is entitled to recover punitive damages from EPC to the extent allowed by law.

212.     Accordingly, TTI is entitled to recover actual, consequential, and punitive damages along with such other and further relief as the Court deems just and proper.

## FOR A FOURTH CAUSE OF ACTION
(Negligent Misrepresentation)

213.     To the extent not inconsistent, TTI incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

214.     As set forth above, EPC made numerous misrepresentations and material non-disclosures to EPC.

215.     EPC had a pecuniary interest in making the above-described misrepresentations and material non-disclosures as they induced TTI to enter into business with EPC.

216.     EPC owed a duty of care to TTI to convey truthful information to TTI regarding its ability to timely supply the Products in accordance with the terms of the Agreement.

217.     By making numerous negligent misrepresentations and material non-disclosures to TTI, EPC breached its duty to exercise due care.

218.     As set forth above, TTI justifiably relied on EPC's misrepresentations to its detriment.

219.     As a direct and proximate result of EPC's conduct, TTI has sustained and will continue to sustain monetary damages and other losses, along with attorney's fees and the costs of bringing this action.

220.    EPC's conduct was also grossly negligent, willful, wanton, malicious, and/or reckless, and TTI is entitled to recover punitive damages from EPC to the extent allowed by law.

221.    Accordingly, TTI is entitled to recover actual, consequential, and punitive damages, along with such other and further relief as the Court deems just and proper.

## FOR A FIFTH CAUSE OF ACTION
(Tortious Interference with Existing Contract)

222.    To the extent not inconsistent, TTI incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

223.    As stated above, EPC was aware of valid contracts between TTI and TTI's customers, including TTI's agreement with Home Depot regarding the Products.

224.    EPC was also aware that TTI could not meet its obligations to its own customers if EPC failed to timely supply the Products in accordance with the Agreement.

225.    Upon information and belief, EPC intentionally procured breaches of the contracts between TTI and its customers by threatening to stop or, in some instances, actually stopping shipment of the Products to TTI unless TTI agreed to EPC's numerous, unilateral price increase demands.  In addition, EPC's wrongful conduct caused TTI's performance of its contracts with its customers to be more expensive, burdensome, and thereby resulted in pecuniary losses to TTI.

226.    EPC had no justification for intentionally procuring any breach in any contract between TTI and its customers.

227.    As a direct and proximate result of EPC's conduct, TTI has sustained and will continue to sustain monetary damages and other losses, all of which are recoverable under the Agreement along with attorney's fees and the costs of bringing this action.

228.    EPC's conduct was also grossly negligent, willful, wanton, malicious, and/or reckless, and TTI is entitled to recover punitive damages from EPC to the extent allowed by law.

229.     Accordingly, TTI is entitled to recover actual, consequential, and punitive damages along with such other and further relief as the Court deems just and proper.

## FOR A SIXTH CAUSE OF ACTION
(Violation of the South Carolina Unfair and Deceptive Trade Practices Act ("SCUTPA"))

230.     To the extent not inconsistent, TTI incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

231.     TTI is a "person" under S.C. Code Ann § 39-5-10.

232.     As described above, EPC's trade practices were deceptive, offensive to public policy,  immoral, unethical, and oppressive.

233.     Before, during, and after the terms of the MSA were in effect, EPC committed the above-described unfair and deceptive acts in the conduct of "trade" and "commerce" as defined under the Act.

234.     The conduct of EPC affects the public interest in that it is capable of and has the potential for repetition.

235.     EPC committed multiple violations of the Act as described throughout this Complaint.  EPC's serial unfair and deceptive acts likewise evidence that EPC lacks the necessary policies and procedures to prevent its unfair and deceptive conduct from recurring.  Moreover, EPC has consistently maintained that its wrongful acts were acceptable thereby making it likely that EPC's unfair trade practices will continue absent deterrence.

236.     EPC also previously engaged in substantially similar unfair and deceptive conduct in relation to other commercial dealings with other companies; illustrative (but non-exhaustive) examples include dealings with the Troxel Company and Specialty Plastics, Inc.

237.     EPC likewise violated SCUTPA by providing an initial quote to TTI which included, among other things, pricing for the Products that EPC knew was not sustainable and

which it would later dishonor in an effort to induce TTI to enter into the MSA thereby gaining an unfair competitive advantage over its competitors. In doing do, EPC unfairly ousted other entities from the opportunity to manufacture the Products through unfair and deceptive competition.

238. As a direct and proximate result of EPC's violations of SCUTPA, TTI has sustained and will continue to sustain monetary damages and other losses.

239. Accordingly, TTI is entitled to recover actual and consequential damages, attorneys' fees and costs, and such other and further relief as the Court deems just and proper.

240. Further, upon information and belief, EPC's violations of SCUTPA were willful and knowing, and TTI is therefore entitled to an award of three times its actual damages sustained, plus its attorneys' fees and costs pursuant to S.C. Code Ann § 39-5-140.

## FOR A SEVENTH CAUSE OF ACTION
### (Quantum Meruit/Unjust Enrichment)

241. To the extent not inconsistent, TTI incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

242. TTI pleads this cause of action in the alternative to its breach of contact claim.

243. TTI conferred a benefit upon EPC by covering certain costs and providing certain sums and services to EPC as described in this Complaint with the expectation and understanding that EPC would pay TTI for the services and sums provided.

