IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

---

TTI CONSUMER POWER TOOLS, INC.,
F/K/A ONE WORLD TECHNOLOGIES, INC.
D/B/A TECHTRONIC INDUSTRIES POWER
EQUIPMENT,

      Plaintiff,

v.

ENGINEERED PLASTIC COMPONENTS,
INC.,

      Defendant,

and                               Civil Action No. 8:22-cv-04085-TMC

ENGINEERED PLASTIC COMPONENTS,
INC.,                                Hon. Timothy M. Cain

      Counter-Plaintiff,

v.

TTI CONSUMER POWER TOOLS, INC.,
F/K/A ONE WORLD TECHNOLOGIES, INC.
D/B/A TECHTRONIC INDUSTRIES POWER
EQUIPMENT,

      Counter-Defendant.

---

## **DEFENDANT/COUNTER-PLAINTIFF'S SECOND AMENDED COUNTERCLAIM AND JURY DEMAND**

      Defendant/Counter-Plaintiff Engineered Plastic Components, Inc. ("EPC"), through its attorneys, Haynsworth Sinkler Boyd, P.A. and Foley & Lardner LLP, submits the following Second Amended Counterclaim to the Second Amended Complaint filed by Plaintiff TTI Consumer Power Tools, Inc., f/k/a Techtronic Industries Power Equipment ("TTI").

## SECOND AMENDED COUNTERCLAIM

Defendant/Counter-Plaintiff EPC states as follows for its Second Amended Counterclaim against Plaintiff/Counter-Defendant TTI:

## PARTIES, JURISDICTION AND VENUE

1. EPC is an Iowa corporation with its principal place of business in West Des Moines, Iowa.

2. TTI is a Delaware corporation with its principal place of business in Anderson, South Carolina.

3. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between the parties and the amount in controversy exceeds $75,000, and because this counterclaim arises out of the same transaction and occurrence that is the subject of TTI's Complaint against EPC.

4. This Court has personal jurisdiction over TTI and venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and because the parties have stipulated and agreed that disputes regarding the Agreement shall proceed in this Court. (Exhibit 1, § 24.9).

5. Jurisdiction and venue also are proper in this Court pursuant to Fed. R. Civ. P. 13 because EPC's claims are brought as a compulsory counterclaim in an action pending before the Court.

## STATEMENT OF FACTS

### EPC's Business

6. EPC is the manufacturer of world-class plastic injection molded products. Since its founding in 1994, EPC has grown from one small facility with four injection molding machines to eighteen (18) locations with 520 machines.

7. EPC is a registered minority company. Although EPC is based in North America,

2

it ships its products internationally to at least twelve (12) different countries.

8.      EPC services automotive, appliances, consumer product and medical industries.  In the automotive industry, EPC frequently functions as a Tier 1 and Tier 2 supplier to major automotive Original Equipment Manufacturers ("OEMs").  EPC also does business with major appliance brands, large companies in the medical industry, and large consumer product companies.

9.      With these various products, EPC has had many examples of successful major program launches of the size more significant than EPC's program with TTI.

10.     In September 2020, TTI approached EPC for injection molding work for the Ryobi Toolbox Program (the "Program") that TTI had with Home Depot, based on the recommendation from TTI's affiliate.  The opportunity involved manufacturing modular storage products—a medium toolbox, small toolbox, small parts toolbox, rolling box, and open crate (collectively, the "Products")—for a contemplated launch in September/October 2021.  EPC presented to TTI its standard company PowerPoint overview sharing EPC's history, footprint, major customers, and its injection molding capabilities.

11.     The same month, in September 2020, EPC provided an initial quote to TTI for the manufacture of several Products for the Program, based on the initial product design and specifications provided by TTI (the "September 2020 Quote").

12.     The September 2020 Quote was expressly based on the designated volumes, and indicated that volume fluctuation in excess of 10% would cause the change in price.  The September 2020 Quote was also based on the regular work week, and did not include any overtime or premium costs.  It expressly provided that prices of resin, a major component in EPC's products, were subject to change, and that the quote was also subject to change upon receipt of tooling.

13.     After EPC submitted the September 2020 Quote, the Products underwent

significant changes, and EPC updated its quotes for the Products based, in part, on these modifications.

### TTI Materially Misrepresented the Nature of The Program to Induce EPC to Participate under False Pretenses

14.     In order to entice EPC to participate in the Program and later to entice EPC to continue participating in the Program, TTI repeatedly guaranteed to EPC, in no uncertain terms, that the nature of the business relationship between EPC and TTI in connection with the Program would be "long-term" and entail no less than a "ten-year commitment."



20.     Instead, from the very beginning, TTI intended to use EPC for a limited time necessary to launch the Program and benefit from EPC's manufacturing expertise and domestic

4859-5505-3966.1

location before switching to less expensive manufacturers in Vietnam.

21.     In fact, from the outset, TTI solicited quotes from Asian suppliers – including the two that it ultimately transferred the Program to – GoodMark and Minghao – and TTI had, prior to engaging EPC, generally used Asian suppliers as a matter of course, but was limited in its ability to do so at the beginning of the Program, particularly in China, due to COVID restrictions.



████████████████████████████████████████████████████

24.    Neither TTI's willingness to utilize cheaper overseas injection molders for the Program nor its contemplation of replacing EPC with same was known by EPC.

25.    Moreover, there was no way for EPC to uncover TTI's true intentions through any amount of diligence.

26.    Had EPC known that TTI was contemplating utilizing other injection molders

████████████████████████████████████████████████████

████████████████████████████████████ EPC would have never agreed to participate in the Program, make significant capital investments, or signed the MSA.

27.    Furthermore, had EPC known TTI's intentions of bringing in cheaper overseas injection molders, it would have never incurred the tremendous amount of cost, around-the-clock efforts, and other expenditures associated with the Program.

**The Master Supply Agreement**

28.    On January 15, 2021, after several rounds of negotiations, EPC and TTI entered into the Master Supply Agreement (the "MSA"), which is attached as <u>Exhibit 1</u>.

29.    Pursuant to the MSA, EPC agreed to manufacture and assemble each Product in accordance with TTI's Specifications and requirements.  (MSA, § 6.1.)

30.    The parties agreed to prices included in Schedule 1 to the MSA, and further agreed that in the event of product variations or adjustments, the future price agreements "shall be as mutually agreed by the Parties." (MSA, § 4.1.)

31.    The parties further agreed that prices would always be subject to adjustment based on the cost of resin raw material, based on Chemical Data, Inc.'s ("CDI's") published quarterly average index of resin raw material cost per pound.  (MSA, § 4.1.) For any resin adjustment based on an increase in resin raw material cost, 100% of the applicable cost increase over the 5% increase

was to be included in TTI's adjusted price as a price increase.  (MSA, § 4.1(ii).)

32.     Although initially, the parties contemplated the resin price adjustment to occur quarterly, in early 2022, TTI agreed to adjust the prices due to increases in resin prices on a monthly basis.

33.     The MSA also required EPC to maintain minimum inventory levels, based on historical data concerning historical use, if available, and other information deemed relevant by the parties.  (MSA, § 3.3.) However, the parties did not agree to an inventory quantity below which EPC could not permit its inventory of each Product by Stock Keeping Unit (SKU) to fall below. The parties also did not have historical use upon which they could base their Minimum Inventory Level assessment.

