IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| TTI Consumer Power Tools Inc. *formerly known as* One World Technologies Inc. *doing business as* Techtronic Industries Power Equipment, | ) ) ) ) ) | Case No.: 8:22-cv-04085-JDA |
| Plaintiff/Counter Defendant, | ) ) | |
| v. | ) ) | **OPINION AND ORDER** |
| Engineered Plastic Components Inc., | ) ) ) | |
| Defendant/Counter Claimant. | ) ) | |

This matter is before the Court on a motion to dismiss filed by Defendant/Counter Claimant Engineered Plastic Components, Inc. ("EPC"). [Doc. 96.] For the reasons set forth below, the Court grants the motion in part and denies the motion in part.

Plaintiff/Counter Defendant TTI Consumer Power Tools, Inc. ("TTI") originally filed this action in the Anderson County Court of Common Pleas [Doc. 1-1], and EPC removed the matter to this Court on November 16, 2022 [Doc. 1]. On December 14, 2022, TTI filed an Amended Complaint [Doc. 22], and on August 2, 2023, TTI filed a Second Amended Complaint [Doc. 82]. On August 16, 2023, EPC filed the instant motion to dismiss. [Doc. 96.] TTI has filed a response to the motion to dismiss [Doc. 98], and EPC has filed a reply [Doc. 101]. Accordingly, the motion is ripe for review.[1]

---

[1] The case was reassigned to the undersigned on February 13, 2024. [Doc. 149.]

## BACKGROUND[2]

TTI, a manufacturer of power tools and outdoor products, determined in 2020 that it wanted to begin producing and supplying modular plastic storage products, including medium toolboxes, small toolboxes, small parts toolboxes, rolling boxes, and open crates (collectively, the "Products"), to Home Depot.  [Doc. 82 ¶¶ 7–8.]  The Products would be manufactured through a complex injection molding manufacturing process, which TTI needed to outsource to a third party with experience and technical capabilities with injection molding because TTI is not an injection molding manufacturer.  [*Id*. ¶ 11.]

**TTI Engaged EPC to Make the Products for Home Depot**

TTI requested a quote from EPC for the opportunity to manufacture the Products for TTI.  [*Id*. ¶ 14.]  In September 2020, TTI met with James Rank and Cheryl Rank from EPC and representatives from two EPC suppliers to discuss EPC's capabilities and pricing.  [*Id*. ¶ 15.]  During that meeting, EPC emphasized its experience and expertise with the materials and processes needed to manufacture the Products via the injection molding process and represented that it had open capacity at all its facilities to meet the forecasted demand.  [*Id*. ¶ 16.] EPC reassured TTI that it was able to perform the complex manufacturing processes and, in early 2021, showed TTI an example of a complex molding project it had done for an automotive client as demonstrative of EPC's capabilities and expertise.  [*Id*. ¶ 18.]  After multiple rounds of price negotiations and discussions about TTI's needs regarding production, storage, delivery, quality, and pricing, TTI awarded the business to EPC.  [*Id*. ¶ 20.]   After selecting EPC as its

---

[2] The facts included in this Background section are taken directly from the Second Amended Complaint.  [Doc. 82.]

2

manufacturer, TTI presented its final pricing quotes, which were based on the pricing terms agreed upon by TTI and EPC, to Home Depot.  [*Id*. ¶ 22.]

Home Depot agreed to TTI's proposal, including the proposed pricing, and initially wanted core placement of the Products in some of its stores by October 2021 to be followed by placement of the Products in additional stores in November 2021.  [*Id*. ¶¶ 23–24.]  EPC knew it was extremely important for the Products to launch on time for TTI to qualify for certain promotions and to eventually expand into the additional stores in November 2021.  [*Id*. ¶ 25.]

**The Master Supply Agreement**

On January 15, 2021, TTI and EPC entered into a Master Supply Agreement (the "MSA"), in which EPC agreed to manufacture, supply, and sell the Products to TTI in compliance with the terms set forth in the MSA.  [*Id*. ¶ 26.]  Per the terms of the MSA, EPC was required to:

    a. Allocate sufficient production and labor capacity to meet TTI's rolling forecast(s) of its expected purchases of the Products;

    b. Allocate sufficient production capacity to fulfill all purchase orders on time;

    c. Keep a minimum inventory of the Products on hand such that EPC's inventory of the Products did not fall below the "Minimum Inventory Level" set forth in Section 3.3 of the MSA;

    d. Manufacture the Products in compliance with TTI's specifications, quality standards, and instructions;

    e. Fulfill purchase orders in a commercially reasonable manner according to the terms of the applicable purchase orders and the [MSA];

f.   Deliver the Products "On-Time," which Section 5.3 of the [MSA] defined as: "a Delivery performed no more than two (2) days prior to or on, and no more than two (2) days later than, the original or rescheduled Delivery date as ordered by TTI";

g.   Comply with the various pricing provisions of the [MSA], which provided, *inter alia*:  (i) the Products' pricing would be set and adjusted according to the TTI Pricing File 111720 ("Pricing File") – which sets forth pricing proposed by EPC, itself–and Section 4.1 of the MSA; and (ii) any pricing modifications, including adjustments based on resin costs, as agreed upon in writing by both parties; and

h.   Comply with the [MSA]'s termination provisions, including but not limited to a requirement of six (6) months written notice prior to termination––or–where a specific set of circumstances occurs such as breach of the [MSA] and the breaching party fails to remedy the same within thirty (30) days of written notice thereof;

i.   Comply with the provisions in the MSA governing EPC's responsibility for defective Products and Products shipped in excess of those ordered *via* TTI' s Purchase Orders, including but not limited to complying with TTI's instructions and requests regarding the same;

j.   Hold TTI Property as bailee and fiduciary for TTI and not create or permit any liens, encumbrances, security interests, levies or charges against TTI Property in favor of EPC or anyone else;

k.   Upon request, permit TTI to access EPC's facility to obtain TTI Property, including molds and equipment, and remove such property from EPC's facility; and

l.   Upon termination of the [MSA], immediately return all TTI Property to TTI.

