IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION

| | |
|---|---|
| TTI CONSUMER POWER TOOLS, INC., F/K/A ONE WORLD TECHNOLOGIES, INC. D/B/A TECHTRONIC INDUSTRIES POWER EQUIPMENT,<br><br>               Plaintiff,<br><br>v.<br><br>ENGINEERED PLASTIC COMPONENTS, INC.,<br><br>               Defendant,<br><br>and<br><br>ENGINEERED PLASTIC COMPONENTS, INC.,<br><br>               Counter-Plaintiff,<br><br>v.<br><br>TTI CONSUMER POWER TOOLS, INC., F/K/A ONE WORLD TECHNOLOGIES, INC. D/B/A TECHTRONIC INDUSTRIES POWER EQUIPMENT,<br><br>               Counter-Defendant. | Civil Action No. 8:22-cv-04085-JDA |

## DEFENDANT/COUNTER PLAINTIFF ENGINEERED PLASTIC COMPONENTS, INC.'S MEMORANDUM IN OPPOSITION TO TTI'S MOTION FOR SUMMARY JUDGMENT

Defendant/Counter-Plaintiff Engineered Plastic Components, Inc. ("Defendant" or "EPC") submits this memorandum in opposition to Plaintiff/Counter-Defendant TTI Consumer Power Tools, Inc.'s ("Plaintiff" or "TTI") Motion for Summary Judgment (Dkt. 222) as to EPC's Second Amended Counterclaim (Dkt. 134) ("Dkt. 134" or "Counterclaim").

**Introduction.**

TTI's Motion seeks summary judgment as to all of EPC's claims. The Motion should be denied. There can be no doubt that EPC has produced sufficient evidence supporting its claim that

1

TTI breached its contracts with EPC. TTI ordered products at agreed upon prices, EPC made and delivered the products to TTI and TTI resold them to Home Depot, and EPC sent dozens of invoices for the delivered products in amounts totaling over $10 million that TTI has not paid.

The record also demonstrates triable issues as to EPC's fraud-based claims, including breach of contract accompanied by fraudulent acts. Despite selling the dream to EPC about a long-term relationship, TTI never intended such a relationship. And, before and during the relationship, TTI made numerous fraudulent statements to EPC and engaged in fraudulent conduct. Among other things, TTI went to great efforts and made repeated misrepresentations to conceal its efforts to replace EPC as the vendor for the subject products, TTI intentionally inflated production requests under false pretenses that they were needed for Home Depot, TTI stated it would pay for the ordered products at agreed-upon prices but had no intention of doing so, and TTI misled EPC to purchase material it would not need because TTI was planning to terminate the MSA. TTI's conduct was reprehensible and fraudulent and record evidence adequately supports triable issues as to EPC's claims for fraud and breach of contract accompanied by fraud.

TTI's motion should also be denied as to EPC's remaining claims. The declaratory judgment claim is appropriate to help clarify and to conclusively articulate the parties' legal rights in dispute. The account stated cause of action is amply supported by the record evidence of TTI ordering products at agreed-upon prices, EPC making and delivering the products and invoicing TTI, and TTI not disputing the accuracy of the invoiced amounts in some instances for many months. The claim for accounting is appropriate given the numerous unpaid invoices and TTI's vague and unsupported defenses to paying them. EPC's conversion claim should proceed given EPC's delivery of products at agreed-upon prices and TTI's resale of them.

**Facts.**

Before this project got underway, there were several brands of interlocking tool boxes on the market, including a successful line made by TTI's affiliate under the Milwaukee Tool brand name. After TTI decided to pursue another tool box line under the Ryobi brand name, it approached EPC in August 2020. Prior to meeting with EPC, TTI had the express goal to "'sell the dream' that this [project] is intended to be a $20-30M business for TTI in the next few years." (TTI_00367273; attached as Ex. 1.) When TTI and EPC representatives met on August 5, 2020, TTI's designs for the products were incomplete and decisions had not been made about several significant issues, such as what material would be used to make the products. Because of the uncertainty of the situation, EPC offered "open book" or cost-plus pricing. (TTI_00510429-TTI_00510430; attached as Ex. 2.) TTI sent EPC a request for quotations on August 14, 2020. (TTI_00153565-TTI_00153566; attached as Ex. 3.) The parties met again on September 2, 2020, and, as reflected in TTI's September 3, 2020 internal email, they were expecting to receive a formal quotation based on EPC's "cost up quoting model." (TTI_00367348-TTI_00367348; attached as Ex. 4.) TTI's notes from that meeting note for EPC's pricing policy that a "closed loop" analysis would be conducted after production started to determine actual costs to adjust prices up or down employing the model. *Id.* EPC in fact presented an initial quote that included projected expenses plus an amount for profit and overhead.

After receiving EPC's quotation, TTI and EPC entered into a Memorandum of Understanding dated October 6, 2020. Thereafter, the parties began negotiating terms of the MSA, including pricing issues. Considerable focus was given to the calculations and provisions of the Pricing File as well as the interrelated updates to TTI's CAD files for the design of the products. The Pricing File included key provisions stating that "resin prices are subject to change as market

3

changes" and "Quote is subject to change upon receipt of tooling and closed loop production assessment." These important provisions were included in the parties' pricing calculations for months before the MSA was finalized and executed. (*See, e.g.*, Ex. 5 (Dep. Ex. 124 (excerpts) sent to TTI on October 6, 2020. *See also* the updated draft sent on December 8, 2020 (Dep. Ex. 159, attached as Ex. 6.)

Although TTI's designs were not complete and there were other uncertainties, the parties executed the MSA on January 15, 2021. Because pricing was based on detailed calculations that would change based on market conditions and a closed loop assessment after production began, the MSA spells out the price of the products by expressly incorporating the Pricing File (including its method for price changes) that was current at the time the MSA was signed. (*See* MSA Schedule 1, attached as Appendix 7 to the Joint Statement of Material Facts ("Jt. Ex."), Dkt. 223). Without the incorporated Pricing File, the MSA simply sets forth the estimated market price per pound of certain proposed ingredients such as "ReproPP Gray = $0.62/lb."[1] (MSA § 4 and Schedule 1, Dkt. 223, Jt. Ex. 7 at p. 6 & Ex. 10 to EPC's Motion for Partial Summary Judgment at p. 12, Dkt. 220.) And, if the parties did not anticipate pricing changes based on subsequent developments such as a change in materials selected by TTI, change in prices paid for materials, and cycle time determined by actual experience after production began, there would be no need for an extensive pricing file – they could have just set forth fixed prices. But that was not the agreement.

Although the parties executed the MSA on January 15, 2021, production did not begin until December 2021. During that interval of almost an entire year, TTI continued to modify its designs, market conditions changed, TTI changed the packaging and shipping directions, TTI added

---

[1] ReproPP was never used to make products during production.