244. As explained above, TTI also conferred a benefit upon EPC when it agreed, under duress, to comply with EPC's multiple, unilateral price increase demands which did not represent the reasonable value of the Products and which were contrary to the pricing agreed to by the parties at the onset of their relationship.

245. EPC realized the above-described benefits when it received the services and excess sums from by TTI.

246.     EPC wrongfully retained the above-described benefits by failing to pay and/or reimburse TTI for the excess sums and services provided by TTI.

247.     These conditions make it unjust for EPC to retain the above-described benefits without (1) making payment to TTI for all sums and services provided by TTI and (2) reimbursing TTI for the excessive sums TTI was forced, under duress, to pay as described above.

248.     As a result of the foregoing, TTI is entitled to be compensated and reimbursed in in an amount to be determined at trial, together with such other and further relief as the Court deems just and proper.

**FOR AN EIGHTH CAUSE OF ACTION**
(Set Off and Deductions)

249.     To the extent not inconsistent, TTI incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

250.     TTI has a right under applicable law to set off all of its damages resulting from any breach of the MSA from any part of the price allegedly still due under the MSA.

251.     TTI has an even broader right to set off under Section 4.5 of the MSA, which states that "TTI shall be entitled to set off any sum due by it to [EPC] under this Agreement against any sum due by [EPC] or any [EPC] 's Affiliates to TTI or TTI's Affiliates under this Agreement or any other agreement between Supplier or any Supplier's Affiliates and TTI or any TTI's Affiliates."

252.     Various provisions of the MSA, including but not limited to Sections 5.4, 12.3, 19.1, 19.2, Schedule 10, and Schedule 6, also work individually and together to give TTI the express right to deduct and set off certain costs that TTI has incurred from any sums allegedly still owed to EPC under the MSA.

253.     As detailed throughout this Complaint, TTI has incurred significant damages as a result of EPC's various breach of the MSA.

254. Further and as detailed throughout this Complaint, TTI has additionally incurred significant costs which EPC is responsible for under the MSA.

255. Accordingly, TTI is entitled to set off its damages and certain costs as permitted under applicable law and the MSA itself.

**FOR A NINTH CAUSE OF ACTION**
(Conversion)

256. To the extent not inconsistent, TTI incorporates the allegations set forth in the preceding paragraphs of this Complaint as if fully rewritten herein.

257. TTI holds an interest in and to its property, including but not limited to the Henkel Seal Application described above.

258. TTI has demanded return of the Henkel Seal Application, but EPC has refused to return TTI's property.

259. EPC has exercised a right and ownership over TTI's property without TTI's permission and to the alteration of the condition and exclusion of TTI's rights thereto.

260. As a direct and proximate result of EPC's unlawful and improper actions, TTI has suffered and will continue to suffer actual damages.

261. As a direct and proximate result of EPC's conduct, TTI has sustained and will continue to sustain monetary damages and other losses, all of which are recoverable under applicable law and the Agreement, along with attorney's fees and the costs of bringing this action.

262. EPC's conduct was also grossly negligent, willful, wanton, malicious, and/or reckless, and TTI is entitled to recover punitive damages from EPC to the extent allowed by law.

263. Accordingly, TTI is entitled to recover actual, consequential, and punitive damages along with such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff TTI Consumer Power Tools, Inc. f/k/a One World Technologies, Inc. d/b/a Techtronic Industries Power Equipment respectfully requests that the Court grant judgment in its favor against Defendant Engineered Plastic Components, Inc. in the form of:

A.  Actual, consequential, and punitive damages;

B.  Alternatively, liquidated damages, where allowed by the MSA and applicable law;

C.  To the extent not already applied, set offs and deductions from any sums allegedly still owed under the MSA or any other agreement between TTI and EPC;

D.  Treble damages under the South Carolina Unfair Trade Practices Act;

E.  TTI's costs, pre-judgment interest, and reasonable attorneys' fees; and

F.  Any and all other relief that the Court deems just and equitable.

Respectfully Submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:/s/ John F. Kuppens
    John F. Kuppens
    Federal Bar No. 5026
    E-Mail: john.kuppens@nelsonmullins.com
    1320 Main Street / 17th Floor
    Post Office Box 11070 (29211-1070)
    Columbia, SC 29201
    (803) 799-2000

    Kelly M. Reid
    Federal Bar No. 13063
    E-Mail: kelly.reid@nelsonmullins.com
    One Wells Fargo Center
    301 South College Street / 24th Floor
    Charlotte, NC 28202
    (704) 417-3000

MAYNARD NEXSEN PC

Lane W. Davis
Federal Bar No. 7739
E-Mail:  LDavis@maynardnexsen.com
104 South Main Street, Suite 900
Greenville, SC  29601
(864) 282-1145

*Attorneys for Plaintiff TTI Consumer Power Tools, Inc.*
*f/k/a One World Technologies, Inc. d/b/a Techtronic*
*Industries Power Equipment*

August 2, 2023