34.     Pursuant to the MSA, the drawings, specifications, tooling, molds, concepts, designs, and manufacturing processes relating to the Products belonged to TTI.  (MSA, §§ 1.1, 14.1, 16.8.)

35.     The MSA contemplated a long-term relationship between the parties, with the initial term of three years and an evergreen clause providing for automatic one-year renewals thereafter.  (MSA, § 21.1.) Either party had a right to terminate the MSA by giving a six-month prior written notice to the other party.  (MSA, § 21.2.) The MSA could also be terminated for breach if a party fails to cure a breach within 30 days of the notice.  (MSA, § 21.2.)

36.     The MSA also required EPC to maintain a minimum (and maximum) level of raw material and inventory for the Program, to ensure that EPC is ready to meet TTI's production needs.  (MSA, § 3.3.)

37.     Both parties agreed to mitigate their costs upon any termination of the MSA. (MSA, § 21.4.)

4859-5505-3966.1

### EPC Makes Significant Capital Investments
### In Preparation For TTI's Program

38.    EPC was excited for the opportunity to work with TTI on this project, which was described to EPC as a 10-15-year program.  Although EPC has worked with many other large customers, this was an important opportunity for EPC, and EPC committed significant resources to ensure that the program was launched smoothly and on time.

39.    In preparation for this long-term partnership, EPC made capital expenditures of approximately $10 million into various items necessary to launch the TTI business.  These capital expenditures included injection molding machines, assembly lines, workstations, screw driving and assembly systems.  Some of the items purchased by EPC in preparation for the TTI launch were specific to the TTI business and cannot be used for other customers.  EPC undertook these expenses to ensure it had sufficient production capacity to meet its obligations under the MSA.

40.    In addition, to accommodate TTI's business and allocate sufficient space for TTI's assembly and Products, EPC made a strategic decision to exit its blow-molding business and sell all equipment for that business, creating 100,000 square foot dedicated onsite warehouse for this project.  As a result of doing so, EPC was able to dedicate significant space for the assembly and warehousing of TTI's Products sufficient to meet its production capacity and warehousing obligations under the MSA.

41.    Also in preparation for the launch of the program, in the summer of 2021, EPC began to hire and train staff.

42.    EPC also incurred approximately $2.4 million in various launch costs.

43.    Had EPC known that TTI was planning on switching from EPC to cheaper overseas injection molding companies, in contravention of TTI's representations that the Program would constitute a long-term, ten to fifteen-year relationship, it would have never exited its blow-molding

4859-5505-3966.1

business, expended countless hours and financial resources hiring and training staff, or incurred the additional $2.4 million in various launch costs.

### TTI Decides To Source The Tools From A Third-Party Vendor That Delivers The Tools Late And In Substandard Form

44.     Although EPC offered to be responsible for design, build and management of tooling necessary to manufacture the Products, including of the injection molding machines, TTI decided to be responsible for design and order all the tools from a tool shop in Charlotte, North Carolina named Delta Mold, Inc. ("Delta Mold").

45.     By not sourcing the tooling to EPC and choosing to involve Delta Mold in the process, TTI removed any ability on the part of EPC to control the quality and timeliness of the tooling.  TTI, together with Delta Mold, became primarily responsible for delivery, quality, and timeliness of tooling.

46.     EPC's engineers provided their tooling recommendations and guidelines to TTI and Delta Mold, so that the tooling enabled EPC to manufacture the Products promptly and to TTI's specifications.  However, Delta Mold did not follow these guidelines, and TTI did not enforce these guidelines with Delta Mold.  TTI cut corners on the quality and quantity of tooling manufactured by Delta Mold to try to save the proverbial penny and due to its inexperience with injection molding.

47.     Having standard-quality tooling was essential to EPC's ability to manufacture the Products to TTI's specifications, and to do so with reasonable expediency necessary to meet various Program deadlines.

48.     Through no fault of EPC, Delta Mold was late on delivering the tools.  The first complete set of tools was not delivered until November 2021—after the expected launch date, while the second set of tools did not arrive until around March 2022.

4859-5505-3966.1

49.    Typically, depending on the industry, tools come in anywhere from three (3) to eight (8) months pre-production.

50.    Delta Mold's delay in delivering the tools made it impossible for EPC to deliver the Products to be made with those tools by the September-October 2021 launch deadline.

51.    Even when Delta Mold's tools arrived, they were in sub-standard working condition.  Among other ways in which Delta Mold's tools were of unacceptable quality, they were not capable of running efficiently and manufacturing the Products to TTI's specifications in standard manufacturing environment.

52.    Delta Mold's tools slowed down the production process, and increased the expected standard cycle times by, in some cases, 150%. This changed the parties' key assumption in entering into the MSA and fundamentally changed the Products.

53.    In addition, despite EPC's suggestions, Delta Mold did not manufacture sufficient number of tools.  For example, it made only one lid latch tool where each box required two latches, creating a bottleneck in EPC's manufacturing process.

54.    EPC understands that Delta Mold also held some of the tools back, pending a payment dispute with TTI.

55.    The tools manufactured by Delta Mold also contained unnecessary complexity, which resulted in weak mold constructions and led to fatigue failures of the mold.

56.    The sub-standard condition of Delta Mold's tools forced EPC's engineers to work around the clock to make some of the corrections and improvements necessary to run the subject tools properly and efficiently.  However, even as of today, the tools are not 100% production-ready.

57.    TTI's employees themselves recognized that the manufacturing delays that led to

TTI missing the September-October 2021 launch date are not fairly attributable to EPC; rather, EPC "ha[s] significant invested interest to hit schedule" and "it's all on Delta."

## TTI Dramatically Changes Product Specifications, Opting For A More Expensive Design

58.    After the MSA was signed in January 2021, the Products underwent significant design changes, which made the Products more expensive to manufacture.  As one example of the change in design, TTI increased durability requirements for the toolbox, which required the material supplier to introduce additives to reinforce product durability to meet the new standard. Whereas EPC initially based its original price on the material that EPC used for similar products sold to a big box customer—the materials whose use TTI initially approved—TTI later updated its engineering specifications to include the cold impact requirement, which drove the material prices higher.

59.    TTI made other drastic changes to the specifications that made the Products more expensive to manufacture.  Among them, TTI chose a different type of resin manufactured by Asahi Kasei, which was of a custom formulation produced by Asahi Kasei specifically for the Program.

60.    Pursuant to the MSA, the pricing agreed between the parties only applies to the Product package "as described in the Specifications." The Specifications described in the MSA have changed significantly and the Products ultimately manufactured by EPC for TTI were different than the Products described in the MSA. In recognition of this fact, TTI agreed that pricing designated in the MSA was inadequate and it agreed to adjust the pricing upward on a going-forward basis.

61.    Altogether, the Products went through close to twenty (20) revisions in a matter of months.  Many of these revisions made the Products more expensive to produce.  While EPC

wanted to adjust the pricing with each individual change, pursuant to MSA § 4.1, it was told by TTI's employees in charge of the project to hold all pricing changes until the program was in production, at which point TTI agreed there would be a one-time true-up.