4

[*Id*. ¶ 28.]  When entering the MSA, TTI relied upon EPC's representations about its willingness and ability to supply the Products per the terms of the MSA.  [*Id*. ¶ 30.]

**EPC Failed to Meet Production Obligations**

Although EPC agreed to allocate sufficient production capacity to meet TTI's rolling forecasts of expected purchases of the Products and to fulfill all purchase orders on time, EPC immediately fell behind on setting up its facilities to manufacture the Products per the MSA's terms in time for the scheduled launch of the Products.  [*Id*. ¶¶ 39–40.]  EPC failed to hire and train labor; failed to prepare its manufacturing space and warehouse space for production; failed to acquire extra warehouse space needed for production; and failed to timely install the assembly cells to manufacture the Products.  [*Id*. ¶ 42.]  EPC's failure to prepare for production caused TTI to incur substantial losses and expenses, including sending TTI's personnel to EPC's facilities to build and otherwise acquire the fixtures needed to assemble the Products before the start of production.  [*Id*. ¶ 44.]  EPC's failure to prepare its facilities for production forced TTI to step in and expend its own resources to get EPC ready for production and delayed the process for working through the quality documentation, training personnel, and resolving any issues before launching the Products.  [*Id*. ¶ 45.]  Because EPC failed to meet the initial launch date, TTI was forced to request a six-month delay from Home Depot and to forfeit the original wide-scale launch, resulting in a much smaller launch of the Products.  [*Id*. ¶ 47.]

Once the Products were in production, it became clear that EPC had grossly misrepresented its capacity, capabilities, and expertise to manufacture the Products under the MSA's terms.  [*Id*. ¶ 49.]  Contrary to EPC's representations to TTI, EPC proved to be inexperienced and incapable of adequately handling the manufacturing processes

needed to make the Products, which slowed production even further.  [*Id*. ¶ 50.]  The production deficiencies were so severe that TTI had no choice but to use even more of its own resources to hold daily calls with EPC to try to get EPC' s production numbers on track.  [*Id*. ¶ 52.]  As a result of EPC's failure to meets its production obligations, TTI incurred various damages, including missed promotional opportunities and lost sales.  [*Id*. ¶ 59.]

**EPC Failed to Meet Minimum Inventory Requirements**

EPC also never satisfied the MSA's minimum inventory requirements.  [*Id*. ¶ 60.] Although the MSA provided for minimum inventory levels, EPC never had the warehouse space to comply with the minimum inventory requirements and never purchased additional warehouse space.  [*Id*. ¶¶ 62–64, 67, 71.]  The lack of warehouse space created problems, including EPC's turning away shipments of resin needed for production, which slowed and halted production of the Products, pushing production even further behind.  [*Id.* ¶ 74.]  Ultimately, TTI was forced to acquire the warehouse space needed to house the inventory.  [*Id.* ¶ 75.]

**EPC Failed to Meet Product Quality Obligations**

The Products EPC supplied also suffered from recurrent quality problems such as missing handles, missing wheels, missing labels, non-functional handles, and stripped screws.  [*Id.* ¶¶ 78–79.]  These quality problems resulted in customer returns, caused TTI to lose sales, required TTI to scrap some of the Products, and further hindered TTI's ability to deliver the Products to its customers in a timely manner.  [*Id.* ¶ 80.]  Ultimately, TTI was forced to hire a third party to monitor EPC's daily operations.  [*Id.* ¶ 82.]

**EPC Failed to Hire Sufficient Labor**

EPC also failed to hire sufficient labor to manufacture the Products.  [*Id.* ¶ 84.]  Once production was near, EPC began asking TTI to support EPC financially in acquiring adequate labor.  [*Id.* ¶ 87.]  TTI had to guide EPC through the process of seeking additional labor through third-party sources.  [*Id.* ¶¶ 89–90.]  Even then, however, EPC failed to hire sufficient labor.  [*Id.* ¶ 90.]

In January 2022, TTI sent a group of its employees to EPC's facility to run the production lines alongside EPC's employees because EPC was behind schedule, refused to hire sufficient labor to meet its obligations under the MSA, and was supplying Products with quality problems.  [*Id.* ¶ 95.]  TTI's employees remained at EPC's facility for several weeks.  [*Id.*]  As previously noted, TTI's employees also had to build the actual fixtures needed to assemble the Products before production started.  [*Id.* ¶ 96.]

**EPC Failed to Meet Its Delivery Obligations**

EPC consistently delivered the Products late.  [*Id.* ¶ 105.]  Because of these late deliveries, TTI was routinely forced to upgrade its shipping methods to meet its customer obligations.  [*Id.* ¶ 110.]  TTI also lost sales as a result of EPC's failure to deliver sufficient quantities of the Products on time.  [*Id.* ¶ 112.]

**EPC Demanded Pricing Adjustments**

Even though the MSA provided that pricing modifications must be agreed to in writing by both parties, EPC unilaterally demanded price increases on multiple occasions and threatened to, or did, stop shipping the Products if TTI did not comply with the increases pricing.  [*Id.* ¶¶ 119, 121.]  EPC demanded its first price increase in December 2021 because it was losing money under the MSA.  [*Id.* ¶ 122.]  On January 7, 2022, TTI

sent EPC a "Notice of breach & temporary price deviation" letter (the "January 2022 Letter"), agreeing under duress to pay temporarily higher prices until EPC could get its costs under control and notifying EPC of various breaches of the MSA.  [*Id.* ¶ 126 (internal quotation marks omitted).]  The January 2022 Letter indicated that the temporarily higher prices would be paid only from December 17, 2021, through January 31, 2022 (the "Deviation Period"), and that on February 1, 2022, the prices would return to those determined by the MSA unless the parties otherwise agreed to amended pricing.  [*Id.* ¶ 128.]  The January 2022 Letter also informed EPC that TTI was willing to negotiate amended pricing, wanted to execute any amended pricing agreement before the end of the Deviation Period, and proposed higher prices for after the Deviation Period.  [*Id.* ¶¶ 129–30.]