4

products to the program, and TTI made significant decisions about its products, such as selecting a different material to make the products. During this period, EPC continued to update TTI on pricing issues.[2] In response to EPC's requests to update pricing in TTI's system, TTI responded that it would make one true up at the start of mass production based on all the changes at that point and apply them retroactively. When EPC repeated the request in November 2021 in connection with a product added to the project, TTI's Tammy Banks sent EPC an email on November 17, 2021 (copying TTI's Production Manager among others) agreeing to true up all prices as follows:

> I cannot update the price yet. Our system requires price approval on all parts in the program. I cannot pick and choose to only update on[e] part.
> **I have committed to you that once we can update the entire program and do the PIR update on our system, we will change the prices.**
> **I will retro back to EPC all monies for parts shipped from start of program**.
> If you make the change now, the pricing will not match and invoices cannot be processed.

(EPC-0090378; Ex. 8.) (Emphasis supplied.)

After mass production started in December 2021, EPC requested pricing changes based on all of the updates to that point, including the actual cost and price increases for the Asahi resin. In response, TTI sent an email "which confirm[ed] EPC's deviated pricing" but sent a letter with the email complaining about it, characterizing the price increase as a breach of contract, and referred to the pricing adjustment as a temporary deviation. (Dep. Ex. 22; attached as Ex. 9.)

TTI also sent emails in early February 2022 confirming revised pricing "for all invoices starting Feb 1st." (EPC-0006392-EPC-0006399 at EPC-0006396; attached as Ex. 10.) Further, TTI agreed, that, "[a]s discussed on our call …, we will implement future pricing based on date

---

[2] See also James Rank's email to TTI dated July 16, 2021 noting that TTI and EPC are "open book" and that TTI is an "open book customer" and discussing updating prices at the start of production. (TTI_00421020, attached as Ex. 7.)

we actually implement, and **based on actual resin price confirmed at that time**." (*Id.*) (Emphasis added.)

TTI continued to order additional products with updated pricing, and EPC continued to make and deliver them to EPC and invoice TTI utilizing the updated pricing.

The price of Asahi's resin continued to skyrocket (although at times it came down somewhat). EPC made additional price increase requests based on its actual cost of the Asahi material (on occasion reducing the portion of the calculation based on a decrease in the cost of the Asahi material) and based on the actual cycle times experienced during initial mass production. TTI sent similar letters about those price increases, but TTI continued to order the products based on the increased prices and EPC continued to make and deliver the products to TTI and invoice them at the new prices.

On October 12, 2022, TTI terminated the MSA without notice. (Ex. 11.) TTI not only refused to pay EPC for over $10 million for products TTI had ordered, received, and resold to Home Depot, but it brought this lawsuit alleging claims against EPC. As discussed below, EPC also learned that TTI's actions at the time of termination were the culmination of its scheme long in the making and that TTI had made fraudulent representations to EPC from the very beginning of the relationship until the termination.

## I.    Fraudulent inducement (Count VI)

EPC has asserted several discreet counterclaims against TTI for fraud, including EPC's sixth cause of action that alleges TTI fraudulently induced EPC to enter into contracts. TTI has moved for summary judgment as to each of those causes of action. The motion should be denied.

To establish a claim for fraud in the inducement, a plaintiff must prove all nine elements of fraud and the following three elements: "(1) that the alleged fraudfeasor made a false

representation relating to a present or preexisting fact; (2) that the alleged fraudfeasor intended to deceive him; and (3) that he had a right to rely on the representation made to him." *Moseley v. All Things Possible, Inc.,* 388 S.C. 31, 36, 694 S.E.2d 43, 45 (Ct. App. 2010) (internal quotation marks omitted). The nine elements of fraud are:

> (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of its falsity or a reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury.

*Id.* (Internal quotation marks omitted.)

It is well-established that when "one promises to do a certain thing, having at the time no intention of keeping his agreement, it is a fraudulent misrepresentation of fact and actionable as such." *Davis v. Upton*, 250 S.C. 288, 157 S.E.2d 567, 568 (S.C. 1967); *Charleston Lumber Co. v. Miller Hous. Corp.*, 318 S.C. 471, 480, 258 S.E.2d 431, 437 (Ct. App. 1995) (same); *Thomas & Howard Co. v. Fowler*, 225 S.C. 354, 358, 82 S.E.2d 454, 456 (1954) ("fraud may be based on promises made with an intention not to perform the same"); Restatement (Second) of Torts § 530 ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention").

TTI attempts to portray EPC's claim as a false representation by TTI about the contents of the MSA. (See Dkt. 222-1 pp. 4-6.) But, contrary to TTI's argument, TTI's misrepresentations were not about the content of the MSA– they were about TTI's intentions. There is no dispute that TTI told EPC repeatedly that this would be at least a ten year, long-term relationship. Sufficient evidence also demonstrates that TTI knew that was false when the representations were made.

In 2020, TTI embarked on its plan to "sell the dream" to EPC of a long-term relationship with TTI and to induce EPC to enter into a contract with it for this project. In doing so, TTI made repeated representations to EPC that this project would be "long term" and entail no less than a "ten-

year commitment." TTI's Steven Hoppa admitted in his deposition that, when TTI "met with EPC about [the] opportunity to get involved in [the Program], [TTI] explained to EPC that [TTI] intended this program to go indefinitely." (Deposition of Steve Hoppa 103:3-7; excerpts attached as Ex. 12.) He further testified that TTI had discussions with EPC about the program lasting at least ten years and indicated that "we're in it for the long term." (*Id*. at 216:20-217:1.)

Similarly, Keith Lombardi of TTI testified during his deposition that TTI communicated to EPC TTI's "plans to continue to expand [the program] over time," "continue to add more Skus," and that the program "wasn't a one-and-done." He also testified that TTI told EPC that "there was going to be additional development after we launched the first products" and that TTI conveyed to EPC that the program would be a ten-year program. (Deposition of Keith Lombardi 56:11-24, excerpts attached as Ex. 13.)

Consistent with this understanding, EPC's pricing quotes provided to TTI in and throughout late 2020 expressly state that the "program life" is "10 years." (See, e.g., Ex. 6 at TTI_00029674.)

In reality, despite TTI's assurances to the contrary, TTI never intended for its relationship to be "long-term." Instead, from the very beginning, TTI intended to use EPC for a limited time necessary to launch the program and benefit from EPC's manufacturing expertise and domestic location before switching to less expensive manufacturers in Vietnam.

In fact, from the outset, TTI solicited quotes from Asian suppliers – including the two that it ultimately transferred the program to and TTI had, prior to engaging EPC, generally used Asian suppliers as a matter of course, but was limited in its ability to do so at the beginning of this program, particularly in China, due to COVID restrictions.