62.    Based on this direction from TTI, EPC did not make any pricing changes to its pricing until December 2021 when the Products went into production.  Pursuant to MSA § 4.1, EPC provided revised pricing in August of 2021.  TTI once again asked EPC to hold off on price changes until after launch in December, at which point TTI agreed there would be a one-time true-up.

63.    In December 2021, following countless verbal and written communications on the subject of pricing, EPC adjusted the prices, pursuant to MSA § 4.1, for the Products to account for drastic changes to product modifications and delays caused by sub-standard tooling, among other factors.

64.    EPC also requested adjusted prices based on the increased cost of resin based on the CDI index, in accordance with MSA § 4.1.

65.    The parties discussed price increases requested by EPC due to changes to product specifications and costs of resin in multiple communications, and at no point did EPC stop shipment of Products to TTI due to the parties' disagreement about the pricing.

66.    EPC was always completely transparent with TTI and readily revealed all of its costs and meager profit margins to TTI.

**TTI's Design Suffers From Multiple Flaws Requiring Drastic Changes**

67.    In addition to tooling-related issues, the launch of the Program was made impossible due to multiple flaws in TTI's design of the Products.

68.    EPC was a manufacture-to-print supplier, and relied on TTI's design to manufacture the Products.

69. However, TTI's design was incomplete and non-functional, and had to be modified in significant respects.

70. Some examples of the numerous design failures that the parties had to work through and that warranted modifications of specifications, making the Products more expensive and time-consuming to produce, included:

  a. Issues with the lock plate of the boxes where the lack of a bottom lead-in angle prevented the boxes from latching together until another part was added to the bottom side as well as the top of each lock;

  b. With respect to the bottom cover of the boxes, height control was a major issue that required several engineering changes, which in turn required multiple levels of mold modification;

  c. The hubs of the toolboxes were not sufficiently strong, and had to be enhanced and re-designed to be thicker, with additional fillet parts added to support the hubs;

  d. Some of the resin types that TTI chose were incompatible when touching each other and created sliding surfaces; contrary to EPC's advice, TTI insisted on having the same types of resin for adjacent surfaces in order to capitalize on resin suppliers' volume discounts;

  e. The parties had to make multiple adjustments to the gasket seal in order to meet various required tests; and

  f. There were multiple issues with fit-up, interference, strength and inability to latch that caused the crates to pop open.

  g. There was also a last-minute change affecting the sliding plate and release where, instead of the sharp corner, TTI decided to make the corner round and to change the material on the sliding plates to avoid the bind-up material interlock condition.

  h. TTI also made last minute modifications to the handle, which had to be modified for proper thickness so that it could be molded.

71. Some of the design failures became evident during the first engineering build event that took place in North Carolina in September 2021, in preparation for the promotional photo and video shoot that Home Depot did in advance of the Black Friday promotion. As part of this engineering build event, the parties planned to build 50 units. Each unit had to be individually

hand-worked.

72.     The tooling samples used during this event were not production tools.  They were made mostly from silicon molded pieces glued together and some machined parts.  These were not the tools that could be used in a regular production process.

73.     Despite the small scale of the project and the individual attention paid to each part, TTI was only able to lock one of the 50 toolboxes that it assembled.  For the other toolboxes, TTI had to add jack screws and stop blocks to keep the lock plates in place in an attempt to show functionality of the toolbox for the marketing video shoot.

74.     The design of TTI's Products continued to change to ensure fit, function and workability of the Products, and included the material change at the eleventh hour, in the middle of December of 2021.

75.     Despite the obvious issues with TTI's product design, EPC went above and beyond to hand-deliver the components and the last-minute molded boxes to guarantee delivery to North Carolina in time to build boxes for the video shoot.

76.     Aside from the design defects and issues with Delta Mold's tooling, EPC's Products and services were of good quality and manufactured in compliance with EPC's obligations under the MSA.

77.     Although the Products suffered from some quality issues, these issues were primarily driven by issues with the tools and/or product design rather than EPC's operator errors.

78.     While TTI sent its own employees to EPC's facilities and while TTI may have retained services of a third party, Stratosphere, none of these were necessary in order to correct any issues with EPC's performance. In fact, none of the quality issues with EPC's Products were a result of EPC's misconduct or breaches of contract.

79.     Likewise, although the parties incurred expedited shipping charges, this was through no fault of EPC.

80.     Even when TTI missed the original October 2021 launch date, EPC worked tirelessly in an effort to support TTI's goal to make up the lost promotional sales.  EPC was running production seven days a week, 24 hours per day, including some holidays.

81.     EPC continued to hire additional staff to support the production.  After increasing operator wagers four times and exhausting all avenues to hire and attract the required labor, EPC worked with several temporary agencies to bring in as many potential production associates as possible to support the required assembly.  EPC paid some temporary agencies as high as $28.50/hour for this help, absorbing a part of these inflated wages on its own.

82.     As individuals within TTI itself acknowledged, EPC was extremely committed to this Program, and provided comprehensive unwavering support to make the Program successful and significantly expand its production capacity, warehousing, and hiring obligations.

### TTI Covertly Re-Engages Asian Manufacturers to Replace EPC Around the Start of Production

83.     Unbeknownst to EPC at the time, by no later than December 1, 2021, while EPC was working around the clock, hiring additional staff, incurring further expenses, and re-doubling its efforts to fulfill the Program's needs, TTI was going behind EPC's back to hire cheaper Asian manufacturers to replace EPC.

84.     Despite being fully aware of EPC's tremendous expenses and efforts toward the Program in late 2021, TTI purposely misled EPC by keeping the fact that it was engaging cheaper replacement manufacturers in Vietnam secret from EPC.

85.     TTI kept its active solicitation of cheaper overseas replacements from EPC so that EPC would keep expending valuable resources, energy, and around-the-clock efforts to TTI's

benefit.

86.     Indeed, while, unbeknownst to EPC, TTI was making arrangements for cheaper overseas replacements in late 2021 and early 2022, TTI artificially inflated its demands to EPC to stockpile products in order to facilitate a smooth transition of the Program to cheaper Vietnamese suppliers.  In particular, TTI requested that EPC manufacture high volumes of Products that TTI did not actually need at the time for sale to Home Depot in order to avoid running out of Products in the event that TTI's launch with the Vietnamese manufacturers was delayed.

87.     EPC was led to believe that TTI's demands were based on Home Depot's legitimate demands for the Product.  However, this intended impression was false.  Even today – over one year after TTI terminated EPC as the Program's supplier in October 2022 – the only Products sold on Home Depot's shelves are Products made by EPC.





93.    Despite knowing early on that TTI would switch suppliers to cheaper overseas options, obviating their need for EPC altogether, TTI misled EPC when it came to advising as to how much product for the Program EPC should order from its sub-suppliers.



95.    TTI's duplicitousness did not stop at concealing the truth.  TTI also continued to actively misrepresent that its relationship with EPC would be long-term in and throughout December 2021 despite knowing full well that its days were numbered as TTI zeroed in on EPC's

cheaper overseas replacements.