On March 17, 2022, EPC demanded its second price increase.  [*Id.* ¶ 131.]  On March 24, 2022, TTI informed EPC that it could not accept this second price increase demand and sent the maximum increased prices TTI would be willing to accept.  [*Id.* ¶ 133.]

**EPC Attempted to Terminate the Agreement**

On March 25, 2022, EPC's President and Chief Executive Officer, Reza Kargarzadeh, notified TTI that EPC considered the MSA "null and void, effective immediately."  [*Id.* ¶ 135 (internal quotation marks omitted).]  Kargarzadeh also directed his team at EPC to immediately stop shipments of the Products and cancel all trucks with the Products until TTI agreed to the second price increase.  [*Id.* ¶ 136.]  The same day, TTI sent EPC a second notice of breach (the "March 2022 Letter"), informing EPC that it had failed to cure the breaches described in the January 2022 Letter; that the March 2022

Letter constituted notice to EPC of its ongoing breach of the MSA; that the MSA remained in full force and effect under its terms despite Kargarzadeh's attempt to declare it null and void; and that Kargarzadeh's directive to stop all shipments constituted an additional breach of the MSA and/or repudiation of the contract. [*Id.* ¶¶ 137–38.] Finally, the March 2022 Letter informed EPC that TTI would take legal action if EPC did not continue to perform its obligations under the MSA and assure TTI of its willingness to do so by 12:00 p.m. on March 27, 2022. [*Id.* ¶ 139.]

**EPC Demanded Additional Price Increases**

On March 29, 2022, TTI sent EPC a "Notice and Temporary Pricing" letter (the "March 2022 Notice") to avoid a sudden cutoff of the Products. [*Id.* ¶ 140.] In the March 2022 Notice, TTI agreed under duress to pay temporarily higher prices for the remainder of the 2022 calendar year. [*Id.* ¶ 141.] The March 2022 Notice stated that TTI would pay the temporary higher prices "so long as EPC: (i) demand[ed] no additional price increases except as permitted under the [MSA], (ii) continue[d] to perform its obligations under the [MSA,] and (iii) no longer threaten[ed] to cease production or shipment." [*Id.* ¶ 143 (internal quotation marks omitted).] However, the March 2022 Notice informed EPC that if it did not meet these conditions, TTI would immediately revert to the pricing terms and conditions set forth in the MSA. [*Id.*]

On April 12, 2022, Kargarzadeh informed TTI that EPC would not agree to the terms in the March 2022 Notice and would again cease shipment of the Products unless TTI agreed to a third price increase for the month of April as well as monthly updates to the pricing moving forward. [*Id.* ¶ 145.] Two days later, TTI sent EPC a "Notice & Extended Temporary Pricing" letter (the "April 2022 Notice"), in which it agreed under

duress to pay temporarily higher prices for a third time.  [*Id.* ¶ 149 (internal quotation marks omitted).]  The April 2022 Notice again stated that TTI would pay the temporary higher prices "so long as EPC: (i) demand[ed] no additional price increases except as permitted under the [MSA], (ii) continue[d] to perform its obligations under the [MSA,] and (iii) no longer threaten[ed] to cease production or shipment."  [*Id.* ¶ 151 (internal quotation marks omitted).]  The April 2022 Notice also informed EPC that TTI would pay an additional reasonable price increase for the month of May 2022 if the parties confirmed the pricing before May 1, 2022, and that TTI would only pay the increased prices in April and May if EPC agreed to comply with the MSA's pricing beginning June 1, 2022.  [*Id.* ¶¶ 152–53.]

After the April 2022 Notice, EPC continued to demand monthly price increases in violation of the MSA, and TTI was forced to comply under duress to ensure EPC continued manufacturing and shipping the Products.  [*Id.* ¶¶ 155–56.]  Because of EPC's numerous, material, continuing, and uncured breaches of the MSA, TTI terminated the MSA and provided EPC with notice of the termination on October 12, 2022.  [*Id.* ¶ 158.]

**EPC Failed to Return TTI's Property**

On April 28, 2021, EPC notified TTI that it needed additional equipment to install the water-tight seal on the Products after molding.  [*Id.* ¶ 160.]  EPC indicated that TTI would need to fund the equipment, which would be installed on the Henkel machine (the "Henkel Seal Application") and would be a TTI asset.  [*Id.*]  EPC subsequently sent TTI an invoice for the cost of the Henkel Seal Application, which TTI paid.  [*Id.* ¶ 162.] Pursuant to the MSA and EPC's admission that the Henkel Seal Application would be a

TTI asset, TTI owns the Henkel Seal Application.  [*Id.* ¶ 164.]  EPC, however, failed to return the Henkel Seal Application to TTI upon termination of the MSA.  [*Id.* ¶ 165.]

In January 2023, TTI notified EPC that it needed to return the Henkel Seal Application to TTI by the end of February 2023.  [*Id.* ¶ 166.]  EPC responded on January 10, 2023, claiming that it owned, had modified, and would not return the Henkel Seal Application.  [*Id.* ¶ 167.] On January 27, 2023, EPC filed an improper molder's lien against the Henkel Seal Application.  [*Id.* ¶ 172.]

**EPC Shipped Excess and Defective Products After Termination of the MSA**

After TTI terminated the MSA, EPC shipped more Products to TTI than TTI had ordered, and the final shipments included thousands of defective Products.  [*Id.* ¶¶ 174–76.] On February 16, 2023, TTI informed EPC of the excess and defective Products and indicated that it would keep the excess Products that were of acceptable quality and would set off the contract price for those products against the sums EPC still owed to TTI.  [*Id.* ¶ 178.]  TTI also requested that EPC retrieve the defective Products, destroy them, and send proof of their destruction; however, EPC denied shipping excess and defective products.  [*Id.* ¶¶ 179, 181.]