On July 15, 2020, David Richley of TTI indicated in an email to several TTI employees

and members of TTI's Hong Kong team that he "like[s]" a Vietnamese molder whom TTI ultimately used to replace EPC, and he "think[s] the key for all these [Vietnamese] vendors is in general they are of smaller scale than what we are used to in [China].  Therefore, capacity planning will be even more critical for this program, so once we have our arms around the exact SKU's/mix and EAU's, we will be able to judge the number and size/type of molding machines are required [sic]."  Richley continues that although he thinks "the preference will be to keep the program 'whole' at whoever we select," "**it's possible we could be forced down a 'divide and conquer' route if the volume/capacity equation at the time of MP (1H 2021) dictates.**"  (Ex. 1 to David Richley Deposition, attached as Ex. 14.)

Similarly laying bare TTI's predetermined scheme of switching to cheaper overseas manufacturers after using a higher quality domestic one to get the program off the ground in an expedited fashion is an August 2020 internal email among TTI team members where they explicitly contemplate a "potential strategy" in which they launch from one supplier in year one for "speed & quality assurance considerations" and "**then transfer some or all of the volume/tooling to a lower cost operation in year 2 or 3**."  In that same email chain, David Richley of TTI writes that **"[w]e may want to invest in a more 'premium' tooling maker/injection molder** . . . to give us the best chance of an accelerated schedule with great product" **before "look[ing] to cost down with a move to a lower cost molder in year 2**." (Richley Dep. Ex. 3 without attachment at TTI_00355717 and TTI_00355720, attached as Ex. 15.)

As also discussed below, TTI's prompt actions to replace TTI after the parties signed the MSA further demonstrate that, despite the representations to EPC, TTI never intended for this project with EPC to be a long-term relationship.

Neither TTI's willingness to utilize cheaper overseas injection molders for the program nor

its contemplation of replacing EPC with same was known by EPC. Moreover, there was no way for EPC to uncover TTI's true intentions through any amount of diligence. Had EPC known that TTI was contemplating utilizing other injection molders through a "divide and conquer" approach or that it was considering "transfer[ring] some or all of the volume/tooling to a lower cost operation in year 2 or 3," EPC would have never agreed to participate in the program, make significant capital investments, or signed the MSA. Furthermore, had EPC known TTI's intentions of bringing in cheaper overseas injection molders, it would have never incurred the tremendous amount of cost, around-the-clock efforts, and other expenditures associated with the program.

EPC has presented sufficient evidence to create genuine issues of fact as to its fraudulent inducement claim, thus, TTI's motion should be denied as to the claim.

## II.     Fraud causing EPC to continue to expend its time energy, and resources under false pretenses (Count VII[3]).

Unbeknownst to EPC at the time, by no later than December 1, 2021, while EPC was working around the clock, hiring additional staff, incurring further expenses, and re-doubling its efforts to fulfill the program's needs, TTI was going behind EPC's back to hire cheaper Asian manufacturers to replace EPC.

Despite being fully aware of EPC's tremendous expenses and efforts toward the program in late 2021, TTI purposely misled EPC by keeping the fact that it was engaging cheaper replacement manufacturers in Vietnam secret from EPC.

TTI's President of its Consumer Products and Tools division was "ready to blow up the program" with EPC (based on pricing concerns) as early as August 2021 – 4 months before production even started. (Dep. Ex. 191 p. 2, attached as Ex. 16.)

---

[3] The Count is improperly labeled as Count VIII beginning at page 36 in the Counterclaim.

The very first day after EPC began production (December 13, 2021), TTI was developing tooling for a new vendor to be ready for Asian mass production and to "shut down EPC" when things were ready in Asia. (Dep. Ex. 193 at text dated December 14, 2021 at 4:00 pm.; attached as Ex. 17.) And, in response to EPC's request in early January 2022 for a price increase (based on the actual cost of the Asahi material and other updates based on the pricing method set forth in the MSA), Shaw responded internally to TTI employees that the request was "ridiculous" and that "[w]e cannot be pushed around by suppliers like this. What is the plan? I want to review the future sourcing plan for this business by next week." (Dep. Ex. 154, attached as Ex. 18.)

As evident after the fact, TTI's despicable plan included ordering but without any intention of paying EPC for millions of dollars of products that EPC made and delivered to TTI, and that TTI in turn sold to Home Depot. *See* Exhibit C to Dr. Gleason's report listing dozens of invoices totaling over $10 million that EPC sent to TTI between January 2021 and September 2022 that TTI has not paid (attached as Ex. 19.)

TTI kept its active solicitation of cheaper overseas replacements from EPC so that EPC would keep expending valuable resources, energy, and around-the-clock efforts to TTI's benefit.

Indeed, while, unbeknownst to EPC, TTI was making arrangements for cheaper overseas replacements in late 2021 and early 2022, TTI artificially inflated its demands to EPC to stockpile products in order to facilitate a smooth transition of the program to cheaper Vietnamese suppliers. In particular, TTI requested that EPC manufacture high volumes of products that TTI did not actually need at the time for sale to Home Depot in order to avoid running out of products in the event that TTI's launch with the Vietnamese manufacturers was delayed.

EPC was led to believe that TTI's demands were based on Home Depot's legitimate demands for the products. However, this intended impression was false. Over two years after TTI

terminated EPC as the program's supplier in October 2022 – the only products sold on Home Depot's shelves were products made by EPC.

In her deposition testimony, Tammy Banks of TTI admitted that by the "end of 2021," TTI "knew that it was going to be a challenge to continue the relationship with EPC." (Deposition of Tammy Banks 91:11-14, excerpts attached as Ex. 20.) Nonetheless, TTI actively hid this from EPC because, according to Tammy Banks, "TTI would not want to share any investigation that we're doing with a current supplier" to avoid that supplier – here, EPC – from paring down its efforts or, in this instance, scaling back the great deal of expense it incurred in connection with the Program for which EPC has been left holding the bag. (*Id.* 56:12-17.)

One of Tammy Banks' goals as a TTI employee for 2022 was to "[c]oordinate a smooth transition out of EPC." (Dep. Ex. 48, attached as Ex. 21.) Her mid-year update recites that her goal was to "ensure EPC continues to build product needed to support [TTI] sales thru Feb 2023." She overachieved however because TTI had "plenty of product to support all of next year planned sales." *Id.* As she was well aware, during this period EPC employees were working extraordinarily hard to make and ship product to meet the intentionally inflated production goals. Even though she knew TTI had plans to terminate the MSA, she concealed that information from EPC and, when asked, told them to continue to buy supplies "based off your history, you have to order what you need." (Banks Dep. 222:16-19, attached as Ex. 20). The predictable end result was that EPC ordered materials that it was left holding after TTI terminated the contract.