97.     By in or around late March of 2022, during the second year of the Program, TTI finalized its decision to hire two of the cheaper overseas manufacturing companies – Goodmark and Minghao – that it had contemplated using to replace EPC back in August 2020, in accordance with its predetermined plan to ███████████████████████████

98.     Once TTI was satisfied that EPC had produced sufficient stock of the Products and Goodmark and Minghao were ready to begin production, TTI discontinued its relationship with EPC without any prior notice, causing EPC to terminate over 100 of its employees the next day.

99.     TTI's bait-and-switch scheme was entirely unknown and unknowable to EPC due to TTI's continual misrepresentations and concealment efforts.

100.     Upon information and belief, TTI has transferred to its cheaper overseas replacements the proprietary manufacturing processes that EPC developed and employed in connection with the Program and which TTI learned through its many visits to "oversee" EPC's production, further evincing TTI's scheme to engage EPC under false pretenses of longevity to glean its quality manufacturing processes before replacing it with cheaper overseas production.

101.     In fact, in making design changes and working on the CAD files for the Products

4859-5505-3966.1

to be manufactured in Vietnam, TTI asked EPC's employees for feedback on how to improve the Products' design.  In addition, TTI incorporated all the practical learnings that it obtained from EPC regarding the design features of the Products, the materials to use, and the molding methods.

**EPC Requests Price Increases To Which It Is Entitled Under The MSA**

102.    Since the time the MSA was entered into in January 2021, the following factors underlying EPC's pricing have changed:

    a.    Manufacturing location – the parties agreed to move the site of the Program from North Carolina to Michigan, to scale up the manufacturing;

    b.    Material selection – as described above, TTI opted for more expensive resin with certain additives to meet the cold impact requirement;

    c.    Product and component design and content – as described above, there were significant changes to the design of the Product;

    d.    Packaging concept – the parties agreed to a different packaging for the Products, which drove up EPC's costs; and

    e.    Palletization concept and shipping concepts – due to the change in shipping configurations, EPC spent weeks if not months in man hours re-palletizing the Products to these varying shipping layouts.

103.    TTI recognized that these changes entitled EPC to price increases under the MSA, and asked EPC to wait to settle on the final pricing at the beginning of production.

104.    Based on the parties' agreement that EPC would hold off on submitting incremental price increases during pre-production period, EPC periodically requested pricing adjustments prior to production.  While TTI recognized that the price quoted in the MSA was no longer applicable to the Products, TTI told EPC to hold on pricing adjustments until December 2021, when the Products were supposed to go into production.  Accordingly, EPC did not request any price increases until December 2021, when the Products went in production.

105.    In December 2021, EPC adjusted the prices based on the vast changes to the Product specifications that TTI made since January 2021, when the MSA was executed.

106.    Thereafter, EPC sought price adjustments on a monthly basis, solely due to drastic increases in resin costs based on the CDI index, in accordance with MSA § 4.1.

107.    TTI has approved EPC seeking resin-related price adjustments on a monthly, rather than quarterly, basis in writing.

108.    In some months, the adjustments actually lowered TTI's prices for the Products.

109.    However, in general, during 2021 and the first part of 2022, resin prices increased sharply, in line with increases in the price of oil. Based on the MSA's provision entitling EPC to seek price adjustments due to the price of resin, EPC's monthly price adjustments were justified.

110.    TTI withheld agreement regarding the pricing for the modified Products, which was not specified in the MSA, in bad faith.

### TTI Improperly Terminates the Agreement

111.    On October 12, 2022, TTI abruptly terminated the parties' MSA effective immediately, without giving EPC any good-faith notice, without giving EPC the six-month notice required under the MSA to terminate as of right, and without giving EPC a written notice of the alleged breach and the opportunity to remedy such breach within thirty (30) days.

112.    TTI's termination of EPC purportedly due to "pricing" was planned for many months, with dates for such termination being the subject of frequent discussions. TTI was emboldened to terminate EPC's involvement in the Program in October 2022 ██████████████

███████████████████████████████████████████████████████

████████████████████

113.    In terminating EPC, TTI never indicated that it has determined the Products' prices to be unreasonably high. Further, given that EPC's pricing reflected changes in the design and specifications of the Products and increases in the cost of resin, EPC's pricing was not unreasonably high.

20

114.    Even if TTI gave EPC written notices complaining of price increases, TTI's complaints were not supported by the language of the MSA, which expressly allowed EPC to seek pricing adjustments due to change in specifications or increases in resin costs.

115.    This abrupt termination notice caught EPC by surprise, leaving EPC with millions of dollars in inventory on hand and in suppliers' possession on purchase orders due to lead time, which it acquired in order to be prepared to manufacture TTI's Products.

116.    EPC also is left with the various capital expenditure items, which it now cannot use for any other customers and whose cost it would fully recover if TTI did not terminate the MSA prematurely.

117.    As of the time of this filing, TTI has also failed to pay EPC millions of dollars for the previously shipped Products.

118.    EPC also has in its possession or has binding commitments to purchase approximately $5 million worth of inventory to meet its commitments to TTI, which were made prior to termination.

119.    EPC is losing approximately $150,000 per month in profits and will continue to do so until TTI's business is fully replaced.

120.    In reliance on the TTI business and opportunity, EPC also lost the ability to utilize its blow-molding business.  EPC was recently approached by a third party for the opportunity in the blow-molding business, but had to decline this opportunity.

121.    Although TTI entered into an agreement with Port City Logistics, Inc. ("Port City"), that agreement provided for a suite of services outside of warehousing. Because EPC provided adequate warehousing and storage space, TTI did not need to enter into agreements with Port City or any other providers in order to secure warehousing space.

4859-5505-3966.1

122. TTI's surprise termination of the MSA with no notice, after EPC had expended so many efforts and resources to comply with the MSA and despite TTI's own material breaches and promises to increase the prices, shows a breath-taking lack of good-faith dealing on TTI's part.

123. Despite all of TTI's material breaches of the MSA and failure to deal in good faith, and despite EPC's performance in accordance with the MSA, TTI initiated this action on October 13, 2022, and now accuses EPC—not TTI—of breaching the MSA.

124. TTI's accusations are false. EPC's reputation has been damaged to the tune of many millions of dollars by TTI making false accusations against EPC. TTI's false accusations have compromised future growth of EPC as a company and interfered with EPC's current customer relationships.

### TTI Has Failed to Make Timely Payments Pursuant to EPC's Invoices

125. Under the terms of the Agreement, TTI's payments for EPC's services were due "Net 120 effective from January 1, 2022." (MSA, § 4.2).

126. TTI has failed to make payments on multiple invoices that are over one-hundred and twenty (120) days old. A listing of the EPC's unpaid invoices is attached as Exhibit 2 to this Counterclaim, and all of these invoices are in TTI's possession.

127. Upon information and belief, TTI was emboldened to withhold payments from EPC due to its foreknowledge that, unbeknownst to EPC, TTI would be terminating its relationship with EPC prematurely, upon substituting cheaper Vietnamese suppliers for EPC.

128. On December 17, 2021, EPC issued TTI Invoice Number RG.172786 for $14,345.76.

129. On March 18, 2022, TTI paid $11,703.68, leaving a balance of $2,642.08 on Invoice Number RG.172786.

130. On May 20, 2022, TTI paid $133.04, leaving a remaining balance of $2,509.04 on

Invoice Number RG.172786.