**TTI Filed This Action**

TTI then filed this action, which now asserts causes of action against EPC for breach of contract, breach of contract accompanied by a fraudulent act, fraud in the inducement, negligent misrepresentation, tortious interference with an existing contract, violation of the South Carolina Unfair and Deceptive Trade Practices Act, quantum meruit/unjust enrichment, setoff and deductions, and conversion.  [*Id.* ¶¶ 185–263.]  TTI seeks actual, consequential, and punitive damages; liquidated damages; setoffs and

deductions from any sums allegedly still owed under the MSA; treble damages; and costs, pre-judgment interest, and attorneys' fees.  [*Id.* at 43.]

## **APPLICABLE LAW**

**Motion to Dismiss Standard**

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a claim should be dismissed if it fails to state a claim upon which relief can be granted.  When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff."  *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  However, the court "need not accept the legal conclusions drawn from the facts," nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments."  *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).  Further, for purposes of a Rule 12(b)(6) motion, a court may rely on only the complaint's allegations and those documents attached as exhibits or incorporated by reference.  *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985).  If matters outside the pleadings are presented to and not excluded by the court, the motion is treated as one for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(d).

With respect to well-pleaded allegations, the United States Supreme Court explained the interplay between Rule 8(a) and Rule 12(b)(6) in *Bell Atlantic Corp. v. Twombly*:

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's

> obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

550 U.S. 544, 555 (2007) (footnote and citations omitted); *see also* 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, at 235–36 (3d ed. 2004) ("[T]he pleading must contain something more . . . than a bare averment that the pleader wants compensation and is entitled to it or a statement of facts that merely creates a suspicion that the pleader might have a legally cognizable right of action.").

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The plausibility standard reflects the threshold requirement of Rule 8(a)(2)—the pleader must plead sufficient facts to show he is entitled to relief, not merely facts consistent with the defendant's liability. *Twombly*, 550 U.S. at 557; *see also Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible the plaintiff is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).

**Pleading Fraud Under Rule 9(b)**

Claims of fraud are held to a heightened pleading standard.  Rule 9(b) of the Federal Rules of Civil Procedure requires that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  The Fourth Circuit Court of Appeals has held that Rule 9(b) requires pleading with particularity the time, place, and contents of the false representations, as well as the identity of the person making the representations.  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  Rule 9(b) serves four purposes: (1) to put defendants on notice so that they have sufficient information to formulate a defense; (2) to protect defendants from frivolous suits; (3) to eliminate fraud actions in which all facts are learned after discovery; and (4) to protect defendants from harm to their goodwill and reputation.  *Id.*

"[L]ack of compliance with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule 12(b)(6)."  *Id*. at 783 n.5.  The Fourth Circuit has cautioned that "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Id*. at 784.

## <u>DISCUSSION</u>

EPC argues that each of TTI's claims should be dismissed because they are either invalid as a matter of law or TTI fails to allege sufficient facts to state a plausible claim for

relief under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.  [Doc. 96-3.]
The Court addresses TTI's claims seriatim.

**Breach of Contract**

"The elements for breach of contract are the existence of the contract, its breach,
and damages caused by such breach."  *Branche Builders, Inc. v. Coggins*, 686 S.E.2d
200, 202 (S.C. Ct. App. 2009).  The Court concludes that, at this stage of the litigation,
TTI has sufficiently alleged the elements of a breach of contract to survive a motion to
dismiss.

The parties do not dispute the existence of a binding contract.  Instead, EPC
argues that the Second Amended Complaint fails to identify specific provisions in the MSA
that EPC allegedly violated.  [Doc. 96-3 at 9–12.]  However, the Second Amended
Complaint alleges that EPC breached production obligations, minimum inventory
requirements, product quality obligations, delivery obligations, pricing provisions,
termination provisions, return of property provisions, and destruction of property
provisions.  [Doc. 82 ¶¶ 39–83, 98–184.]  Additionally, the Second Amended Complaint
alleges that these breaches resulted in damages for TTI.  [*E.g.*, *id.* ¶¶ 44, 47, 57, 59, 75–
76, 82, 97, 109–12, 157.]  Accordingly, the Court concludes that the Second Amended
Complaint sufficiently alleges a short and plain statement of this claim for breach of
contract, and EPC's arguments relate to factual matters better addressed on a record
than on the pleadings.

**Breach of Contract Accompanied by a Fraudulent Act**

To establish a claim for breach of contract accompanied by a fraudulent act, a
plaintiff must demonstrate: "(1) a breach of contract; (2) fraudulent intent relating to the

breaching of the contract and not merely to its making; and (3) a fraudulent act accompanying the breach." *Connor v. City of Forest Acres*, 560 S.E.2d 606, 612 (S.C. 2002). The Court concludes that, at this stage of the litigation, TTI has sufficiently alleged the elements of a breach of contract accompanied by a fraudulent act to survive a motion to dismiss.