Steven Hoppa of TTI testified during his deposition that TTI instructed its employees that it should hide its efforts to obtain cheaper overseas manufacturing replacements from EPC "to make sure that . . . EPC would at least be continuing to try to get product to us." Mr. Hoppa explained that "[w]e know that once somebody's told that they're no longer going to be part of the

future, that we expect quality to go down even further, and then we expect there's a big interruption in the actual supply [] so we wanted to make sure that we were avoiding that."  (Hoppa Dep. 102:14-103:2, excerpts attached as Ex. 12.)

In an April 2022 email chain between TTI employees about shifting to Vietnamese suppliers Steven Hoppa of TTI instructs his TTI colleagues that "no communication regarding last buys or other transitions should be brought up directly to EPC."  When asked about the reason for concealing the shift to Vietnamese suppliers, Steven Hoppa explained that he did not want EPC to learn of TTI's plans to switch molders because he did not want the "quality of the products that [EPC was] still responsible for making [to] go down," and to avoid EPC ceasing its efforts to deliver products to TTI in connection with the Program. (Hoppa Dep. 248:1-249:8 and Dep. Ex. 84, attached as Exs. 12 and 22.)

Keith Lombardi of TTI testified during his deposition that it was important to keep the transition to cheaper overseas manufacturers a secret because TTI "typically do[esn't] want to let one supplier know that [TTI is] dealing with another supplier.  Maybe we're going to leverage them for cost" and that EPC "probably did not know" about TTI's transition to Vietnamese suppliers as of as recently as March 24, 2022.  (Lombardi Dep.  221:1-22, excerpts attached as Ex. 13.)

TTI's duplicitousness did not stop at concealing the truth.  TTI also continued to actively misrepresent that its relationship with EPC would be long-term in and throughout December 2021 despite knowing full well that its days were numbered as TTI zeroed in on EPC's cheaper overseas replacements.

On December 10, 2021, Reid Cheatham of TTI e-mailed EPC's CEO, Reza Kargarzadeh, as well as several other senior EPC employees affiliated with the program, copying nine senior

TTI employees responsible for the program, "to extend thanks to [Mr. Kargarzadeh] and the entire EPC team," noting that TTI was "impressed to see first-hand the investment made in the program and all understand how critical these initial shipments of high quality product will be to galvanize the future of this program."  Mr. Cheatham ended his correspondence with a representation that "**[t]his is just the start of a great partnership together.**"  (Dep. Ex. 156, attached as Ex. 23.)

By in or around late March of 2022, TTI finalized its decision to hire two of the cheaper overseas manufacturing companies that it had contemplated using to replace EPC back in August 2020, in accordance with its predetermined plan to "move to a lower cost molder in year two."

Once TTI was satisfied that EPC had produced sufficient stock of the products and the Asian vendors were ready to begin production, TTI discontinued its relationship with EPC without any prior notice, causing EPC to terminate over 100 of its employees the next day.

TTI's bait-and-switch scheme was entirely unknown and unknowable to EPC due to TTI's continual misrepresentations and concealment efforts.

TTI has transferred to its cheaper overseas replacements the proprietary manufacturing processes that EPC developed and employed in connection with the program and which TTI learned through its many visits to "oversee" EPC's production, further demonstrating TTI's scheme to engage EPC under false pretenses of longevity to glean its quality manufacturing processes before replacing it with cheaper overseas production.

In fact, in making design changes and working on the CAD files for the products to be manufactured in Vietnam, TTI asked EPC's employees for feedback on how to improve the Products' design.  In addition, TTI incorporated all the practical learnings that it obtained from EPC regarding the design features of the products, the materials to use, and the molding methods.

### III.     Breach of contract accompanied by a fraudulent act (Count I).

TTI's Motion seeks summary judgment as to EPC's first cause of action for breach of contract accompanied by fraud.  (TTI Motion p. 1 and memorandum in support pp. 14-22; Dkt. Nos. 222 and 222-1.)  TTI's Motion should be denied because EPC has presented sufficient evidence that TTI breached its contracts with EPC and that TTI's breaches were accompanied by fraud.

In South Carolina, "[t]here is no cause of action distinct from breach of contract for breach of contract accompanied by a fraudulent act." *Smith v. Canal Ins. Co.*, 275 S.C. 256, 260, 269 S.E.2d 348, 350 (1980) and Dkt. 193 p. 16.  With respect to breach of contract issues, EPC alleges and has presented evidence that, among other things, TTI breached its contracts with EPC by failing to pay over $10 million for products ordered by TTI at prices agreed to by TTI, shipped by EPC to TTI, and resold by TTI to Home Depot.  Dkt. 134 ¶¶ 125-207.

TTI argues that its failure to pay these invoices did not constitute breaches of contracts because it had not agreed to certain price changes in a writing signed by both parties.  (Dkt. 222-1 p. 18.)  This argument fails for several reasons.  It is fundamental that parties do not have a binding contract for the sale of goods without an agreement on the essential term of price or a "definite method for ascertaining it." *McPeters v. Yeargin Const. Co.*, 290 S.C. 327, 331, 350 S.E.2d 208, 211 (1986).  The express terms of the MSA set forth a definite method for ascertaining prices for the products.  When presented information requiring a price adjustment using the method of adjustment, TTI had a duty to act in good faith to adjust the prices accordingly.  "There exists in every contract an implied covenant of good faith and fair dealing." *Adams v. G.J. Creel & Sons, Inc.*, 320 S.C. 274, 277, 465 S.E.2d 84, 85 (1995).  See also *Commercial Credit Corp. v. Nelson Motors, Inc.*, 247 S.C. 360, 147 S.E.2d 481 (1966), and S.C. Code § 36-1-304 ("Every contract or

15

duty within the Uniform Commercial Code imposes an obligation of good faith in its performance and enforcement.")

No consideration is required for price adjustments employing the MSA method (S.C. Code § 36-1-209), and the communications between the parties adequately satisfied any requirement for a writing documenting the price changes.[4] *See, e.g., Speed v. Speed*, 213 S.C. 401, 408, 49 S.E.2d 588, 591 (1948) and *Smith v. McClam*, 289 S.C. 452, 456, 346 S.E.2d 720, 723 (1986).

Also, the parties' exchange of emails sufficed under the Uniform Electronic Transactions Act (UETA) based on the context and surrounding circumstances, such as the conduct of the parties. S.C. Code Ann. § 26-6-50. Under the UETA, "An electronic record satisfies a law requiring a record to be in writing," and "An electronic signature satisfies a law requiring a signature." S.C. Code Ann. § 26-6-70. An electronic record is a record that is, "created, generated, sent, communicated, received, or stored by electronic means," and an electronic signature is, "an electronic sound, symbol, or process attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." S.C. Code Ann. § 26-6-20. An electronic record or signature can be attributed to someone if it is the act of that person, and this can be shown in any manner. S.C. Code Ann. § 26-6-90.