131.    On July 11, 2022, TTI paid $303.94, leaving a remaining balance of $2,205.10 on Invoice Number RG.172786.

132.    On December 23, 2021, EPC issued TTI Invoice Number RG.172926 for $11,010.60.

133.    On July 15, 2022, TTI paid $3,980.80, leaving a balance of $7,029.80 on Invoice Number RG.172926.

134.    On January 15, 2022, EPC issued TTI Invoice Number RG.173362 for $635.12.

135.    On January 19, 2022, EPC issued TTI Invoice Number RG.174393 for $8,820.48.

136.    On May 20, 2022, TTI paid $4,410.24, leaving a remaining balance of $4,410.24 on invoice RG.174393.

137.    On January 24, 2022, EPC issued TTI Invoice Number RG.174675 for $6,878.88.

138.    On February 9, 2022, EPC issued TTI Invoice Number RG.175105 for $18,788.22.

139.    On February 13, 2022, EPC issued TTI Invoice Number RG.175164 for $34,848.00.

140.    On February 18, 2022, EPC issued TTI Invoice Number RG.174980 for $17,658.00.

141.    On February 20, 2022, EPC issued TTI Invoices Numbers RG.175229, RG.175243, and RG.175247 for a total amount of $81,098.40.

142.    On March 8, 2022, EPC issued TTI Invoice Number RG.175381 for $23,767.20.

143.    On March 21, 2022, EPC issued TTI Invoices Numbers RG.175468, RG.175469, RG.175470, and RG.175471 for a total amount of $142,732.80.

144.    On March 22, 2022, EPC issued TTI Invoices Numbers RG.175483 and

RG.175484 for a total amount of $51,196.80.

145.    On March 31, 2022, EPC issued TTI Invoice Number RG.175551 for $30,237.76.

146.    On July 29, 2022, TTI paid $26,458.04, leaving $3,779.72 remaining to be paid on the March 31, 2022 invoice.

147.    On April 19, 2022, EPC issued TTI Invoice Number RG.175721 for $26,294.40.

148.    On April 25, 2022, EPC issued TTI Invoice Number RG.175770 for $34,435.20.

149.    On April 26, 2022, EPC issued TTI Invoice Number RG.175796 for $31,884.16.

150.    On April 28, 2022, EPC issued TTI Invoice Number RG.175809 for $31,884.16.

151.    On May 3, 2022, EPC issued TTI Invoice Number RG.175830 for $26,859.60.

152.    On May 6, 2022, EPC issued TTI Invoice Number RG.175862 for $20,332.80.

153.    On May 10, 2022, EPC issued TTI Invoice Number RG.175885 for $32,244.80.

154.    On May 19, 2022, EPC issued TTI Invoice Number RG.176031 for $20,332.80.

155.    On May 24, 2022, EPC issued TTI Invoice Number RG.176069 for $20,332.80.

156.    On June 6, 2022, EPC issued TTI Invoice Number RG.176080 for $18,799.20.

157.    On June 15, 2022, EPC issued TTI Invoice Number RG.176220 for $35,270.40.

158.    On June 16, 2022, EPC issued TTI Invoices Numbers RG.176227, RG.176228, and RG.176230 for a total amount of $67,798.00.

159.    On June 17, 2022, EPC issued TTI Invoices Numbers RG.176233, RG.176234, RG.176236, RG.176237, RG.176238, and RG.176239 for a total amount of $211,795.20.

160.    On June 20, 2022, EPC issued TTI Invoices Numbers RG.176235, RG.176248, RG.176249, RG.176250, RG.176251, RG.176252, RG.176253, and RG.176254 for a total amount of $216,604.80.

161.    On June 21, 2022, EPC issued TTI Invoices Numbers RG.176263, RG.176264,

RG.176265, RG.176266, RG.176267, RG.176268, RG.176269, RG.176270, and RG.176271 for a total amount of $318,348.

162.    On June 22, 2022, EPC issued TTI Invoice Number RG.176275 for $20,361.60.

163.    On June 23, 2022, EPC issued TTI Invoices Numbers RG.176290 and RG.176291 for a total amount of $130,521.60.

164.    On June 23, 2022, EPC issued TTI Invoice Number RG.176292 for $35,270.40.

165.    On October 20, 2022 TTI paid $24,623.60, leaving a remaining balance of $10,646.80 on Invoice Number RG.176292.

166.    On June 23, 2022, EPC issued TTI Invoice Number RG.176293 for $20,361.60.

167.    On October 20, 2022 TTI paid $14,215.20, leaving a remaining balance of $6,146.40 on Invoice Number RG.176293.

168.    On June 23, 2022, EPC issued TTI Invoice Number RG.176294 for $20,361.60.

169.    On October 20, 2022, TTI paid $14,215.20, leaving a remaining balance of $6,146.40 on Invoice Number RG.176294.

170.    On June 23, 2022, EPC issued TTI Invoice Number RG.176295 for $27,075.60.

171.    On October 20, 2022, TTI paid $18,902.50, leaving a remaining balance of $8,173.10 on Invoice Number RG.176295.

172.    On June 23, 2022, EPC issued TTI Invoice Number RG.176296 for $27,075.60.

173.    On October 20, 2022, TTI paid $18,902.50, leaving a remaining balance of $8,173.10 on Invoice Number RG.176296.

174.    On June 23, 2022, EPC issued TTI Invoice Number RG.176297 for $27,075.60.

175.    On October 20, 2022, TTI paid $18,902.50, leaving a remaining balance of $8,173.10 on Invoice Number RG.176297.

4859-5505-3966.1

176.    On June 23, 2022, EPC issued TTI Invoice Number RG.176298 for $27,075.60.

177.    On October 20, 2022, TTI paid $18,902.50, leaving a remaining balance of $8,173.10 on Invoice Number RG.176298.

178.    On June 24, 2022, EPC issued TTI Invoices Numbers RG.176304, RG.176305, RG.176306, RG.176307, RG.176308, RG.176309, RG.176310, RG.176311, and RG.176312 for a total amount of $283,346.40.

179.    On June 27, 2022, EPC issued TTI Invoices Numbers RG.176317, RG.176318, RG.176320, and RG.176321 for a total amount of $111,264.00.

180.    On June 28, 2022, EPC issued TTI Invoices Numbers RG.176327, RG.176328, RG.176329, and RG.176330 for a total amount of $147,968.40.

181.    On June 29, 2022, EPC issued TTI Invoices Numbers RG.176319, RG.176331, RG.176332, RG.176333, RG.176334, and RG.176335 for a total amount of $203,600.40.

182.    On June 30, 2022, EPC issued TTI Invoices Numbers RG.176338, RG.176339, RG.176340, RG.176341, RG.176342, and RG.176343 for a total amount of $203,600.40.

183.    On July 1, 2022, EPC issued TTI Invoices Numbers RG.176346, RG.176347, RG.176348, RG.176349, RG.176350, and RG.176351 for a total amount of $161,179.20.