EPC argues that TTI fails to state a claim for breach of contract accompanied by a fraudulent act because this claim is not an independent claim under South Carolina law; TTI does not allege a breach of contract; and TTI has failed to plead fraudulent intent and a fraudulent act with particularity under the heightened pleading standard in Rule 9(b) of the Federal Rules of Civil Procedure. [Doc. 96-3 at 12–18.] Although EPC is correct that in South Carolina "[t]here is no cause of action distinct from breach of contract for breach of contract accompanied by a fraudulent act," *Smith v. Canal Ins. Co.*, 269 S.E.2d 348, 350 (S.C. 1980), it has directed the Court to no cases dismissing a claim for breach of contract accompanied by a fraudulent act on a Rule 12(b)(6) motion. Indeed, the Court's independent research has revealed cases where courts have allowed both a claim for breach of contract and a claim for breach of contract accompanied by a fraudulent act to move forward at the motion to dismiss stage. *See DAS Ventures LLC v. Pure Fishing Inc.,* No. 3:23-cv-596-JFA, 2023 WL 11887253, at *2–4 (D.S.C. July 11, 2023) (denying a motion for partial dismissal as to breach of contract and breach of contract accompanied by fraudulent act claims against one defendant); *Lowery v. Metro. Life Ins. Co.*, No. 7:20-cv-1469-TMC, 2020 WL 10758551, at *5–7 (D.S.C. Dec. 23, 2020) (denying a motion to dismiss a breach of contract claim and granting leave to amend to assert a separate claim for breach of contract accompanied by a fraudulent act); *Ateyeh v. Volkswagen of*

16

*Florence, Inc.*, 341 S.E.2d 378, 379 (S.C. 1986) (reversing the trial court's sustaining of demurrers to causes of action for breach of contract and breach of contract accompanied by a fraudulent act and concluding that a widow had the capacity to sue for breach of her spouse's health insurance policy and could also, therefore, seek punitive damages for breach of contract accompanied by fraudulent act).  Moreover, as previously stated and as EPC acknowledges, to prove a claim for breach of contract accompanied by a fraudulent act, a plaintiff must establish more than is needed for a breach of contract claim because the plaintiff must establish a breach of contract *and* that the breach was accomplished with a fraudulent intent and was accompanied by a fraudulent act.  If the plaintiff proves all these elements, it is entitled to punitive damages.  *Smith*, 269 S.E.2d at 350.  Thus, dismissing TTI's claim for breach of contract accompanied by a fraudulent act would eliminate the possibility for TTI to recover punitive damages.

The Court has already concluded that the Second Amended Complaint sufficiently alleges a breach of contract claim; accordingly, the Court turns to EPC's argument that TTI has failed to plead fraudulent intent and a fraudulent act with particularity under the heightened pleading standard in Rule 9(b).  Courts in this district have held that a claim for breach of contract accompanied by a fraudulent act is subject to the heightened pleading standard of Rule 9(b).  *DAS Ventures LLC*, 2023 WL 11887253, at *3 (collecting cases).  "Fraudulent act" is defined as "any act characterized by dishonesty in fact or unfair dealing."  *Conner*, 560 S.E.2d at 612.

Here, TTI alleges that EPC's breaches were characterized by dishonesty or unfair dealing.  For example, TTI alleges that "EPC's representations regarding its pre-launch preparations were designed to prevent TTI from discovering that EPC had no intention of

actually taking the needed steps to prepare for launch until the last possible second, all in an effort to ensure EPC incurred the lowest possible overhead costs while ultimately forcing TTI to absorb the costs associated with preparing EPC's facilities for Production." [Doc. 82 ¶ 43.]    Additionally, TTI provides "illustrative (but non-exhaustive) list[s] of communications"—including the times, places, and contents of the representations and who made the representations—where EPC made representations to TTI that were allegedly part of a scheme to prevent TTI from recognizing EPC's breaches.    [*E.g.*, *id.* ¶¶ 70, 86; *see id.* ¶ 197 (alleging that the circumstances surrounding EPC's various breaches "evidence a dishonest design and devious scheme orchestrated in an effort to secure and keep TTI's business . . . while passing its own costs off to TTI").]    Upon review, the Court concludes that TTI has satisfied the heightened pleading standard required by Rule 9(b) to state a claim for breach of contract accompanied by a fraudulent act.

**Fraud in the Inducement**

To establish a claim for fraud in the inducement, a plaintiff must prove all nine elements of fraud and the following three elements: "(1) that the alleged fraudfeasor made a false representation relating to a present or preexisting fact; (2) that the alleged fraudfeasor intended to deceive him; and (3) that he had a right to rely on the representation made to him."    *Moseley v. All Things Possible, Inc.*, 694 S.E.2d 43, 45 (S.C. Ct. App. 2010) (internal quotation marks omitted).    The nine elements of fraud are:

> (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

18

*Id.* (internal quotation marks omitted). The Court concludes that TTI has sufficiently alleged the elements of fraud in the inducement to survive a motion to dismiss.

EPC argues that the Second Amended Complaint fails to allege sufficient facts to show that EPC did not have the sincere intent to fulfill its promises, that EPC knew of the falsity of any statements when it submitted its bid before January 2021, or that TTI reasonably relied on any promises outside of the MSA and fails to plead fraud with particularity. [Doc. 96-3 at 18–24.] The Second Amended Complaint alleges that TTI had an in-person meeting in Anderson, South Carolina, in September 2020 with James Rank and Cheryl Rank from EPC and representatives from two EPC suppliers. [Doc. 82 ¶ 15.] During that meeting, "EPC emphasized its experience and expertise with the materials and processes needed to manufacture the Products *via* the injection molding process." [*Id.* ¶ 16.] EPC "was aware the project was TTI's first endeavor into this type of injection molding with a domestic manufacturer and TTI was relying upon EPC's manufacturing expertise." [*Id.* ¶ 17.] When representatives from TTI visited one of EPC's facilities in early 2021, EPC showed TTI "an example of a complex molding project it had done for an automotive client as demonstrative of EPC's capabilities and expertise." [*Id.* ¶ 18.] However, TTI alleges that contrary to EPC's representations "about its expertise and capabilities to handle the manufacturing processes needed to produce the Products, EPC proved to be inexperienced and incapable of adequately handling the manufacturing processes needed to make the Products" and that the sample molding project EPC had shown to TTI "was actually the work product of an entirely different entity." [*Id.* ¶ 50.] Upon review, the Court concludes that TTI has adequately pled the elements of a claim for fraud in the inducement with sufficient particularity.