Here, the primary drivers of the price were the actual cost of materials, the actual expense of labor and machine time based on a determination of cycle time, plus an agreed-upon amount for overhead and profit to EPC. That the parties agreed upon this method is well documented in

---

[4] For example, the MSA calls for price adjustments on a quarterly basis (MSA § 4.1, Jt. Ex. 7, pp. 6-7), but, given the extreme volatility of the resin market at the time, TTI agreed in April 2022 not only to adjust prices based on actual prices paid by EPC but also to adjust them on a monthly basis. ("Per our call today, we can move to monthly adjustment vs quarterly … but as we discussed, if it's going to be based on actual then EPC will need to create a monthly usage report for each P/N that tracks the usage of each resin based on the specific resin shipments within a given month at that corresponding monthly resin price."; EPC-0001693-0001699 at 0001693, attached as Ex. 24.)

the oral and written communications before the MSA was signed, the express terms of the MSA (adopting the Pricing File), the oral and written communications between the parties after signing the MSA and before and after the start of production, and the parties' course of dealing.  Moreover, TTI is estopped from denying the agreement.

The MSA establishes initial pricing for the products by incorporating "TTI Pricing File 111720."  (MSA Schedule 1, Jt. Ex. 7, p. 29.)  That Pricing File provides that "resin prices are subject to change as market changes" and "Quote is subject to change upon receipt of tooling and closed loop production assessment."  (Ex. 10 to EPC's Motion for Partial Summary Judgment at p. 12.)  These important provisions were included in the parties' pricing calculations for at least a couple of months before the MSA was finalized and executed.  (See, e.g., Ex. 5 (Dep. Ex. 124 (excerpts) sent to TTI on October 6, 2020.)

Because the MSA (with incorporated Pricing File) provides a price change mechanism based on actual EPC expenses and cycle times, no formal modification to the MSA was needed to update those changes.  TTI breached the MSA by not paying the agreed-upon prices, with the changes documented by EPC showing its actual expenses.  TTI had a duty to update the price changes based on these actual expenses.  It cannot dodge the increased expense by arguing that it did not sign a formal modification.  It had a duty to perform its obligations in good faith and failed to do so.

Further, there are sufficient writings demonstrating agreement to the price changes.  After the parties executed the MSA, TTI changed most aspects of the project, but the parties did not enter into formal amendments to reflect those changes.

TTI also added three products (and "skus", including a wall rail) to the project after execution of the MSA without a formal modification of the MSA.  The parties reached agreement

as to the details for the additional products, TTI ordered them, and EPC made and delivered them, all without a formal modification of the MSA – but based on sufficient writings to satisfy any writing requirement.

An important change was TTI's selection of a different resin other than the "ReproPP" mentioned in the MSA as the primary material for making the toolboxes. TTI worked with Asahi Kasei and selected a resin with substantial impact modifiers and additives, and TTI was involved in negotiating the actual price of the modified material. The formula was proprietary to Asahi and unknown to EPC, no industry index tracked the price, and it was more expensive than ReproPP. Further, the use of the Asahi material resulted in increased cycle time and increased the density or weight of the end product. Because the material is purchased at a cost per pound, this increased the cost of material needed to make the products.

The writings exchanged between the parties were sufficient to modify the material to be used to make the products -- TTI would surely have complained if EPC had made them with ReproPP. By the same token, the mechanism for pricing adjustments in the MSA and the incorporated Pricing File along with the writings exchanged by the parties are sufficient to establish TTI's agreement to pay pricing for the products based on the increased actual cost of the material used to make them.

Prior to mass production, EPC repeatedly asked TTI to reflect the increased price of the Asahi material based on Asahi's actual prices. TTI agreed that the pricing needed to be updated, but TTI requested that the pricing increase be modified in its internal system at the beginning of production and based on its promise to true up all pricing when production began. (Ex. 8, EPC-0090378 dated November 17, 2021.) EPC agreed to that request.

After mass production began in December 2021, prices were adjusted several times based on actual pricing of Asahi's material as well as the actual cycle time. These writings are sufficient to modify the pricing of products under the MSA, and, moreover, EPC relied on these agreements.

TTI also argues that because it sent letters agreeing to increased pricing but stated that it was doing so "under duress" and reserving its rights that somehow those agreements were not binding on TTI. TTI does not challenge the fact that the pricing changes were based on the actual costs of the Asahi material and actual cycle times. In addition, the price changes were based on the parties' agreement and course of dealing under the mechanism for modifying prices. Moreover, TTI, through its counsel, also promised to continue to pay for the products it was ordering. (Ex. 25, email from John Kuppens, Esq., dated October 28, 2022 stating that, "TTI has not cancelled any binding purchase orders under the Agreement, and TTI confirms that EPC should ship products according to the attached binding purchase orders ... TTI will continue to pay for all binding purchase orders according to all terms and conditions of the Agreement...")

There can be no question that the Pricing File was an integral part of the MSA – without it, there would be no agreement with respect to the essential term of pricing for the products. The Pricing File states that pricing is subject to change based on market changes for the cost of resin and for actual cycle time after a closed-loop assessment. TTI cannot dodge its obligations by simply refusing to sign a formal document reflecting price changes – it has an obligation to do so and to comply with its obligations under the MSA in good faith.

Sufficient evidence also demonstrates TTI made fraudulent representations to EPC and committed fraudulent acts in connection with its breaches of contract, including the following:

1.      TTI entered into dozens of individual contracts with EPC by ordering products from EPC worth a total of over $10 million, but TTI had no intention of paying EPC for the products even though TTI resold them to Home Depot.

2.      TTI inflated its need for shipment of products causing great stress on EPC employees under the false pretense that its customer (Home Depot) needed them.

3.      TTI told EPC to purchase materials based on its purchasing history even though TTI knew it was about to terminate the MSA resulting in EPC purchasing materials it could not use.

4.      In order to induce EPC to keep shipping products after TTI was complaining about price increases, TTI promised to pay EPC the agreed-upon pricing if EPC shipped the products, but TTI did not pay for the products at all and had no intention of doing so.

### IV.    Fraudulent concealment (Count VIII).

TTI argues there is no triable issue as to EPC's cause of action for fraudulent concealment on the grounds that it did not owe EPC a fiduciary duty and therefor had no duty to disclose its business plans. (Dkt. 222-1 pp. 22-23.)  Fraudulent concealment is a viable claim in South Carolina. *See, e.g., Fisher v. Pelstring*, 817 F. Supp. 2d 791, 823 (D.S.C. 2011) (recognizing cause of action for fraudulent concealment); *Ardis v. Cox*, 314 S.C. 512, 517, 431 S.E.2d 267- ___ (1993) (same). Here, TTI not only went to great lengths to conceal its scheme, it made many fraudulent statements to EPC along the way.