184.    On July 5, 2022, EPC issued TTI Invoices Numbers RG.176352, RG.176353, RG.176354, RG.176355, RG.176356, and RG.176359 for a total amount of $239,174.40.

185.    On July 6, 2022, EPC issued TTI Invoices Numbers RG.176369, RG.176370, RG.176371, RG.176372, RG.176373, RG.176374, RG.176375 for a total amount of $188,042.40.

186.    On July 7, 2022, EPC issued TTI Invoices Numbers RG.176380, RG.176381, RG.176382, RG.176383, RG.176384, and RG.176385 for a total amount of $164,937.60.

187.    On July 8, 2022, EPC issued TTI Invoices Numbers RG.176387, RG.176388,

RG.176389, RG.176390, RG.176391, and RG.176392 for a total amount of $161,179.20.

188.    On July 11, 2022, EPC issued TTI Invoices Numbers RG.176398, RG.176399, RG.176400, RG.176401, RG.901402, RG.901403, RG.901404, RG.901405, RG.901406 for a total amount of $153,543.04.

189.    On July 12, 2022, EPC issued TTI Invoices Numbers RG.176406, RG.176407, RG.176408, and RG.176409 for a total amount of $107,452.80.

190.    On July 13, 2022, EPC issued TTI Invoices Numbers RG.176412, RG.176413, RG.176414, RG.176415, and RG.176416 for a total amount of $158,443.20.

191.    On July 14, 2022, EPC issued TTI Invoices Numbers RG.176422, RG.176423, RG.176424, RG.176425, and RG.176426 for a total amount of $134,316.00.

192.    On July 15, 2022, EPC issued TTI Invoices Numbers RG.176430, RG.176431, RG.176432, RG.176433, and RG.176434 for a total amount of $174,528.00.

193.    On July 18, 2022, EPC issued TTI Invoices Numbers RG.176451, RG.176452, RG.176453, RG.176454, and RG.176455 for a total amount of $158,443.20.

194.    On July 19, 2022, EPC issued TTI Invoices Numbers RG.176462, RG.176463, RG.176464, RG.176465, and RG.176466 for a total amount of $134,316.00.

195.    On July 20, 2022, EPC issued TTI Invoices Numbers RG.176472, RG.176473, RG.176474, RG.176475, and RG.176476 for a total amount of $174,528.00.

196.    On July 21, 2022, EPC issued TTI Invoices Numbers RG.176477, RG.176478, RG.176479, RG.176480, and RG.176481 for a total amount of $134,316.00.

197.    On July 22, 2022, EPC issued TTI Invoices Numbers RG.176486, RG.176487, RG.176488, RG.176489, and RG.176490 for a total amount of $158,443.20.

198.    All of the aforementioned invoices were issued to TTI, but as of November 22,

4859-5505-3966.1

2022, over $10 million in these invoices remains unpaid by TTI, including $5,065,477.08 in invoices that are more than 120 days past due.

199.    To date, EPC has met all of its obligation to TTI under the MSA, yet TTI has failed to pay any of the above-referenced obligations.

### TTI Induces EPC to Continue Shipping Products By Making False Promises of Payment, But Instead Withholds Payment Of More Than $10 Million Due to EPC

200.    On October 25, 2022, following TTI's October 12, 2022 notification of termination, EPC, through its counsel Foley & Lardner LLP, requested confirmation that TTI wanted EPC to continue shipping the Products in accordance with TTI's releases during the months of October and November 2022, and that TTI intended to pay EPC for any Products shipped in October and November and during the prior months per the pay terms in the parties' Agreement.

201.    TTI, through its counsel Nelson Mullins Riley & Scarborough LLP, responded on October 28, 2022, confirming that:

        a.    TTI has not canceled any binding purchase orders under the Agreement;

        b.    EPC should ship products according to the binding purchase orders; and

        c.    TTI will continue to pay for all binding purchase orders according to all terms and conditions of the Agreement, ***including but not limited to the net 120 payment terms set forth in Section 4.2 of the Agreement***.

202.    Although TTI vaguely reserved the right to exercise setoff rights, it did not actually exercise that right at the time.  Rather, it inquired regarding Accounts Receivable balances over 90 days "so TTI can review."

203.    Thus, TTI promised to pay EPC within 120 days, as provided in Section 4.2 of the MSA.

204.    By indicating it would pay for all binding purchase orders, TTI implicitly identified a determinate sum of money under the Agreement ($$10,265,651.22 to be precise) in which EPC

28

would gain an ownership interest upon delivery of the Products in question.

205.    In reliance on TTI's representation, EPC continued making shipments of the Products to TTI's releases.

206.    Upon delivery of those products, EPC gained the right to ownership of the sum of money identified in the correspondence from TTI's counsel.

207.    Notwithstanding the above communication, TTI has not made any additional payment to EPC on any of the outstanding invoices.

208.    Instead, on November 23, 2022, after having received all the Products it apparently needed, TTI sent EPC a letter for the first time indicating that it would be not be issuing any payments on more than $10 million in outstanding accounts receivable, and would not be issuing any payment on any additional sums due or which may become due to EPC pursuant to the MSA.

209.    On November 30, 2022, in response to TTI's November 23, 2022 correspondence, EPC, in good faith, asked TTI to provide detailed breakdown of "TTI's total damages and costs" that are referenced in TTI's November 23 correspondence.

210.    Failing to reciprocate EPC's good faith in trying to resolve the issue, TTI refused to provide any breakdown of its claim to more than $10 million in damages, noting that it does "not see the value of engaging in extensive letter-writing campaign in this matter."

211.    TTI, without EPC's authorization, continues to exercise ownership rights over the determinate sum identified in the correspondence from TTI's counsel. EPC has delivered good quality products to TTI, which TTI sold to Home Depot and has collected for these products, while refusing to pay EPC for delivery of these products.

212.    This unauthorized exercise of ownership rights is to the exclusion of EPC, the rightful owner of the determinate sum.

213.     TTI's brazen and unjustified withholding of more than $10 million in EPC's accounts receivable, without any explanation or substantiation, placed EPC in difficult financial condition.

## COUNT I – BREACH OF CONTRACT ACCOMPANIED BY FRAUD[1]

214.     EPC incorporates by reference its allegations stated in the preceding paragraphs as if set forth in full herein.

215.     The MSA requires TTI to:

a.     Pay EPC for the Products that EPC manufactures at the prices specified in the MSA.  However, if the design and specifications of the Products change, future price agreements for product variations and other adjustments to the Products "shall be as mutually agreed by the parties," (MSA, § 4.1);

b.     Adjust the pricing for the Products based on an increase in resin raw material costs over five percent—with TTI agreeing in writing to adjust the prices to account for changes in the price of resin on a monthly basis, (MSA, § 4.1);

c.     Provide at least a six-month notice of termination without cause, and at least a 30-day notice of termination with cause, (MSA, § 21.2);

d.     Pay EPC on its invoices within 120 days, (MSA, § 4.2); and

e.     Otherwise act in good faith.

216.     The MSA also requires EPC to maintain minimum inventory levels (MSA, § 3.3), and to seek TTI's guidance as to what to do with TTI's Products and TTI Property post-termination (MSA, § 21.3).  The MSA therefore contemplates that TTI would reimburse EPC for inventory on hand in the event of termination.