19

**Negligent Misrepresentation**

To state a valid claim for negligent misrepresentation, a plaintiff must establish:

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance on the representation.

*Quail Hill, LLC v. Cnty. of Richland*, 692 S.E.2d 499, 508 (S.C. 2010). The Court concludes that TTI's negligent misrepresentation claim should be dismissed.

EPC argues that TTI is barred from bringing a negligent misrepresentation claim by the economic loss doctrine. [Doc. 96-3 at 24–25.] The economic loss rule bars a tort claim "where duties are created *solely* by contract." *Kennedy v. Columbia Lumber & Mfg. Co.*, 384 S.E.2d 730, 737 (S.C. 1989). Whether duties are created solely by contract "turns on the determination of the source of the duty plaintiff claims the defendant owed." *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88 (S.C. 1995). On the one hand, "[a] breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie." *Id.* However, "[a] breach of a duty arising independently of any contract duties between the parties . . . may support a tort action." *Id.* Thus, "[i]n most instances, a negligence action will not lie when the parties are in privity of contract [unless] there is a special relationship between the alleged tortfeasor and the injured party not arising in contract." *Id.*

TTI argues it has a special relationship with EPC that gives rise to duties independent of contractual duties.[3]  [Doc. 98 at 21–22.]  More specifically, TTI argues that "EPC violated a duty imposed by tort law – *i.e.*, the duty not to commit fraud" and that EPC had a separate duty of disclosure because provisions in the MSA "create[d] a fiduciary relationship on the part of EPC as to TTI."  [*Id.*]   However, a review of the Second Amended Complaint shows that TTI's negligent misrepresentation claim is based solely on contractual duties because TTI alleges that "EPC owed a duty of care to TTI to convey truthful information to TTI regarding its ability to timely supply the Products *in accordance with the terms of the Agreement.*"  [Doc. 82 ¶ 216 (emphasis added).]  As to TTI's argument that EPC owed it a duty not to commit fraud, that duty is covered by TTI's claim for fraud in the inducement.  *Cf. Harrell v. BMW of N. Am., LLC*, 517 F. Supp. 3d 527, 540 (D.S.C. 2021) (recognizing that courts often apply the economic loss doctrine to dismiss negligence and negligent misrepresentation claims but that its application to fraud claims is not settled).  With respect to TTI's assertion that EPC had a separate duty of disclosure because the MSA created a fiduciary relationship, the Court notes that the

---

[3] TTI also argues that the economic loss doctrine is an affirmative defense and that a motion to dismiss filed under Rule 12(b)(6) generally cannot reach the merits of an affirmative defense.  [Doc. 98 at 20.]  However, as TTI also acknowledges [*id.*], "where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)," *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).  Here, the Second Amended Complaint provides sufficient facts for EPC to raise the economic loss doctrine in a motion to dismiss and for the Court to conclude that TTI's negligent misrepresentation claim is barred by the economic loss doctrine.  *See Godawa v. Dixie Camper Sales of S.C., Inc.*, No. 6:16-1101-HMH, 2016 WL 3125459, at *5 (D.S.C. June 2, 2016) (granting a motion to dismiss a negligence claim as barred by the economic loss doctrine).

MSA provides that EPC "shall hold TTI Property[4] as bailee and fiduciary for TTI." [Doc. 96-1 ¶ 14.2 (footnote added).] Therefore, to the extent the MSA created any fiduciary relationship between TTI and EPC, it was limited to EPC's holding TTI's Property as bailee. But, as stated, TTI's negligent misrepresentation claim is premised on EPC's alleged duty "to convey truthful information . . . regarding its ability to timely supply the Products in accordance with the terms of the Agreement." [Doc. 82 ¶ 216.] Accordingly, the negligent misrepresentation claim is not alleged to be based on any fiduciary relationship between the parties. Upon review, the Court concludes that the negligent misrepresentation claim is barred by the economic loss doctrine.

**Tortious Interference with an Existing Contract**

"The elements of a cause of action for tortious interference with contract are: (1) the existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages." *Camp v. Springs Mortg. Corp.*, 426 S.E.2d 304, 305 (S.C. 1993). "[A]n action for tortious interference protects the property rights of the parties to a contract against unlawful interference by third parties." *Threlkeld v. Christoph*, 312 S.E.2d 14, 15 (S.C. Ct. App. 1984). The Court concludes that TTI's tortious interference with an existing contract claim should be dismissed.

EPC argues that TTI has failed to state a claim for tortious interference with an existing contract because: "(a) TTI does not and cannot allege facts to suggest that EPC

---

[4] The MSA defines TTI Property as "Any molds and tooling . . . and other materials . . . and equipment owned and supplied by TTI or developed or procured by [EPC] for TTI or otherwise containing TTI or its Affiliate's designs or other Intellectual Property Rights that has been or is being placed into the possession of" EPC. [Doc. 96-1 ¶ 14.1.]

acted intentionally in procuring any breach; (b) TTI does not allege any breach of contract with TTI by Home Depot or any other third party; (c) TTI cannot establish that EPC is a stranger to the TTI-Home Depot business relationship; and (d) TTI cannot adequately plead the absence of justification on the part of EPC."  [Doc. 96-3 at 26.]  The Court agrees that TTI does not sufficiently allege any breach of contract with Home Depot or another third party.