TTI argues that a duty of disclosure only arises in a confidential or fiduciary relationship. TTI's argument fails because "a fiduciary relationship is not always required for a duty to disclose to exist" in connection with a fraudulent concealment claim. *Fisher v. Pelstring*, 817 F. Supp. 2d 791, 823 (D.S.C. 2011) (citation omitted); *see also Consol. Insured Benefits, Inc. v. Conseco Med.*

*Ins. Co.*, 2006 WL 3423891, at *10 (D.S.C. Nov. 27, 2006) (quotation omitted). The South Carolina Supreme Court has held that "where material facts are accessible to the vendor only, and he knows them not to be within the reach of diligent attention, observation and judgment of the purchaser, the vendor is bound to disclose such facts and make them known to the purchaser." *Lawson v. Citizens and Southern Nat. Bank of S.C.*, 259 S.C. 477, 485, 193 S.E.2d 124, 128; *Memari v. Ply Gem Prime Holdings, Inc.*, No. 2:13-cv-850-RMG, 2013 U.S. Dist. LEXIS 206444, at *14 (D.S.C. Aug. 6, 2013) (internal quotation marks and citations omitted) (same).

In *Memari*, the court determined that "[p]laintiff [] alleged sufficient facts to state [d]efendants' duty to speak" and a claim for fraudulent concealment where "[p]laintiff [] alleged that despite his diligence, he could not have discovered" the allegedly fraudulently concealed information, "that [d]efendants were the only parties in possession of this information," and "that [d]efendants were aware of [plaintiff's] ignorance." 2013 U.S. Dist. LEXIS at *14-15. Similarly, in *Lawson*, the South Carolina Supreme Court held that the respondent sufficiently pleaded appellant's duty to disclose and "a case of actionable fraud" where appellant failed to disclose the defective nature of the land it sold to the respondent; respondent was unaware of the defective nature of the land, and the "defect was not apparent to the respondents and not within the reach of their diligent attention and observation." *Lawson*, 259 S.C. at 485.

Like in *Memari* and *Lawson*, in the case at hand, TTI's duty to disclose stems from the fact that its intentions to switch to Vietnamese manufacturers were unknown to EPC and no amount of diligence by EPC could have uncovered TTI's true intentions. (*See* Dkt. 134 ¶ 277, 282). TTI was well-aware of EPC's ignorance of its true intentions. (Dkt. 134 ¶ 277). TTI actively concealed these intentions from EPC in order to encourage EPC to continue its production efforts. *Id;* Dkt. 134 ¶¶ 277, 280-81.

EPC also alleges TTI's duty to disclose in a manner "by the open-book nature of [TTI's] relationship with EPC, in which trust and confidence was tantamount." (Dkt. 134 ¶ 278). *See Consol. Insured Benefits, Inc. v. Conseco Med. Ins. Co.*, 2006 WL 3423891, at *10 (D.S.C. Nov. 27, 2006) (explaining that the relationship was one in which trust and confidence was necessarily implied, triggering a duty to disclose, where, among other things, the parties had an open-book relationship). For these reasons and those stated in Section II & IV above, TTI's Motion as to Count VII of EPC's Counterclaim should be denied.

## V.     Declaratory Judgment (Count II)

The Declaratory Judgment Act gives courts, "[i]n a case of actual controversy," the power to "declare the rights and other legal relations of any interested party." *See* 28 U.S.C. § 2201. "A declaratory judgment action presents a justiciable controversy where 'the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Dyer v. Air Methods Corp.*, No. 9:20-cv-2309-DCN, 2020 U.S. Dist. LEXIS 237523, at *15 (D.S.C. Dec. 17, 2020). EPC has adequately pled an active controversy between the parties regarding: (a) whether EPC breached the MSA by requesting price increases (Dkt. 134 ¶ 228); (b) whether TTI breached the MSA by refusing to pay EPC's invoices within 120 days of submission (Dkt. 134 ¶ 198-199); (c) whether TTI had a legitimate right to setoff, and at what amount (Dkt. 134 ¶ 201-212, 230); and (d) whether TTI is required to compensate EPC for various damages when TTI improperly terminated the MSA.  Each of these disputes is sufficient to provide a justiciable controversy. *See Shore Bank v. Harvard*, 934 F. Supp. 2d 827, 837 (E.D. Va. 2013) (dispute over contract rights sufficient to provide controversy for purposes of declaratory judgment action).

TTI argues that EPC's declaratory judgment claim must be dismissed as "wholly duplicative" of its breach of contract accompanied by fraud claim. (Dkt. 222-1 at p 23.) TTI is incorrect. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. Courts should not dismiss a declaratory judgment claim where it would help clarify legal rights and resolve the dispute. *See Cont'l Cas. Co. v. Fuscardo*, 35 F.3d 963, 965 (4th Cir. 1994). A declaratory judgment claim may be brought despite the presence of a parallel breach of contract claim – particularly where the declaratory judgment claim will help the court clarify the legal rights of the parties. *See U.S. Home Corp. v. Settlers Crossing, LLC*, Civil Action No. DKC 2008-1863, 2010 U.S. Dist. LEXIS 22653, at *30 (D. Md. Mar. 11, 2010) (allowing declaratory judgment claim to proceed despite presence of parallel contract claim because it "will serve the purpose of enabling the full rights and obligations of the parties to be conclusively articulated so that full relief can be afforded"); *Flowshare, LLC v. TNS, US, LLC*, No. 4:16-CV-00300-JAR, 2017 U.S. Dist. LEXIS 116778, at *18 (E.D. Mo. July 26, 2017) (Even where the declaratory judgment claim 'encompasses' the breach of contract claim, this does not require dismissal).

As explained above, EPC specifically articulated a number of disputes between the parties. Some of these disputes – such as, for example, whether ***EPC*** has breached any of its duties to TTI and whether TTI's setoff claim against TTI is justified – seek the Court's ruling regarding EPC's conduct, which is distinct from the conduct of TTI that is at issue in EPC's breach-of-contract claim. This is thus a paradigmatic example of a permissible declaratory judgment claim that will help the Court clarify the legal rights of the parties pursuant to the MSA.

TTI also incorporates its argument that it is entitled to summary judgment as to EPC's breach of contract accompanied by fraud act cause of action. As set forth above in Section III, EPC has

produced sufficient evidence to support of contract accompanied by fraud claim. Accordingly, TTI's Motion as to EPC's cause of action for declaratory judgment should be denied.