---

[1] EPC respectfully reserves the right to plead breach of contract accompanied by fraud as a separate cause of action, in addition to its breach of contract claim, in the event that the Court rejects EPC's argument in its Motion to Dismiss TTI's Second Amended Complaint (Dkt. 96) that breach of contract accompanied by fraud is not an independent cause of action under South Carolina law.

217.   EPC has fully performed its obligations under the Agreement, and does not owe any damages to TTI pursuant to the Agreement.

218.   EPC has fully performed its obligations under the Agreement.

219.   TTI has materially breached the Agreement by its conduct described above, including, but not limited to:

a.   Terminating the MSA without cause and without proper notice;

b.   Refusing to grant and otherwise objecting to EPC's legitimate price adjustments expressly contemplated in the MSA;

c.   Refusing to pay EPC's invoices within 120 days of submission;

d.   Refusing to pay for EPC's capital expenditures, inventory on hand and inventory commitments made prior to termination, and refusing to pay for other components of EPC's obsolescence claim and other damages that EPC incurred when TTI improperly terminated the MSA; and

e.   Otherwise failing to act in good faith.

220.   As a result of TTI's breaches, EPC has suffered damages in excess of $75,000.

221.   TTI's breach of the MSA was accompanied by TTI's fraudulent intent to deceive EPC into believing that the Program would be long-term and no less than ten years in duration as part of its pre-meditated scheme to induce EPC into signing the MSA and continuing to expend significant resources to maintain high volumes for the Program for only one or two years before switching to cheaper overseas suppliers in breach of the MSA and transferring EPC's manufacturing processes, hard-work, and expertise to the new suppliers without EPC's permission.

222.   TTI's breach of the MSA was accompanied by the fraudulent acts of misrepresenting the longevity of the Program to EPC and fraudulently concealing TTI's true intentions of switching to cheaper overseas suppliers after only one or two years.

223.   Among other fraudulent acts, TTI's breach of the MSA was accompanied by: TTI misrepresenting that the Program would last at least ten years when in reality it had intended to,

and did, replace EPC with cheaper overseas alternatives within less than two years; ███████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  ██████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████

224.    EPC is entitled to punitive damages because TTI's breach of contract was accompanied by fraud.  EPC is also entitled to attorney's fees.

## COUNT II – DECLARATORY JUDGMENT

225.    EPC incorporates by reference its allegations stated in the preceding paragraphs as if set forth in full herein.

226.    There is a dispute between EPC and TTI regarding whether TTI had the right to terminate the MSA based upon EPC's price increases.

227.    EPC is entitled to a declaratory judgment that TTI had no right to terminate the MSA based upon EPC's price increases, and thus TTI breached the Agreement by terminating.

228.    There is also a dispute between EPC and TTI regarding whether EPC has the right to recover various significant capital investments, as well as its current inventory for the TTI business and other components of the typical obsolescence claim, in the event the termination were allowed to stand.

229.    There is also a dispute between EPC and TTI regarding whether TTI had any setoff rights based on any unpaid obligations under the MSA.

230.    EPC is entitled to declaratory judgment that TTI had no right to setoff, and thus TTI breached its obligation to pay EPC for various invoices.

231.    There is also a dispute between EPC and TTI regarding whether EPC materially breached the Agreement.

232.    EPC is entitled to declaratory judgment that EPC did not materially breach the Agreement.

### COUNT III – ACCOUNT STATED

233.    EPC incorporates by reference its allegations stated in the preceding paragraphs as if set forth in full herein.

234.    After EPC issued the Invoices to TTI as described in this Complaint and as summarized in Exhibit 2 to this Complaint, TTI did not timely dispute the amounts due in the invoices, and indeed, agreed to continue to pay for all purchase orders according to all terms and conditions of the Agreement, including but not limited to the net 120 payment terms set forth in Section 4.2 of the Agreement.

235.    Notwithstanding this, and despite EPC's repeated attempts at collecting payment, TTI has failed to pay on the outstanding invoices, leaving a total amount due and owing of $5,065,477.08 that is 120 days past due, and a total amount due and owing of $10,265,651.22 on all of the Invoices.

236.    EPC is also entitled to interest at the rate of eight and three-fourths percent per annum on the accounts stated under South Carolina law.

### COUNT IV – ACTION FOR AN ACCOUNTING

237.    EPC incorporates by reference its allegations stated in the preceding paragraphs as if set forth in full herein.

238.    EPC is entitled to an accounting regarding TTI's unilateral exercise of its setoff rights under the MSA and South Carolina law, in an amount exceeding $10 million.

239.    Determining EPC's right to payment and TTI's supposed setoff rights will involve

4859-5505-3966.1

analysis of long and complicated accounts that are not practical for a jury to comprehend.

240.    Determining EPC's right to payment and TTI's supposed setoff rights will require analyzing TTI's records relating to its purported "damages." EPC requires enhanced discovery into TTI's alleged damages, including discovery into TTI's relationships with its customer and their third parties which TTI claims it had to enter into as a result of EPC's breaches.

241.    An accounting is necessary to determine the proper amount of any alleged setoff rights claimed by TTI under the MSA and South Carolina law.

242.    EPC requested TTI to provide accounting of its setoff by letter of November 30, 2022, but TTI flatly refused to provide it.

243.    As such, EPC respectfully requests the Court to order TTI to provide an accounting of its unpaid obligations, including interest, which it asserts as part of its alleged set-off rights.

## COUNT V – CONVERSION

244.    EPC incorporates by reference its allegations stated in the preceding paragraphs as if set forth in full herein.

245.    TTI has exercised ownership rights over $10,265,651.22, a determinate sum of money.

246.    TTI identified this determinate sum in the above referenced correspondence from TTI's counsel.

247.    Upon fulfilling its obligations under the binding purchase orders in question, EPC gained an ownership right to that determinate sum.

248.    EPC notified TTI of its ownership interest in the determinate sum when EPC requested the delivery of the sum.

249.    Despite this notification, and without EPC's authorization, TTI has continued to exercise ownership rights over the determinate sum to the exclusion of EPC, the rightful owner.

250.    As described elsewhere in this Counterclaim, TTI, through its counsel, acted willfully, recklessly, or with conscious indifference to EPC's rights, in getting EPC to continue shipping the Products to TTI by promising to pay EPC and then, when EPC has completed the shipments, withholding the payment duly owed to EPC.

## COUNT VI – FRAUD IN THE INDUCEMENT CAUSING EPC TO PARTICIPATE IN THE PROJET UNDER FALSE PRETENSES

251.    EPC incorporates by reference its allegations stated in the preceding paragraphs as if set forth in full herein.

252.    Prior to EPC signing the MSA on or around January 15, 2021, TTI repeatedly represented to EPC that its involvement in the Program would be long-term, lasting for at least ten years.

253.    TTI's representations were materially false because from the outset, TTI had been planning to switch suppliers from EPC to cheaper overseas suppliers by the second year of the Program.

254.    In fact, TTI did terminate EPC's involvement in the Program in the Program's second year and replaced TTI with two cheaper Vietnamese suppliers – Goodmark and Minghao – as per its plan to do so from the beginning.