The Second Amended Complaint alleges that "EPC intentionally procured breaches of the contracts between TTI and its customers" [Doc. 82 ¶ 225], but it fails to allege any factual allegations to support this conclusory allegation, *see Twombly*, 550 U.S. at 555 (holding that "a formulaic recitation of the elements of a cause of action will not do" under Rule 8(a) and that "[f]actual allegations must be enough to raise a right to relief above the speculative level").  A review of the Second Amended Complaint reveals no allegations that any contract with a TTI customer was actually breached.  *See Alexander v. S.C. Dep't of Transp.*, No. 3:20-4480-TLW-SVH, 2021 WL 5167807, at *12 (D.S.C. Aug. 23, 2021) (concluding that a complaint failed to state a claim a claim for tortious interference with contractual relations where the complaint "failed to identify the terms of the contract at issue that were allegedly breached, how those terms were breached, or how those terms were intentionally breached by [d]efendants"), *Report and Recommendation adopted by* 2021 WL 5166400 (D.S.C. Nov. 4, 2021), *appeal dismissed*, 2022 WL 898489 (4th Cir. Mar. 28, 2022).  TTI argues that "all that is required" is an allegation "that EPC interfered with TTI's contractual relations with its customers" and that the Restatement (Second) of Torts supports its position because it provides that a party who causes another party's performance under a contract to be more expensive

or burdensome is subject to liability for the resulting pecuniary loss.  [Doc. 98 at 23–24.]

However, this argument ignores South Carolina case law holding that "[a]n essential

element to the cause of action for tortious interference with contractual relations requires

the intentional procurement of the contract's breach" and "[w]here there is no breach of

the contract, there can be no recovery."  *Eldeco, Inc. v. Charleston Cnty. Sch. Dist.*, 642

S.E.2d 726, 732 (S.C. 2007).  Thus, because the Second Amended Complaint does not

allege sufficient facts to plead that any contract between TTI and a third party was

breached, EPC is entitled to dismissal of the tortious interference with an existing contract

claim.[5]

**South Carolina Unfair Trade Practices Act**

The South Carolina Unfair Trade Practices Act ("SCUTPA") prohibits "[u]nfair

methods of competition and unfair or deceptive acts or practices in the conduct of any

trade or commerce."  S.C. Code Ann. 39-5-20(a).  To state a claim under the SCUTPA,

a plaintiff must allege:

> (1) that the defendant engaged in an unlawful trade practice,
> (2) that the plaintiff suffered actual, ascertainable damages as
> a result of the defendant's use of the unlawful trade practice,
> and (3) that the unlawful trade practice engaged in by the
> defendant had an adverse impact on the public interest.

*Havird Oil Co. v. Marathon Oil Co.*, 149 F.3d 283, 291 (4th Cir. 1998).  "Under South

Carolina law, unfair or deceptive acts have an adverse impact upon the [public] if those

acts have the potential for repetition."  *Ameristone Tile, LLC v. Ceramic Consulting Corp.*,

966 F. Supp. 2d 604, 621 (D.S.C. 2013) (alteration in original) (internal quotation marks

---

[5] Because the Court concludes that the tortious interference with an existing contract
claim is dismissed on this basis, it declines to address EPC's alternative arguments
regarding this claim.

omitted).  "Potential for repetition can be demonstrated by either showing the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence or showing the company's procedures created a potential for repetition of the unfair and deceptive acts."  *Id*. (internal quotation marks omitted).  Conduct "that affects only the parties to the transaction and not the public interest provides no basis for a SCUTPA claim."  *Id*. (internal quotation marks omitted).

EPC argues that TTI fails to state a claim for violation of the SCUTPA because it has failed to plead facts to show that EPC engaged in an unlawful trade practice and that the unlawful trade practice had an adverse impact on the public interest because the practice was capable of repetition.  [Doc. 96-3 at 29–32.]  The Court concludes that TTI has not plausibly alleged an adverse impact on the public interest because the conduct complained of in this matter affects only TTI and EPC as the parties to the MSA.  Although TTI contends that it has specifically alleged prior unfair and deceptive conduct by EPC in relation to other entities [Doc. 98 at 28 (citing Doc. 82 ¶¶ 236, 237)], the Court concludes that these allegations are insufficient to plead an adverse impact on the public interest.  With respect to TTI's allegation that EPC "engaged in substantially similar unfair and deceptive conduct in relation to other commercial dealing with other companies," including Troxel Company and Specialty Plastics, Inc. [Doc. 82 ¶ 236], a review of the Second Amended Complaint shows that it fails to allege any factual allegations to support this conclusory allegation, *see Twombly*, 550 U.S. at 555.  And TTI's allegation that EPC "provid[ed] an initial quote to TTI which included . . . pricing for the Products that EPC knew was not sustainable and which it would later dishonor in an effort to induce TTI to enter into the MSA thereby gaining an unfair competitive advantage over its competitors"

and ousting its competitors from the opportunity to manufacture the Products does no more than reallege its breach of contract and fraud in the inducement claims. *See Ardis v. Cox,* 431 S.E.2d 267, 271 (S.C. Ct. App. 1993) ("A deliberate or intentional breach of a valid contract, without more, does not constitute a violation of the SCUTPA. Otherwise, every intentional breach of a contract within a commercial setting would constitute an unfair trade practice and thereby subject the breaching party to treble damages." (internal citation omitted)). Finally, even though TTI argues that its "allegations demonstrate that EPC lacks the policies and procedures to prevent the same unfair and deceptive practices from repeating in the future" [Doc. 98 at 28], no factual allegations in the Second Amended Complaint plausibly allege that EPC's procedures create a potential for repetition of the allegedly unfair and deceptive acts. Accordingly, EPC is entitled to dismissal of the claim for violation of the SCUTPA.

**Quantum Meruit/Unjust Enrichment**

"Unjust enrichment is an equitable doctrine which permits the recovery of that amount the defendant has been unjustly enriched at the expense of the plaintiff." *Dema v. Tenet Physician Servs.-Hilton Head, Inc.*, 678 S.E.2d 430, 434 (S.C. 2009). Absent an express contract, recovery under quantum meruit is based on quasi-contract, the elements of which are: "(1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value." *Ellis v. Smith Grading & Paving, Inc.*, 366 S.E.2d 12, 15 (S.C. Ct. App. 1988). The Court concludes that TTI has sufficiently alleged a claim for quantum meruit/unjust enrichment to survive a motion to dismiss.