### VI.    Accounted Stated (Count III).

TTI argues that it should be granted summary judgment as to EPC's cause of action for account stated on the grounds that TTI did not expressly or impliedly agree about the amount TTI owes EPC. (Dkt. 222-1 p. 24.) TTI is wrong. "Assent might be expressed or implied from the circumstances." *Gwathmey v. Burgiss*, 104 S.C. 280, 88 S.E. 816, 817 (1916). Here, the parties agreed that TTI would pay EPC's invoices within 90 or 120 days of issuance. (MSA § 4.2, Jt. Ex. 7 p. 7.) EPC issued multiple invoices to TTI beginning on December 17, 2021. (Dkt. 134 ¶¶ 128-197.) Despite the passage of more than 120 days since their issuance, TTI did not dispute any of the invoices. (*Id.* ¶¶ 203, 234.)

To the contrary, when EPC questioned TTI about the payment, TTI agreed that it would "continue to pay for all binding purchase orders according to all terms and conditions of the Agreement, including but not limited to the net 120 payment terms set forth in Section 4.2 of the Agreement." (Ex. 25.) EPC does not allege that TTI reiterated that any such payment would be subject to TTI's set off rights under the MSA. Rather, EPC alleges that "[a]lthough TTI vaguely reserved the right to exercise setoff rights, it ***did not actually exercise that right at the time***." (Dkt. 134 ¶ 202). It was only on "November 23, 2022, after having received all the products it apparently needed," that "TTI sen[t] EPC a letter ***for the first time*** indicating that it would not be issuing any payments on more than $10 million in outstanding accounts receivable." (*Id.* ¶ 208). Even in that correspondence, TTI did not allege that the invoices were somehow inaccurate. In the meantime, some of the unpaid invoices were issued almost a year prior to TTI's November 23, 2022 exercise of setoff rights. (*Id.* ¶ 128). Given the 120-day standard payment terms, and EPC's express follow-

up with TTI, TTI's belated November 23, 2022 invocation of setoff rights is, assuredly, unreasonable and untimely under the circumstances.

More fundamentally, TTI cannot show that it had a legitimate basis to exercise any set-off rights. Under the MSA, TTI has a setoff right regarding "any sum due by it to [EPC] under this Agreement against any sum due by [EPC] to TTI." (MSA § 4.5, Jt. Ex. 7 p. 7.) However, EPC's Counterclaim expressly alleges that EPC has performed all of its obligations under the MSA, and thus owes TTI nothing under the MSA. (Dkt. 134 ¶ 217-218.)

Implied assent may be found where, as here, a party does not object to a statement of account within a reasonable time. See, e.g., *Bank of Am., N.A. v. Southern*, No. 2019-001941, 2022 WL 1567016, at *1 (S.C. Ct. App. May 18, 2022) (plaintiff established the elements of an account stated because defendant "impliedly agreed to the amount by failing to object to the account as stated within a reasonable time"); *Huggins v. Com. & Sav. Bank*, 141 S.C. 480, 497, 140 S.E. 177, 182 (1927) ("Evidence of the retention by a depositor of statements or passbook of his bank, after a reasonable time for examination, without notice to the bank of objection thereto, may be given to show an implied admission of an acquiescence in the correctness of the account"). At a minimum, the jury should be able to evaluate whether TTI's months' long silence and its subsequent October 28, 2022 assurance to EPC that it would continue paying "according to all terms and conditions of the Agreement, including … the net 120 payment terms set forth in Section 4.2 of the Agreement" amounted to an implicit acknowledgment of the account stated.

It was only on "November 23, 2022, ***after having received all the products at apparently needed***", that "TTI sen[t] EPC a letter ***for the first time*** indicating that it would not be issuing any payments on more than $10 million in outstanding accounts receivable. (Dkt. 134 ¶ 208). In the meantime, some of the unpaid invoices were issued as early as December 17, 2021—almost a year

prior. (Dkt. 134 ¶ 128). TTI's belated November 23, 2022 objection is, assuredly, unreasonable under the circumstances.[5]

## VII.    Accounting (Count IV).

TTI argues that argues that it should be granted summary judgment as to EPC's accounting cause of action. (Dkt. 222-1 pp. 24-26.) This argument lacks merit.

A plaintiff may pursue an action for an accounting when the amounts due are uncertain and may be difficult to ascertain without an accounting. *See Indus. Packaging Supplies, Inc. v. Davidson*, No. 6:18-651-TMC, 2018 U.S. Dist. LEXIS 234769, at *5 (D.S.C. Oct. 24, 2018) (denying motion to dismiss action for an accounting where plaintiff pled generally that amount due was unknown and could not be ascertained without accounting). EPC has adequately alleged complicated accounts with disputes over the amounts due that cannot be ascertained without an accounting. EPC has pled the existence of approximately 309 outstanding invoices, with various due dates and with accumulating interest calculations. (Dkt. 134 ¶¶ 128-199 & Ex. 19 hereto). EPC has also alleged that it spent

---

[5] The authority TTI cites to in its brief (Dkt. 222-1 p. 24) is inapposite. *CACH, LLC v. Martin* concerned a **consumer** account and the plaintiff was therefore precluded from asserting an account stated claim under South Carolina law. No. 2013-CP-40-7021, 2016 WL 845237, at *2 (S.C. Com. Pl. Feb. 25, 2016) (citing *Huggins v. Commercial & Sav. Bank*, 140 S.E. 177, 181-82 (S.C. 1927) ("there is no dispute that the subject account is a consumer account … Accordingly, pursuant to *Huggins*, an account stated theory is simply inapplicable"). In *Wakefield v. Spoon*, unlike here, the account stated claim was tried to a jury, and there was "no testimony that the defendant was furnished with a copy of the account before the action was begun." 100 S.C. 100, 84 S.E. 418, 420 (1915). Not so here. In *Brown v. Rogers*, 76 S.C. 180, 56 S.E. 680, 681 (1907), the question before the court was whether "the report of the special referee can be regarded as an account stated," which bears no relation to the present circumstances. Finally, in *S. Welding Works, Inc. v. K & S Const. Co.*, 286 S.C. 158, 160, 332 S.E.2d 102, 104 (Ct. App. 1985), in considering an appeal from a jury verdict concerning an allegedly negligent repair, the court noted that plaintiff failed to provide any evidence proving at trial the existence of an express or implied account stated. The Court further noted that the parties "never agreed on a contract price." Here, EPC pled allegations with specificity, including that TTI agreed to pay EPC's invoices within 90 or 120 days of issuance (MSA § 4.2.), but TTI has not disputed the accuracy of the invoices and led EPC to believe that these invoices would be paid. (Dkt. 134 ¶ 201).