4859-5505-3966.1

256.    TTI intended for EPC to act upon its material misrepresentations by participating in the Program and working diligently toward its ends with the hopes of maintaining a long-term relationship as evidenced by, among other things, TTI's intentions to utilize EPC as ████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████

257.    EPC was completely unaware of TTI's intentions and/or willingness to switch from EPC to cheaper overseas suppliers shortly after the launch of the Program.

258.    EPC relied upon TTI's representations that its involvement in the Program would last for ten years or longer, and it would not have signed the MSA if it knew that TTI's true intentions were to switch suppliers prematurely.

259.    EPC had a right to rely upon TTI's representations regarding its intentions for the length of EPC's involvement and reasonably did so, as it had no way to uncover the truth behind TTI's intentions to switch suppliers prematurely.

260.    No amount of diligence by EPC could have uncovered the falsity of TTI's representations regarding the longevity of EPC's involvement in the Program.

261.    As a direct and proximate result of TTI's misrepresentations, TTI has been injured by, among other things, expending valuable, time, resources, energy, and expenses in an amount to be determined at trial.

## COUNT VIII – FRAUD IN THE INDUCEMENT CAUSING EPC TO CONTINUE TO EXPEND ITS TIME, ENERGY, AND RESOURCES UNDER FALSE PRETENSES

262.    EPC incorporates by reference its allegations stated in the preceding paragraphs as if set forth in full herein.

263.    On or around, and subsequent to, December 1, 2021, TTI repeatedly represented to

36

EPC that its intentions for the longevity of EPC's involvement in the Program had not changed as evidenced by, among other things, ███████████████████████████████████████ ████████████████████████████████████████████

264.    These representations were materially false because as of no later than December 1, 2021, TTI had already re-engaged with cheaper overseas suppliers, Goodmark and Minghao, to replace EPC, according to its original plan.

265.    TTI knew or recklessly disregarded the truth or falsity of these misrepresentations yet purposely kept its plans to replace EPC a secret from EPC so that EPC would continue its around-the-clock efforts.

266.    TTI intended for EPC to act upon its misrepresentations by continuing to expend significant costs and around-the-clock efforts, as evidenced by TTI employees' testimony spelling out the reasons behind its intent to mislead EPC.

267.    TTI even artificially inflated its demands to EPC to stockpile products in order to facilitate a smooth transition of the Program to cheaper Vietnamese suppliers.

268.    EPC was unaware of TTI's efforts to engage Minghao and Goodmark to replace EPC, thereby cutting short its involvement in the Program.

269.    EPC had a right to rely upon TTI's representations regarding its intentions for the length of EPC's involvement and reasonably did so, as it had no way to uncover the truth behind TTI's intentions to switch suppliers prematurely.

270.    No amount of diligence by EPC could have uncovered the falsity of TTI's representations regarding the longevity of EPC's involvement in the Program.

271.    As a direct and proximate result of TTI's misrepresentations, TTI has been injured by, among other things, expending valuable, time, resources, energy, and expenses in an amount

to be determined at trial.

## COUNT VIII – FRAUDULENT CONCEALMENT

272.    EPC incorporates by reference its allegations stated in the preceding paragraphs as if set forth in full herein.

273.    From in or around August of 2020, when TTI began communicating with EPC about the Program, until in or around October 2022, when it discontinued its relationship with EPC, TTI made repeated representations to EPC that its involvement in the Program would be long-term, for at least ten years.

274.    Throughout EPC's involvement in the Program, TTI concealed the fact that it had been planning to switch suppliers from EPC to cheaper overseas suppliers by the second year of the Program.

275.    TTI had a duty to disclose its true intentions to switch suppliers because, among other reasons, EPC demonstrated its trust and confidence in TTI in connection with the Program as evidenced by, among other things, the circumstances surrounding EPC's involvement in the Program, the nature of TTI and EPC's dealings in connection with the Program and their position towards each other.

276.    TTI's duty to disclose its true intentions to switch suppliers is triggered by, among other things, the Program itself calling for good faith and full disclosure.

277.    In addition, TTI had a duty to disclose its true intentions because the undisclosed facts, including TTI's plans to switch to cheaper overseas suppliers and its communications and agreements with Minghao and Goodmark, were accessible and knowable to only TTI. TTI knew that no amount of due diligence by EPC could uncover these material, undisclosed facts. And, TTI took active steps to conceal these facts by, among other things, instructing its employees to

4859-5505-3966.1

hide from EPC its efforts to obtain cheaper overseas substitutes.

278.    Furthermore, TTI's duty to disclose is triggered by the open-book nature of its relationship with EPC, in which trust and confidence was tantamount.



281.    TTI knowingly concealed the fact that it was planning to switch suppliers because it did not want EPC's efforts in connection with the Program to wane, and it was afraid that if it told EPC the truth, EPC could take steps to protect itself from continued harm at the hands of TTI.

282.    EPC was unaware of TTI's efforts to engage cheaper overseas suppliers to replace EPC, thereby cutting short its involvement in the Program.

283.    EPC had a right to rely upon TTI's representations regarding its intentions for the length of EPC's involvement and reasonably did so, as it had no way to uncover what TTI concealed.

284.    If EPC knew that TTI intended to switch suppliers prematurely, it would have never participated in the Program, nor would have continued its production efforts while TTI was courting and confirming its replacements.

285.    As a direct and proximate result of TTI's fraudulent concealment, TTI has been injured by, among other things, expending valuable, time, resources, energy, and expenses in an amount to be determined at trial.

4859-5505-3966.1

**WHEREFORE**, Defendant/Counter-Plaintiff EPC, having fully answered the allegations of the Complaint, respectfully requests that this Court enter an Order:

a.    Dismissing TTI's claims with prejudice;

b.    Granting judgment in favor of EPC and against TTI;

c.    Ordering TTI to provide accounting of its purported "setoff" claim;

d.    Awarding EPC all damages as a result of EPC's reliance on TTI's false assurances, misrepresentations, and fraudulent concealment;

e.    Awarding EPC punitive damages allowed under the law;

f.    Awarding EPC treble damages allowed under the law;

g.    Awarding EPC all attorney fees and costs permissible under the law; and

h.    Affording EPC all such other relief as this Court deems just and proper.

## <u>JURY TRIAL REQUEST</u>

Defendant/Counter-Plaintiff EPC respectfully requests trial by jury as to any claims and issues in TTI's Complaint against EPC and EPC's Counterclaim against TTI so triable.

*[Signature Block on the Following Page]*

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

/s/ Christopher B. Major
Christopher B. Major, Fed ID No. 9382
One North Main, 2nd Floor
Greenville, SC 29601
Telephone:  864.240.3200
Facsimile:  864.240.3300
Email:  cmajor@hsblawfirm.com

and

**FOLEY & LARDNER LLP**

Vanessa L. Miller (admitted *pro hac vice*)
Irina Kashcheyeva (admitted *pro hac vice*)
500 Woodward Avenue, Suite 2700
Detroit, MI 48226-3489
Telephone:  313.234.7100
Email:  vmiller@foley.com
Email:  ikashcheyeva@foley.com

*Attorneys for Defendant, Engineered Plastic Components, Inc.*

Date:  January 16, 2024