EPC argues that TTI's claim for quantum meruit/unjust enrichment is barred because a plaintiff cannot recover under a quantum meruit theory if the compensation sought is provided for in the terms of an express contract between the parties.  [Doc. 96-3 at 32–33.]  However, "[a] breach of contract claim and quantum meruit claim can be alternative rather than inconsistent remedies."  *JASDIP Props. SC, LLC v. Estate of Richardson*, 720 S.E.2d 485, 488 (S.C. Ct. App. 2011).  Accordingly, the Court denies EPC's motion to dismiss the quantum meruit/unjust enrichment claim.  *See Gillins v. Celadon Trucking Servs., Inc.*, No. 2:16-cv-11795-DCN, 2016 WL 4455018, at *6 (D.S.C. Aug. 24, 2016) (denying a motion to dismiss and allowing claims for breach of contract and quantum meruit/unjust enrichment to proceed).

## Setoff and Deductions

"Setoff" is defined as "[a] defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim."  SETOFF, Black's Law Dictionary (12th ed. 2024).  EPC argues that TTI's claim for setoff and deductions fails because setoff is not an independent cause of action under South Carolina law, and, further, Section 4.5 of the MSA establishes only a defensive right to setoff, and Sections 5.4, 12.3, 19.1, and 19.2 and Schedules 6 and 10 do not provide a cause of action separate from a general breach of contract claim.  [Doc. 96-3 at 33.]  "[B]ecause [it] initiated the instant litigation, Plaintiff[] cannot assert a claim for [setoff]."  *Mach. Sols., Inc. v. Doosan Mach. Tool Am. Corp.*, No. 3:16-cv-02718-JMC, 2017 WL 1062522, at *4 (D.S.C. Mar. 21, 2017) (citing cases for the proposition that a setoff is a counterclaim and dismissing a declaratory judgment action where the only identifiable claim was for setoff), *order amended on reconsideration*, No. 3:16-cv-02718-JMC, 2018 WL 661468 (D.S.C. Feb. 2,

2018); *see also Mach. Sols., Inc.*, 2018 WL 661468, at *3 (stating that the court's "additional review of South Carolina appellate court decisions regarding [setoff] . . . reaffirmed that [setoff] is generally considered an affirmative defense or counterclaim" and citing cases).  TTI has directed the Court to no case allowing a plaintiff to assert a claim for setoff and deductions in a complaint.[6]  Accordingly, EPC is entitled to dismissal of TTI's claim for setoff and deductions.[7]

**Conversion**

"Conversion is the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights."  *Green v. Waidner*, 324 S.E.2d 331, 333 (S.C. Ct. App. 1984) (internal quotation marks omitted).  "Conversion may arise by some illegal use or misuse, or by illegal detention of another's personal property."  *Regions Bank v. Schmauch*, 582 S.E.2d 432, 442 (S.C. Ct. App. 2003).  "To prevail in a conversion action, the plaintiff must prove either title to or a right to possession of the personal property at the time of the conversion."  *Causey v. Blanton*, 314 S.E.2d 346, 348 (S.C. Ct. App. 1984). Conversion cannot arise from a defendant's exercise of a legal right over the property.

---

[6] TTI contends that *Palmetto State Bank v. Johnson*, No. 1:16-cv-03800-JMC, 2017 WL 4012308 (D.S.C. Sept. 12, 2017), supports its position that setoff can be raised as an independent cause of action.  [Doc. 98 at 29–30.]  However, nothing in *Palmetto State Bank* provides that a plaintiff may assert setoff as a cause of action in a complaint. Indeed, *Palmetto State Bank* recognizes that "[t]he *defense* of setoff has the nature and effect of an independent action by the defendant against the plaintiff, and may be raised *as a counterclaim*."  2017 WL 4012308, at *3 (emphases added) (internal quotation marks omitted).

[7] The Court notes that TTI has also raised setoff as an affirmative defense to EPC's Second Amended Counterclaim.  [Doc. 146 ¶¶ 300–03.]

*Castell v. Stephenson Finance Co.*, 135 S.E.2d 311, 313 (S.C. 1964).  The Court concludes that TTI's allegations sufficiently plead a conversion claim.

EPC argues that TTI's conversion claim fails because the Second Amended Complaint fails to allege that EPC's possession of the Henkel Seal Application was wrongful and because TTI's remedies are covered by the MSA.  [Doc. 96-3 at 33–35.] Upon review, the Court concludes that TTI has plausibly alleged a conversion claim with respect to the Henkel Seal Application.  Although "[c]onversion consists of conduct more onerous than a simple breach of contract," *Trevillyan v. APX Alarm Sec. Sys.*, No. 2:10-1387-MBS, 2011 WL 11611, at *6 (D.S.C. Jan. 3, 2011), here, TTI alleges more than a simple breach of contract.  As previously noted, the MSA provides that EPC "shall hold TTI Property as bailee and fiduciary for TTI."  [Doc. 96-1 ¶ 14.2.]  And the Second Amended Complaint alleges that EPC held the Henkel Seal Application "as bailee and fiduciary for TTI."  [Doc. 82 ¶ 173 (internal quotation marks omitted).]  The Court concludes that these allegations are sufficient to state a claim for conversion.

## CONCLUSION

Based on the above, EPC's motion to dismiss [Doc. 96] is GRANTED IN PART and DENIED IN PART.  The motion is granted with respect to TTI's claims for negligent misrepresentation, tortious interference with an existing contract, violation of the SCUTPA, and setoff and deductions, and the motion is denied with respect to TTI's claims for breach of contract, breach of contract accompanied by a fraudulent act, fraud in the inducement, quantum meruit/unjust enrichment, and conversion.

IT IS SO ORDERED.

s/Jacquelyn D. Austin
United States District Judge

Greenville, South Carolina
September 24, 2024