millions in capital expenditures and inventory. (Dkt. 134 ¶¶ 39, 115). EPC further alleged that this case "involve[s] analysis of long and complicated accounts that are not practical for a jury to comprehend." (Dkt. 134 ¶ 239). Together with allegations regarding TTI's vague setoff rights (Dkt. 134 ¶ 202), EPC's denial of these rights (Dkt. 134 ¶ 229), and TTI's refusal to provide any breakdown of the amounts it claims it is owed (Dkt. 134 ¶¶ 209-211), EPC has alleged "long and complicated accounts where it would not be practicable for a jury to comprehend the issues and correctly make adjustments."[6]

  As an example of the issues with TTI's offset, it is claiming as damages in this matter approximately five million dollars for supposed lost profits on promotional sales during the fourth quarter of 2021. (Lioy Report Opinion #3, Ex. 26.) Yet TTI's own records show that the promotions were cancelled because of delays in the delivery of the tooling to be supplied by TTI's toolmaker – Delta Mold. Specifically, a TTI internal presentation admits that "Tooling schedule delays have forced us [to] cancel all in store and .com [Black Friday] orders." (TTI_00345141, Ex. 27) (emphasis in original.) Similarly, TTI seeks over six million dollars in damages for supposed warehousing costs it claims were incurred because EPC lacked sufficient warehousing space. (Lioy Report Opinion #2, Ex. 28.) Yet TTI's expert included in his damages calculation logistics invoices dated a full year after TTI terminated the MSA. *See* Exhibit 5 to Lioy Report, Ex. 29.)

---

[6] TTI cites to *GSH of Alabama* for the proposition that EPC fails to include sufficient explanation as to why the accounts in this matter would be too complicated for a jury to calculate (Dkt. 222-1 p. 25). *See GSH of Alabama, LLC v. Southstar Fin.*, LLC, 2:17-CV-02689, 2018 WL 1335189, at *3 (D.S.C. Mar. 15, 2018). The complaint in *GSH of Alabama* alleged only that the case involved a complex business relationship, without providing any more details as to the nature of the alleged complexity. *Id*. Here, as discussed above, EPC has alleged a complex dispute over amounts allegedly due to both sides that will not be practicable for a jury to understand. *GSH of Alabama* is inapposite.

## VIII.   Conversion (Count V).

TTI's arguments that it should be granted summary judgment as to EPC's cause of action for conversion are also without merit. EPC asserts a conversion claim based on TTI's improper retention of both the products delivered by EPC and also identifiable funds TTI retained from the sale of the products to Home Depot.

**First**, EPC has a sufficiently alleged a conversion claim based on the products delivered to TTI. In *Mod. Pharmacy, LLC, Pharmaquick, LLC, & Michael Rosenbaum, Plaintiffs, v. J M Smith Corp., d/b/a Smith Drug Co.,* No. 7:19-CV-1218-TMC, 2020 WL 13491295, at *5 (D.S.C. Mar. 25, 2020), plaintiff sought to dismiss defendant's conversion counterclaim, by alleging—as TTI does here—that "the mere failure to pay a debt does not constitute a conversion." *Id*. The Court found plaintiff's argument unavailing, reasoning:

> Defendant alleges that it 'provided goods, merchandise, and equipment, including pharmaceutical drugs' to Plaintiffs "with the expectation that [Plaintiffs] would pay [Defendant] the agreed amount for those Goods,' … taking the allegations in the light most favorable to Defendant, it has stated a claim for conversion...

*Id*. Similarly, here, EPC has alleged produced evidence that it shipped products to TTI (and continued shipping products to TTI through November 2022 in reliance on TTI's representation that it intended to pay), yet TTI has refused to issue payment. (Dkt. 134 ¶¶ 200, 204, 208, 211). These allegations and evidence are sufficient.

**Second**, EPC has also sufficiently alleged a conversion claim based on a determinate sum of funds that TTI set aside for payment to EPC. It is undisputed that money may be the subject of conversion when it is "capable of being identified and there may be conversion of determinate sums even though the specific coins and bills are not identified." *Moore v. Weinberg*, 383 S.C. 583, 589, 681 S.E.2d 875, 878 (2009).

28

TTI's authority is inapposite. Neither *Ray* nor *Channelbind* addressed circumstances where, as here, the conversion concerned the wrongful retention of physical goods without payment. In *Ray v. Pilgrim Health & Life Ins. Co.*, 206 S.C. 344, 346, 34 S.E.2d 218, 218 (1945), the court held that the appellant "rightfully received" the funds in question, an insurance premium, and returned the deposit in question. Here, in contrast, EPC gained an ownership interest in the funds after having delivered the products in question which TTI continues to exercise dominion over (Dkt. 134 ¶¶ 204-25, 211).  Similarly, in *Channelbind Int'l Corp. v. Esselte Corp.*, No. C.A. 7:08-2880-HMH, 2009 WL 3617611, at *7 (D.S.C. Oct. 29, 2009), plaintiff alleged that defendants refused to transfer a business to plaintiff, which was necessarily contractual in nature. Unlike *Channelbind*, EPC's conversion claim is predicated on an identifiable sum of particular funds, as well as goods delivered to TTI.

By indicating it would pay for all orders pursuant to the MSA after being presented with a statement of account, TTI implicitly identified a determinate sum of money under the Agreement ($10,265,651.22) in which EPC gained an ownership interest after having delivered the products in question. (Dkt. 134 ¶¶ 204-205, 211).[7]

## CONCLUSION

For reasons set forth herein, TTI's motion for summary judgment should be denied.

[Signature on Next Page]

---

[7] TTI cites *Owens v. Andrews Bank & Tr. Co.*, 265 S.C. 490, 497, 220 S.E.2d 116, 119 (1975), for the proposition that there can be no conversion when there is a mere obligation to pay a debt, but *Owens* addressed an inapposite consumer banking transaction, where the court merely held "money on deposit in a bank cannot be the subject of conversion unless it was intended to be kept separate or constituted a specific intact fund."

Respectfully submitted,

**HAYNSWORTH SINKLER BOYD, P.A.**

 s/Robert Y. Knowlton
 Robert Y. Knowlton, DSC No. 2380
 1201 Main Street, 22nd Floor
 Columbia, SC 29201
 (803) 540-7843 Telephone
 (803) 765-1243 Facsimile
 bknowlton@hsblawfirm.com

Christopher B. Major, DSC No. 9382
One North Main, 2nd Floor
Greenville, SC 29601
(864) 240-3200 Telephone
(864) 240-3300 Facsimile
cmajor@hsblawfirm.com

*Attorneys for Defendant/Counter-Plaintiff*
Dated:  May 13, 2025          *Engineered Plastic Components, Inc.*